Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No. 17-mj-00341-BGM |
| | ) |
| vs. | ) **MOTION FOR DISCOVERY INTO** |
| | ) **SELECTIVE ENFORCEMENT** |
| SCOTT DANIEL WARREN, | ) |
| | ) |
| Defendant. | ) |

Defendant Scott Daniel Warren, through his *pro bono* counsel, requests this Court
to order the Government to disclose any and all information related to his claim that the
United States Fish and Wildlife Service selectively enforced the law by referring his case
for prosecution in response to Dr. Warren's exercise of his First Amendment right to freely
associate with the humanitarian organization No More Deaths. Defendant seeks all
discovery relevant to his selective enforcement claim within the Government's knowledge
and control, including but not limited to the following:

(1) Any and all information and documentation, including internal communications
of the United States Fish and Wildlife Service ("FWS") and communications
between FWS and any other law enforcement agency, whether oral or written,

concerning the agency's investigation of Dr. Warren or other No More Deaths volunteers for their humanitarian work in the Cabeza Prieta National Wildlife Refuge;

(2) Any and all internal FWS communications and communications between FWS and any other law enforcement agency, including but not limited to the U.S. Attorney's Office and U.S. Border Patrol, whether oral or written, concerning the decision to refer Dr. Warren and other NMD volunteers for criminal prosecution based on their humanitarian aid work in the Cabeza Prieta refuge;

(3) Any and all information or documentation, including any communications, whether oral or written, concerning any FWS interactions with or investigations of any humanitarian aid workers in the Cabeza Prieta refuge, including information regarding any verbal warnings, written citations, or prosecution referrals involving such individuals;

(4) All investigative, incident, and/or arrest reports relating to potential or actual enforcement action taken against any person for allegedly driving a motor vehicle off of a designated public roadway within the Cabeza Prieta National Wildlife Refuge between 2014 and 2018, including but not limited to all notes and interviews concerning the citation, arrest, and/or referral of such cases for prosecution;

(5) All investigative, incident, and/or arrest reports relating to potential or actual enforcement action taken against any person for allegedly abandoning property within the Cabeza Prieta National Wildlife Refuge between 2014 and 2018,

including but not limited to all notes and interviews concerning the citation, arrest, and/or referral of such cases for prosecution;

(6) All materials related to FWS's amendment of the Acknowledgement of Danger and Release and Hold Harmless Agreement and Permit to Access Barry M. Goldwater Range; Cabeza Prieta National Wildlife Refuge; Area A Portion of Sonoran Desert National Monument, Sec. 13;

(7) A copy of all agreements between any government agency and any group or individual, including but not limited to the Samaritans, Humane Borders, Aguilas del Desierto, and others, governing activities in the Cabeza Prieta refuge and/or Barry M. Goldwater Range for any purpose for the past 5 years (including special use permits);

(8) Any materials of any sort relating to policies or practices permitting humanitarian aid or search and rescue operations in the Cabeza Prieta refuge and/or Barry M. Goldwater Range; and

(9) Any and all materials related to agreements and/or protocols between government agencies and No More Deaths related to access to other government managed land areas.

Following the Government's disclosure of the above items, and after Defendant has had a reasonable opportunity to review the materials, Defendant reserves the right to seek additional disclosure to develop his claim of selective enforcement. This motion is supported by and specifically incorporates the accompanying Memorandum of Points and Authorities.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

On June 1, 2017, an officer of the U.S. Fish and Wildlife Service ("FWS") stopped Dr. Warren while he was conducting humanitarian work in the Cabeza Prieta National Wildlife Refuge, on behalf of the organization No More Deaths ("NMD"). Dr. Warren received a verbal warning for unauthorized driving in the wilderness, but FWS did not take any further action against Dr. Warren at that time. Over the next several months, however, FWS coordinated with Border Patrol agents to actively target NMD volunteers and interfere with their humanitarian operations. FWS and Border Patrol officials (1) regularly communicated about NMD's presence in the refuge, (2) exchanged text messages referring to NMD volunteers as "bean droppers" and (3) celebrated the arrest of one volunteer. The escalating tensions between NMD on the one hand, and FWS and Border Patrol on the other, culminated in FWS's decision to refer Dr. Warren and other NMD volunteers for criminal prosecution.

Over six months later, on December 6, 2017, the Government charged Dr. Warren with Operating a Motor Vehicle in a Wilderness Area under 50 C.F.R. § 35.5 and Abandonment of Property under 50 C.F.R. § 27.93, based on the June 1, 2017 incident. Information received through a Freedom of Information Act request indicates that over the past three years, FWS has not referred any individuals for criminal prosecution who violated refuge regulations in Cabeza Prieta, *except for NMD volunteers*. In light of the available information concerning FWS's enforcement practices, together with the evidence that FWS actively coordinated with Border Patrol to target NMD volunteers and interfere

with their humanitarian mission, Defendant has made an initial showing that his treatment by FWS (1) had a discriminatory effect, and (2) was motivated by discriminatory intent. Accordingly, this Court should order disclosure of the items listed above and any other materials relevant to Defendant's selective enforcement claim.

## II.     STATEMENT OF FACTS

NMD is a humanitarian aid organization formed by a coalition of groups dedicated to ending death and suffering of migrants in Mexico-US borderlands. *See* "About No More Deaths," http://forms.nomoredeaths.org/about-no-more-deaths/. Dr. Warren is an active volunteer with NMD, working with the organization to prevent migrants from dying during their journey. Often, this work takes the form of venturing into remote desert areas to place emergency water and food in areas migrants frequently traverse. Humanitarian volunteers also search for migrants who are lost in the area and, more often, recover the bodies of people who have died on the journey.

Much of the lifesaving work of NMD volunteers must of necessity be carried out in the Cabeza Prieta National Wildlife Refuge. Over the past several years, the bodies of scores of people who died after crossing the border have been recovered in the refuge. In 2017 alone, some thirty-two sets of human remains were found there, according to the Pima County Office of the Medical Examiner.[1]

---

[1] Rory Caroll, *Eight activists helping migrants cross brutal desert charged by U.S. government,* THE GUARDIAN, Jan. 24, 2018, at https://www.theguardian.com/us-news/2018/jan/24/us-immigration-activists-arizona-no-more-deaths-charged.

Much of the Cabeza Prieta refuge consists of a designated "Wilderness Area." While the public is permitted to hike in these areas, environmental regulations strictly limit the use of motor vehicles. 50 C.F.R. § 35.5. In the refuge, a road, known as the Charlie Bell Road, runs west from Ajo to the Growler Mountains, where, at an area known as Charlie Bell Pass, it enters the designated "Wilderness Area" and becomes an "administrative road," or road generally authorized for vehicle travel only by government agents.

On April 28, 2017, NMD representatives met with officials from FWS to discuss the mutual goal of saving lives within Cabeza Prieta. (Exhibit 1 [filed under seal], FWS Memo re Meeting with NMD). According to a memo authored by an FWS official, NMD requested permission from FWS to drive on administrative roads for the purpose of conducting search and rescue operations, recovering human remains, and placing humanitarian supplies within the refuge. FWS denied the requests. (Exhibit 1, at 2).

A little over one month later, and despite the ongoing discussions between FWS and NMD, FWS actively interfered with NMD's humanitarian relief efforts in Cabeza Prieta. On June 1, 2017, FWS officer Jose Luis Valenzuela located a pickup truck along the Charlie Bell Road, 2.32 miles into the "Wilderness Area" in the Growler Valley. He also observed jugs of water and canned food both near the truck and elsewhere in the refuge. The truck, which the officer quickly learned was registered to the Unitarian Universalist Church of Tucson, was claimed by a group of four individuals, including Dr. Warren. They identified themselves as NMD volunteers and explained that they were there performing humanitarian efforts. All of the volunteers had valid visitor permits for the refuge, which they showed to the FWS officer upon request. When Dr. Warren admitted to driving the

6

pickup truck, the officer informed him he had violated the regulations prohibiting unauthorized vehicles in the wilderness, and that he "may be receiving a violation citation in the mail, pending further investigation[.]" (Exhibit 2, FWS Report for Incident 95732)[2].

Over the course of summer 2017, both FWS and the Border Patrol ramped up their efforts to crack down on NMD's relief work. On June 15, 2017, just two weeks after Dr. Warren's interaction with FWS in Cabeza Prieta, NMD's humanitarian operations were further disrupted when Border Patrol raided an NMD campsite providing medical care to migrants in distress, resulting in the arrest of four suspected undocumented immigrants. *See* Fernanda Santos, *Border Patrol Raids Humanitarian Aid Group Camp in Arizona*, NY TIMES, June 16, 2017. When asked about the raid, one Border Patrol agent was angry and defensive, indicating that NMD had "gone too far" by generating negative press against the law enforcement agency. (Exhibit 3, Declaration of Robin Reineke, at 3, ¶ 9).

Two weeks later, on July 1, 2017, FWS changed the permit requirements for access to the Cabeza Prieta refuge to specifically prohibit the "abandonment of personal property or possessions," including but not limited to "water bottles, water containers, food, food items, food containers[sic] blankets, clothing, footwear, [and] medical supplies"—in other words, the very type of humanitarian supplies that FWS knew NMD regularly places in the refuge for use by individuals in distress. (Exhibit 4, Acknowledgement of Danger and

---

[2] Although this report, obtained via FOIA request, redacts the defendant's name, a comparison with the affidavit filed by the Government (Doc. 6) clearly establishes that it describes the incident at issue in this case.

Release and Hold Harmless Agreement and Permit to Access Barry M. Goldwater Range; Cabeza Prieta National Wildlife Refuge; Area A Portion of Sonoran Desert National Monument, at 2, Sec. 13).

Approximately two weeks after that, on July 19, 2017, FWS officer Valenzuela coordinated with Border Patrol to intercept a group of four NMD volunteers who were performing a search and rescue operation in the Cabeza Prieta refuge. (Exhibit 5, FWS Report for Incident 97720, at 1-2). Upon investigation by the Pima County Sheriff's Office, one volunteer was arrested and charged for damaging a Department of Homeland Security camera. (*Id.* at 2). FWS gave the volunteers verbal warnings for entering the refuge without permits and operating a motor vehicle in a designated wilderness area, but FWS took no further action against the volunteers at that time. (*Id.*, at 2-4).

FWS and Border Patrol continued to coordinate their efforts to target NMD volunteers and interfere with their humanitarian work. On July 28, 2017, FWS official Margo Bissel and Border Patrol agent John Marquez exchanged text messages about their agencies' actions against NMD. Bissel wrote to Marquez that NMD has "been very quiet since we started action against them . . . Until last week." (Exhibit 6 [filed under seal], Text messages between Bissel and Marquez, at 1). Referring to the July 19 incident, Bissel asked, "Did you hear about the group at Charlie Bell Well?" Agent Marquez responded, "Oh yeah. That really sparked everything back up." (*Id.*, at 1-2). Bissel replied, "Love it. One lady was arrested, trying to tear the camera off! Oh my gosh!!" (*Id.*, at 2).

On July 31, 2017, three days later, Agent Marquez sent Bissel a text message asking her to let him know if any more NMD volunteers came to the Cabeza Prieta refuge,

referring to the volunteers as "bean droppers." (Exhibit 6, at 3). Bissel responded that eight volunteers had come the previous week to obtain permits for the refuge, but three of them were on the "do-not-issue list." (*Id.*, at 3-4). "They acted so surprised," she wrote, followed by an unamused face emoji.[3] "Oh sweet," Agent Marquez replied. (*Id.*, at 4). Bissel then wrote, "Heard we are pressing charges against Scott Warren," to which Marquez responded, "Yeah I heard that about Scott Warren too I think." (*Id.*).

Two more weeks passed, and on August 13, 2017, an FWS officer stopped four more NMD volunteers in Cabeza Prieta while they were conducting a humanitarian supplies drop. (Exhibit 7, FWS Report for Incident 98844, at 1-2). While the FWS officer did not issue any citations against the volunteers at that time, he indicated in his written report concerning the incident that the Assistant United States Attorney would be contacted for "further guidance." (*Id.*, at 2).

On October 13, 2017, Bissel wrote to Agent Marquez, "They're baaaack….! A ton of No More Deaths last two days in here getting permits." (Exhibit 6, at 7). "Sweet," Marquez responded, and asked for the volunteers' names. (*Id.*).

On December 6, 2017, the Government filed an Information (Doc. 1) charging Dr. Warren, pursuant to 16 U.S.C. § 668dd(c) and (f)(2) (the National Wildlife Refuge Administration Act), with two misdemeanor violations: 50 C.F.R. § 35.5, Operating a Motor Vehicle in a Wilderness Area, and 50 C.F.R. § 27.93, Abandonment of Property. All of the charges stem from Defendant's humanitarian aid activities on behalf of NMD in

---

[3] *See* https://emojipedia.org/unamused-face/.

the Cabeza Prieta refuge on June 1, 2017. On the same day the Government filed charges against Dr. Warren, it also filed charges against eight other NMD volunteers in relation to the incidents that occurred in Cabeza Prieta on July 19, 2017 and August 13, 2017.

The decision by FWS, in concert with Border Patrol, to actively target and pursue criminal charges against Dr. Warren and other NMD volunteers breaks from years of precedent in which individuals violating refuge regulations were simply given verbal warnings or issued written citations, but were not referred for criminal prosecution. Information obtained through the Freedom of Information Act ("FOIA") reveals that between 2015 and March 2018, there were fourteen incidents in which FWS encountered individuals in Cabeza Prieta and issued verbal warnings for conduct ranging from unauthorized driving in the wilderness to the unauthorized discharge of a firearm in the refuge. (Exhibit 8, FWS Reports for Incidents 64539, 64560, 67397, 61029, 80952, 85500, 97809, 98844, 105669, 105814, 106441, 106815). During this period, the *only* individuals who were referred for prosecution by FWS were NMD volunteers. No hunters, bird watchers, hikers or any other class of persons were referred for prosecution besides NMD volunteers. Significantly, volunteers with another humanitarian organization, Aguilas Del Desierto, were issued written citations for unauthorized driving on an administrative road while searching for migrants, but FWS did not refer those individuals for criminal prosecution. (Exhibit 9, FWS Report for Incident 80952).

II.   **RELEVANT LEGAL STANDARDS**

    A.   **Selective enforcement of criminal laws violates the Equal Protection Clause of the Fifth Amendment.**

The Equal Protection Clause of the Fifth Amendment prohibits the federal government from selectively enforcing criminal laws based on a discriminatory motive. *United States v. Armstrong*, 517 U.S. 456, 464-65 (1996). This prohibition applies both to a prosecutor's charging decisions and to the activities of law enforcement agencies. *Armstrong*, 517 U.S. at 464-65; *Whren v. United States*, 517 U.S. 806 (1996) ("the Constitution prohibits selective enforcement of the law based on considerations such as race"); *United States v. Davis*, 793 F.3d 712, 720 (7th Cir. 2015) (selecting targets for sting operations based on race would violate the Constitution).

"*Substantive* claims of selective prosecution and selective enforcement are generally evaluated under the same two-part test," requiring a showing of discriminatory effect and discriminatory intent. *United States v. Washington*, 869 F.3d 193, 214 (3d Cir. 2017) (emphasis in original); *Armstrong*, 517 U.S. at 465-66; *Lacey v. Maricopa County*, 693 F.3d 896, 920 (9th Cir. 2012). To demonstrate discriminatory effect, a "claimant must show that similarly situated individuals [] were not prosecuted" for the same conduct. *Armstrong*, 517 U.S. at 465. To establish discriminatory intent, he must demonstrate that "the government undertook a particular course of action 'at least in part because of' its adverse effects upon a particular group or person." *United States v. Turner*, 104 F.3d 1180, 1184 (9th Cir. 1997) (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)).

A selective enforcement claim may be based on the defendant's membership in a suspect class, or the exercise of protected statutory or constitutional rights. *Wayte*, 470 U.S. at 608; *United States v. Kidder*, 869 F.2d 1328, 1336 (9th Cir.1989). There is no question that the doctrine extends to government retaliation for the exercise of a First Amendment

right. *Wayte*, 470 U.S. at 604-610; *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out"); *United States v. Steele*, 461 F.2d 1148, 1151 (9th Cir. 1972) ("Steele is entitled to an acquittal if his evidence proved that the authorities purposefully discriminated against those who chose to exercise their First Amendment Rights."); *Fedorov v. United States*, 600 A.2d 370, 382 (D.C. 1991) ("The government—absent an adequate explanation—is not free to punish more severely those . . . who are political demonstrators, while excusing those who . . . are not making a political statement.").

Discrimination based on the exercise of protected First Amendment activities is unlawful, regardless of whether the activities are conducted "as an individual, or . . . as a member of a group unpopular with the government." *United States v. Falk*, 479 F.2d 616, 620 (7th Cir. 1973).  Thus, the government may not pursue enforcement actions as a means to chill protected speech or curb an individual's right to freely associate with others. *C.E. Carlson, Inc. v. Sec. Exch. Comm'n*, 859 F.2d 1429, 1437 (10th Cir. 1988) ("To move forward on their selective prosecution theory, petitioners were required to show that . . . their selection for enforcement was deliberately based on an unjustifiable consideration, in this case the exercise of first amendment rights to freedom of speech and association"); *United States v. Steele*, 461 F.2d at 1152 ("An enforcement procedure that focuses upon the vocal offender is inherently suspect, since it is vulnerable to the charge that those chosen for prosecution are being punished for their expression of ideas, a constitutionally protected right."). *See also Boy Scouts of Am. v. Dale*, 530 U.S. 640, 647 (2000) ("implicit

in the right to engage in activities protected by the First Amendment is a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 622 (1984)).

## B.   Discovery standard for selective enforcement claims

Because Defendant asserts a claim of selective *enforcement*, based on the conduct of FWS, he need not satisfy the heightened standard for discovery applicable to selective p*rosecutio*n claims. Rather, under the framework applied in the Seventh Circuit, the Court may authorize initial discovery to develop a selective enforcement claim based solely on a showing of disparity in the prosecution of similar offenses. *Davis*, 793 F.3d at 722. Alternatively, under the test recently established by the Third Circuit, the Court may order discovery upon a showing of (1) "some evidence of discriminatory effect," including statistical evidence or its equivalent, and (2) a "reasonable inference of discriminatory intent." *Washington,* 869 F.3d at 220-2.

In *Armstrong*, the Supreme Court held that to obtain discovery for a selective *prosecution* claim, a defendant must produce "some evidence tending to show the existence of the essential elements" of the claim—discriminatory effect and discriminatory intent. 517 U.S. at 468 (quoting *United States v. Berrios*, 501 F.2d 1207, 1211 (2nd Cir. 1974)). To demonstrate discriminatory effect at this initial stage, the defendant must make "a credible showing of different treatment of similarly situated persons." *Id*. at 470. This rigorous standard reflects the "presumption that a prosecutor has not violated equal protection," a presumption that flows from the special role that United States Attorneys

play helping the President to "discharge his constitutional responsibility to 'take Care that the Law be faithfully executed.'" *Id*. at 464-65.

As recognized by the Third and Seventh Circuits, the distinction between selective prosecution and selective enforcement claims is crucial. In *Davis*, an *en banc* panel of the Seventh Circuit held that *Armstrong*'s demanding standard does not apply to discovery requests for selective enforcement claims. 793 F.3d at 721. The Court explained that "the sort of considerations that led to the outcome in *Armstrong* do not apply to a contention" of selective enforcement because law enforcement agents "are not protected by a powerful privilege or covered by a presumption of constitutional behavior." *Id*. at 720-21.

> Unlike prosecutors, agents regularly testify in criminal cases, and their credibility may be relentlessly attacked by defense counsel. They also may have to testify in pretrial proceedings, such as hearings on motions to suppress evidence, and again their honesty is open to challenge. Statements that agents make in affidavits for search or arrest warrants may be contest, and the court may need their testimony to decide whether if shorn of untruthful statements the affidavits would have establish probable cause. Agents may be personally liable for withholding evidence from prosecutors and thus causing violations of the constitutional requirement defendants have access to material, exculpatory evidence.

*Id*.

While the Seventh Circuit did not specify a discovery standard for selective enforcement claims, it found the district court had a "legitimate reason" for ordering discovery based solely on evidence of racial disparity in the *prosecution* of phony stash house cases. 793 F.3d at 722. Specifically, in the 20 stash-house stings prosecuted in the district, 75 out of 94 defendants were black. *Id.* at 715. In light of this information, the Seventh Circuit directed the district court to proceed with discovery in "measured steps,"

first by inquiring "whether there is *any reason to believe* that race played a role in the investigation[.]" *Id.* at 722 (emphasis added). The Court instructed the judge to "make limited inquiries, perhaps including affidavits or testimony of the case agents, to determine whether forbidden selectivity occurred or *plausibly could have* occurred." *Id.* at 723 (emphasis added). "If the initial inquiry gives the judge reason to think" that selective enforcement occurred, the court could then require disclosure of additional information, including the targeting criteria for criminal investigations. *Id.* at 722-723.

In *Washington*, the Third Circuit adopted the "core rationale" of *Davis*, observing that "the law supports greater flexibility when the discretionary decisions of law enforcement, rather than those of prosecutors, are targeted by a defendant's request for discovery." 869 F.3d at 197. The Court held that "a district court may exercise its discretion to grant limited discovery" on a selective enforcement claim even if the defendant "has not otherwise met his or her full burden under *Armstrong/Bass.*" *Id.* As to the standard, the Court explained that although a defendant must present "some evidence" of discriminatory effect, the proffer may consist of statistical evidence "or its equivalent," and "may be based in part on patterns of prosecutorial decisions (as was the case in *Davis*) *even if* the underlying challenge is to law enforcement decisions." *Id.*, at 220-221 (emphasis in original). Distinct from the *Armstrong* standard, a defendant need not show that "similarly situated persons of a different race or equal protection classification were not arrested or investigated by law enforcement." *Id.*, at 221. Nor must the defendant provide "some

evidence" of discriminatory intent. *Id*. Rather, "the proffer must be strong enough to support a reasonable inference of discriminatory intent and non-enforcement." *Id*.

Other courts have approved of *Davis*'s distinction between selective enforcement and selective prosecution, particularly in the context of discovery requests. *See United States v. Hare*, 820 F.3d 93, 101 (4th Cir. 2016) (noting the "cogent" reasoning of *Davis* but not reaching issue); *United States v. Mumphrey*, 193 F. Supp 3d 1040, 1048 (N.D. Cal. 2016) ("[a]lthough the Court agrees with the reasoning in *Davis*, it need not resolve [in this case] this issue whether *Armstrong* applies with full force to claims of selective enforcement."). Others have criticized the application of *Armstrong* requirements to selective enforcement claims, "noting their seeming impossibility." *United States v. Jackson*, No. 16cr2362 MCA, 2018 U.S. Dist. LEXIS 21067, at *14 (D.N.M. Feb. 7, 2018) (citing cases); *United States v. Mesa-Roche*, 288 F. Supp. 2d 1172, 1185 (D. Kan. 2003) ("[I]mposing the similarly situated requirement makes the selective enforcement claim impossible to prove. . . How could a defendant, without discovery, ever make such a showing?"); *United States v. Paxton*, No. 13 CR 103, 2014 U.S. Dist. LEXIS 56857, 2014 WL 1648746, at *4 (N.D. Ill. Apr. 17, 2014) ("In selective enforcement cases . . . identifying the class of [similarly situated] individuals is a much more burdensome endeavor, and one that may prove insurmountable."); *United States v. Laneham*, No. CIV 16-2930 JB, 2017 U.S. Dist. LEXIS 176486, at *78, n.14 (D.N.M. Oct. 25, 2017) (following binding Tenth Circuit precedent applying *Armstrong* to selective enforcement claims but noting "[i]n practice, however, *Armstrong*'s discovery standard may be most appropriate for selective prosecution cases than for selective enforcement cases.")

16

The Ninth Circuit has not addressed whether *Armstrong* applies to selective enforcement claims. However, given the "cogent" reasoning of *Davis* and *Washington*, this Court should follow the Seventh and Third Circuits and find that *Armstrong* does not apply to Defendant's discovery request. Accordingly, the Court should authorize discovery if Dr. Warren makes an initial showing of disparity in the criminal prosecution of refuge regulation violations, *Davis*, 793 F.3d at 722, or alternatively, if he shows (1) "some evidence of discriminatory effect," which may be based on charging decisions, and (2) a "reasonable inference of discriminatory intent." *Washington,* 869 F.3d at 220-22.

## III.   DEFENDANT HAS SATISFIED THE DISCOVERY STANDARD FOR SELECTIVE ENFORCEMENT CLAIMS UNDER *DAVIS* AND *WASHINGTON.*

### A.   Defendant has provided "some evidence" of discriminatory effect.

To obtain discovery under *Davis*, all that is required is a preliminary showing of disparity in prosecutorial charging decisions, even when the claim is selective enforcement rather than prosecution. *Davis*, 793 F.3d at 722. This requirement is essentially the same as the first prong of the Third Circuit's discovery standard under *Washington*, 869 F.3d at 220-21—"some evidence" of discriminatory effect—which may be based on patterns of prosecutorial decisions. Furthermore, at this initial stage, a defendant need not show that similarly situated persons were not arrested or investigated. *Id.*

Dr. Warren has easily met this requirement. Between 2015 and March 2018, there were fourteen incidents in Cabeza Prieta in which FWS issued verbal warnings or written citations to individuals for violating refuge regulations. (Exhibits 2, 7, 8). The only individuals referred for prosecution by FWS were NMD volunteers. Under *Davis* and

*Washington*, this is sufficient to establish "some evidence" of discriminatory effect, as it demonstrates that the *only* persons targeted for enforcement are members of the protected class. *Davis*, 793 F.3d at 719 (permitting discovery where "the overwhelming majority of the defendants named [were] individuals of color"); *Mumphrey*, 193 F. Supp. 3d at 1059 (explaining that to obtain discovery under *Davis*, "the defendant can simply rely on statistics showing, *e.g.*, that a significant majority of persons targeted by law enforcement is made up of members of a protected class").

Furthermore, although Defendant is not required to demonstrate the preferential treatment of similarly situated individuals at this initial stage, it is highly significant that FWS did not seek criminal charges against members of another humanitarian organization, Aguilas Del Desierto, who received written citations for unauthorized driving on administrative roads while conducting humanitarian work. (Exhibit 9). These individuals are similarly situated to Dr. Warren because they were engaging in similar conduct under similar circumstances, but they were not part of the organization being actively targeted by FWS. Thus, even under the more rigorous *Armstrong* standard, Defendant has demonstrated "some evidence" of discriminatory effect by showing the preferential treatment of similarly situated individuals. *Armstrong*, 517 U.S. at 468.

## B. Defendant has demonstrated a "reasonable inference" of discriminatory intent.

Dr. Warren also easily satisfies the second prong of the *Washington* discovery standard—a "reasonable inference of discriminatory intent." 869 F.3d at 221. The fact that the only individuals FWS referred for criminal prosecution for violating refuge regulations

are NMD volunteers is itself sufficient to raise a reasonable inference of discriminatory intent. *Murphey*, 193 F. Supp at 1063 ("As an initial matter, the fact that 100% of all the OSS defendants are African American is probative of discriminatory intent, particularly when the relevant population is not 100% African American."); *United States v. Tuitt*, 68 F. Supp. 2d 4, 10 (D. Mass. 1999) (under *Armstrong*, a "[a] discriminatory effect which is severe enough can provide sufficient evidence of discriminatory purpose"). *See also United States v. Aguilar*, 883 F.2d 662, 706 (9th Cir. 1989) ("If all other things are equal, the prosecution of only those persons exercising their constitutional rights gives rise to an inference of discrimination.").

Discriminatory intent may also be inferred from the sequence of events beginning with the meeting between NMD and FWS officials on April 28, 2017 and culminating in the extraordinary decision to file criminal charges against Dr. Warren on December 6, 2017. Dr. Warren was not stopped by FWS and prevented from conducting his humanitarian work in Cabeza Prieta until after the April 2017 meeting where FWS refused to grant NMD access to administrative roads. Over the following months, FWS, in coordination with Border Patrol, ramped up its efforts against NMD, interrupting the humanitarian work of two groups of volunteers in July and August 2018.  During this period, an FWS official regularly contacted a Border Patrol agent about NMD's presence in Cabeza Prieta, and the two celebrated and joked about the arrest of an NMD volunteer and the denial of permits to volunteers. (Exhibit 6). *Cf. United States v. Mumphrey*, 193 F. Supp. 3d 1040, 1064 (N.D. Cal. 2016) (race-based comments and conduct by law enforcement probative of discriminatory intent); *Busby v. City of Orlando*, 931 F.2d 764,

781-82 (11th Cir. 1991) (in employment discrimination case, concluding that racially derogatory jokes are evidence of discriminatory intent). This information strongly suggests that FWS referred Dr. Warren's case for prosecution "at least in part" because of his association with NMD. *United States v. Turner*, 104 F.3d at 1184. Accordingly, Defendant is entitled to discovery further develop his selective enforcement claim.

## CONCLUSION

The available information indicates that FWS has never taken criminal enforcement action against anyone for violating refuge regulations in Cabeza Prieta, except for those associated with NMD. FWS's decision to refer Dr. Warren and other NMD volunteers for criminal prosecution was precipitated by escalating tensions between NMD, FWS, and Border Patrol, demonstrated not only by the series of targeted enforcement actions that occurred in the summer of 2017, but also by the disparaging text messages exchanged between FWS and Border Patrol officials involved in the enforcement actions. Based on all the relevant circumstances and available information, Dr. Warren has made a preliminary showing that FWS referred his case for criminal prosecution in response to the exercise of his First Amendment right to freely associate with NMD to carry out the mission of saving migrant lives in the desert. Accordingly, Defendant requests this Court to issue an order requiring the Government to disclose any and all information related to his selective enforcement claim, including but not limited to Items (1) through (9) above.

RESPECTFULLY SUBMITTED this 14th day of September, 2018.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight

531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott
Daniel Warren

CERTIFICATE OF SERVICE

I certify that on September 14th, 2018, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701