Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | ) |
| Plaintiff, | ) No. 17-mj-00341-RCC(JR) |
| vs. | ) **REPLY IN SUPPORT OF MOTION TO DISMISS BASED ON SELECTIVE ENFORCEMENT AND/OR PROSECUTION AND RENEWED MOTION FOR DISCOVERY AND REQUEST FOR EVIDENTIARY HEARING** |
| SCOTT DANIEL WARREN, | ) |
| Defendant. | ) |

Dr. Warren requests that this Court hold an evidentiary hearing and grant his motion on selective enforcement and/or prosecution and renewed motion for discovery because the government's position actually confirms that FWS's actions violate equal protection.

***First***, even assuming the government's version of the facts were true, FWS's actions were constitutionally impermissible. It admits its actions toward Dr. Warren were unusually severe and were based solely on his NMD affiliation. RB at 5 ("The government prosecuted the defendant for doing what NMD was explicitly told not to do. It was the defendant's blatant disregard for federal law that caused FWS to refer the matter for prosecution."). It then insists FWS's actions toward Dr. Warren were justified by "ongoing and intentional violations." RB at 4. But all of the reasons it offers concern its stance toward *NMD*—not toward Dr. Warren. It presents no evidence of prior violations *by Dr. Warren*. It never even

claims anybody had warned Dr. Warren personally not to drive on administrative roads, nor that he himself had expressed an intent to defy the law. Indeed, the agent who stopped him reported that Dr. Warren denied knowing he was in a restricted area. Exh. 27 at 12. The government never denies that FWS treated him more harshly because he was part of NMD.

Instead, the government assumes FWS's reasons for targeting *NMD* were permissible, and therefore its disparate treatment of *Dr. Warren* based on his association was also permissible. Neither is correct. First, it cannot punish Dr. Warren for the actions of others based only on common group membership, no matter what the other individuals did or said, even if they were speaking for the group. Dr. Warren has a First Amendment right to free association, and punishing him more harshly for his own acts simply because he belongs to a given group violates the Constitution. *See, e.g., Brown v. United States,* 334 F.2d 488 (9th Cir. 1964) (government may not attribute group's criminal aims to individual member absent showing he shares the aims). Thus, whatever defiance or criminal intent FWS may believe it detected from NMD, it may not attribute that to Dr. Warren merely by association. Second, FWS cannot justify more severe action based only on stated resistance to certain laws. The government explains that its scaled-up response was because one member "unequivocally informed Mr. Slone that NMD would continue to perform their actions regardless of whether they had permission and would fight any citations in court." RB at 5. In other words, despite the government's claim that FWS was justified by "ongoing and intentional violations," it never identifies *any* prior violations, and was instead reacting to one member's *statements*. NMD members have a First Amendment right to say almost anything they like to FWS officials. FWS may have been *offended* by what it perceived as defiance, but at the time the officer stopped Dr. Warren, that statement is the only thing the government alleges NMD had done to justify its harsher treatment of Dr. Warren.

In *United States v. Falk,* 479 F.2d 616 (7th Cir. 1973) (*en banc)*, the government charged Falk with refusing to submit to the draft and failure to possess required draft cards. Falk "was an active member of a draft counseling organization known as the Chicago Area

Draft Resisters," and alleged that he was selectively prosecuted because of this association, his "status as an active and vocal dissenter," and activities in assisting others in avoiding the draft. *Id.* at 619. A divided Seventh Circuit panel held that "select enforcement of a law against someone in a position to influence others is unquestionably a legitimate prosecutorial scheme to secure general compliance with the law. Especially would this seem true with respect to draft card possession requirements at a time when defiance of the law is widespread." *United States v. Falk,* 472 F.2d 1101, 1108 (7th Cir. 1972). The *en banc* Court rejected this rationale and decried "discrimination on the basis of the exercise of protected First Amendment activities, whether done as an individual or, as in this case, as a member of a group unpopular with the government." 479 F.2d at 620. It recognized the import of proffered evidence that the prosecutor had stated "that a good deal of their trouble in enforcing the draft laws came from people such as Falk." *Id.* at 621. In other words, while it may seem *rational* for law enforcement to target those who openly and vocally defy the laws, it is clearly *not* constitutional. *See also United States v. Steele,* 461 F.2d 1148, 1151 (9th Cir. 1972) (unconstitutional to prosecute for census violations only those who "urg[e] the public to avoid compliance with census requirements;" Court condemned agency's "compil[ing] special background dossiers" on those it described as "hard core resisters" where "organization had been very concerned about the census resistance movement").

**<u>Second</u>**, the evidence belies the government's claim that FWS's only reason for treating NMD members more harshly was to "enforce and encourage compliance with regulations." RB at 4. It claims all the extra focus FWS placed on identifying and pursuing NMD volunteers was justified by a member's comment at an April 2017 meeting. RB at 4-5. But the facts show the targeting began *before* this meeting: on February 17, 2017, over three months earlier, an officer emailed out photos of a truck he believed to belong to NMD, advising his colleagues to look out for them. Exh. 2. It is thus logically impossible for the government's explanation—that FWS's actions toward NMD were all a result of NMD's defiant statements at the meeting—to be true. *See Perez v. City of Roseville,* 882 F.3d 843,

3

853-54 (9th Cir. 2018) (rejecting proffered explanation "because it is internally inconsistent or otherwise not believable," noting "the Department's constantly shifting justifications").

The government's opening claim also contains another fatal flaw: it equates the presence of a purportedly legitimate motive with the absence of discriminatory intent. But the law is clear, as the government agrees, that proper and improper purposes can and often do coexist. Thus, even if the government had proven it had a valid reason to pursue NMD volunteers, this is no answer to the extensive evidence of concurrent *improper* motives. *See* RB at 4 (recognizing that a discriminatory purpose requires showing of motivating "at least in part" due to improper motive); *see also Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 265 (1977) (noting it is rare to find "a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one.").

Then, the government tries to defend its illegal conduct by pointing to other ways it could also have discriminated, but did not. RB at 5. This proves nothing. The claim is not that FWS uniformly took every possible action against anyone associated with NMD, nor that it never enforced the law against anyone else. It is that it treated NMD members *more harshly* than it treated similarly situated individuals, *because* they were NMD members. That is still unconstitutional even though FWS allowed NMD members some privileges and took reasonable enforcement actions against non-members, as long as a *difference* in treatment based on group membership occurred. Moreover, one of the things it wants credit for—granting permits to NMD volunteers in February, June, and July, 2017—was not a discretionary act it had any power to withhold. *See* Exh. 12 (permit application listing authority under 50 CFR Part 13); 50 CFR § 13.21(b) ("Upon receipt of a properly executed application for a permit, the Director *shall issue* the appropriate permit unless" enumerated exceptions apply). And shockingly, the government insists FWS could not have been discriminating because it never "took any action concerning" the volunteers it singled out in February 2017 and flagged for special law enforcement attention, including distributing the photo of their vehicle to agents, *see* Exh. 2. But sending out an email to officers directing

their attention to certain individuals because they are part of a certain group *is* taking action concerning them, and constitutes evidence of improper purpose, even if nobody actually ticketed or arrested them. The same goes for the volunteers flagged by refuge staff in July (Exh 17), whose names the Assistant Refuge Manager proposed distributing to other federal officials. FWS flagged them, tracked them, and made its intentions clear.

The government then attempts to dispose of four more categories of direct evidence of discriminatory intent in a single paragraph. RB at 6. It fails to adequately address any of them. Regarding the draft letter (Exh. 6), the government insists it was proper because FWS "drafted the letter based on the addressee's conduct." RB at 6.[1] But that is not exculpatory; the problem with the letter is that as FWS appeared to realize, *her conduct was not illegal.* Dr. Warren pointed out that the letter leaves a blank for what the addressee will be cited for (Doc. 95 at 7 n.2), and to this day, the government has never identified a regulation she allegedly violated.[2] Instead the government focuses on her association with NMD, explaining that she was present at the April 2017 meeting at which another NMD member professed a willingness to incur violations. RB at 6. But that type of expression is not illegal. FWS knew she was an active NMD member, and knew it wanted to cite her, but it could not identify any law she broke. That is strong evidence that group membership, rather than simple enforcement of refuge regulations, motivated FWS's actions.

Regarding the change to the permit application, the government offers a single sentence: that the change "served only to provide examples of items that any person entering

---

[1] The government also cites an Exhibit—Exh. 27, pp. 12-13—for support, but that exhibit makes no mention of the recipient of the letter.
[2] The letter also states that her access permit "has been revoked." Exh. 6 at 3. 50 CFR § 13.28 provides that the FWS must issue a notification of "*proposed* revocation," and must "inform the permittee of the right to object to the proposed revocation" (emphasis added). FWS did not include this required notification of rights in its letter. Similarly, FWS's letter purports to refuse issuance of a permit for the next year. However, 50 CFR § 13.21(b) allows denial only if "The applicant has been assessed a civil penalty or convicted of any criminal provision of any statute or regulation relating to the activity for which the application is filed, if such assessment or conviction evidences a lack of responsibility." Even if it had identified a regulation she violated and issued a violation notice, it could not refuse a permit on that basis in the absence of a civil penalty or criminal conviction, which would not yet have occurred.

the refuge could not leave behind. . . which was a reasonable change based on NMD's ongoing blatant disregard for adhering to federal law." RB at 6 (citing to magistrate judge's order in another case denying an Administrative law claim). Even if that were true (which Dr. Warren disputes), it would not mean the change could not also reflect discriminatory intent. If FWS thought its permit was insufficiently clear, it could, and should, have clarified it in a neutral manner by identifying examples of the types of objects considered to be "personal property" from across the spectrum of refuge users, including campers, hikers, and hunters. Instead, it focused on "water bottles, water containers, food, food items, food containers blankets [sic], clothing, footwear, medical supplies, garbage, or trash generated by and/or used by me and/or my group." Exh. 12 at 3. In other words, it added a list of the items NMD uses in its work. It did not add, for instance, tents, tarps, sleeping bags, weapons, ammunition, or spent casings, even though it was amending an application widely used by all types of visitors that its own leadership believed to be unclear. And it readily admits that the change was "based on" NMD's actions (RB at 6)—which it characterizes as an "ongoing blatant disregard for adhering to federal law." This characterization confirms the government's bias against NMD, as all the evidence reveals that FWS had initiated the revision by June 14, 2017 (Exh. 8), at which time it had observed only a single incident, that involving Dr. Warren on June 1. How a single incident with one vehicle observed on an administrative trail, in which, according to the officer, the driver stated he was unaware he was in a wilderness area (Exh. 27 at 12), constitutes "ongoing blatant disregard" for the law the government never says.

As for the blacklist, the government explains the people it put on its list "were in vehicles that drove on restricted administrative roads after the April 2017 meeting." RB at 6. This argument ignores several crucial points. First, it ignores the fact that FWS personnel entitled this list "NMD names." Exh. 16. Not "violator names" or "ineligible names," but "NMD names." Thus, while it *could* make a neutral list of people whose prior violations made them ineligible for permits, its own documents reveal that that is not how it conceived

of this list. Moreover, the government concedes that many of the people on the list were added because they "were in the vehicles that drove on restricted administrative roads." RB at 6. But again, the government has never identified a law forbidding being a passenger in a vehicle on a restricted road. If this were actually a list of people "knowingly and deliberately violating federal law," it would not have included NMD members who had not personally violated any regulations. And indeed, while the government insists (without reference to any law) that refusal of permits to everyone on the list was perfectly legal, the regulations on permit issuance provide otherwise. *See supra* note 2. Several of the NMD volunteers on the list were never cited at all, let alone penalized or convicted. Finally, the government claims the criterion for placement on the list was being "in vehicles that drove on restricted administrative roads after the April 2017 meeting." RB at 6. But that holds true *only* for NMD members. Others drove in off-limits areas after April 2017 and were not added. Exh. 27 at 35 (March 11, 2018 incident with off-road driving). The only difference is that the March 11 individuals were not NMD members. The government's explanation that the blacklist was actually a perfectly legal list of people who could be denied permits based on prior violations is thus "unworthy of credence." *Reeves v. Sanderson Plumbing Prods.,* 530 U.S. 133, 147 (2000), and supports discriminatory intent.

Finally, regarding the text messages, all the government says is that they contain "unremarkable statements approving of a legitimate law enforcement action and the refusal of permits to individuals who had already violated the terms of their permits." RB at 6. But this characterization glosses over serious issues. For one thing, the tone of the conversations was inappropriate, and revealed, in both Bissel and Marquez, a disdain for NMD that supports a finding of discriminatory intent. *See* Exh. 25 at 5-9 ("bean droppers," "They acted so surprised 😒,"[3] "Love it," "Oh sweet," "They're baaaack…!"). The government also entirely ignores the substantive problem with the messages: they document an ongoing

---

[3] This emoji is called "Unamused Face" in Apple's nomenclature. *See* https://emojipedia.org/unamused-face/.

unofficial collaboration between two unrelated agencies to target NMD volunteers—something which at least the BP agent appeared to realize was improper, as he falsely reported that the FWS employees he collaborated with were merely "concerned citizens." Exh. 25-26. And the government never responds at all to the evidence that, despite their non-overlapping missions, the two agencies repeatedly collaborated to detain and cite NMD members, and to track individuals associated with NMD without regard to whether they had broken any law. Doc. 95 at 11-13. It identifies no permissible law enforcement purpose for, for instance, Officer Ebban's statement that he would "try to get a name on the female" related to NMD for BPA Marquez. *Id.* at 13. Insisting that the texts were "unremarkable," the government entirely ignores this unconventional and hidden arrangement.

      ***Third***, the government cannot avoid the evidence of discriminatory effect. It argues that FWS's decision to skip over the more moderate step of issuing a violation notice, as it does in all non-NMD cases, and go straight to criminal prosecution based on Dr. Warren's status as a NMD volunteer, was somehow excusable because Dr. Warren has not asked for a plea deal. But the government cannot justify a discriminatory decision based on what occurred *after* that decision was made. And the government's bare insistence that "in all likelihood, [Dr. Warren] would have pleaded not guilty and proceeded to engage in the same full-throated defense that preceded this motion," Doc. 105 at 7-8, is rank and self-serving speculation. When FWS chose to refer the case for prosecution, a range of other interests came into play, and Dr. Warren could have any number of reasons for contesting the criminal charges once filed that would not necessarily have mattered if the case had been handled via violation notice. And perhaps more important, it is irrelevant. The government's point is that the "defendant fails to demonstrate any prejudice." RB at 7. But a selective enforcement claim does not *require* prejudice, and the government did not and cannot cite any law suggesting that it does. It requires that the defendant was "treated differently from members of the unprotected class." *Chavez v. Ill. State Police,* 251 F.3d 612, 636 (7th Cir. 2001). FWS hauled Dr. Warren into court to face criminal charges without giving him the

8

opportunity it routinely provides to non-NMD members to resolve the matter with an online payment, and that is discriminatory whether he would have taken the opportunity or not.

In any event, this argument—that submitting the case for criminal charges is not actually more severe than issuing a violation notice in any meaningful way—is inconsistent with the government's own position. Its argument throughout is that the more severe action was an appropriate response to what it calls "ongoing and intentional violations," RB at 4, and that "the defendant's blatant disregard for federal law [] caused FWS to refer the matter for prosecution." *Id.* at 5. So, which is it—is it a more severe reaction that was justified, or was it not more severe at all? The government's attempt to have it both ways reveals it cannot prevail with either version.

The government then tries to avoid the inescapable fact that it never referred anyone else for prosecution for violating refuge regulations by making irrelevant distinctions. First, it baldly asserts that the three cases involving firearms are "wholly irrelevant." RB at 8. But the circumstances need not be identical; they need only be alike on "all relevant factors, the number of which depends on the context of the case." *Chavez,* 251 F.3d at 636 (rejecting distinguishing factors as not relevant to challenged decision). The government never argued that FWS's choice of response is dictated by which regulation was at issue, and without that connection, it's just like the fact that the claimant's car was red and the similarly situated driver's was not, rejected by the *Chavez* Court—a distinction, certainly, but not one that explains the different treatment. The government then claims "[f]ive of the matters involve the defendant or other members of No More Deaths." RB at 8. That is wrong; there were only four. Three yielded referrals; the fourth was a continuation of the third incident, involving most of the same people already referred based on the previous day.

The *only* argument the government ever makes that the other seven were not similarly situated to Dr. Warren is that "in each instance the individual only committed one violation." RB at 8. Again, the government has this wrong on both ends. At least two other incidents involved multiple violations: in report 61029, the driver was observed on

administrative trails on two separate occasions—April 29, 2015 and May 8, 2015. Exh. 27 at 6. And report 80952 identified a troop of "several vehicles parked on and off the road at the Lower Well Rescue Beacon." Exh. 27 at 8. Each of these vehicles apparently constituted a violation. Only one similarly situated example is required. *See* cases cited in Doc. 95 at 5.[4]

The government then accuses Dr. Warren of being "misleading" by arguing "that FWS knew the defendant only committed one violation." RB at 9. Ironically, that is not what he argued; he clearly stated that "the report that gave rise to *this* prosecution listed only a single violation." Doc. 95 at 18. That is indisputably true. The fact that the *prosecutors* added another charge and disclosed information regarding an additional alleged violation does not address the fact that *FWS*, the agency whose actions are at issue here, processed this as a single-violation event—when it obviously could, and sometimes did, list multiple violations. *See, e.g.,* Exh. 27 at 16, 21. The officer reported that he observed supplies in the truck Dr. Warren drove, and observed similar supplies on a rescue beacon elsewhere in the refuge—but he also observed other trucks in the refuge and verified that thirteen individuals had signed in, and did *not* report that he saw, or even suspected, Dr. Warren leaving anything behind. Exh. 27 at 12-13. A FWS supervisor then approved his report. *Id.* The prosecutors' "reasonable inference," RB at 9, is not the same thing as *FWS* identifying a regulation violation and taking action on it. The government has offered no reason why, if it believed Dr. Warren had violated an additional regulation, FWS did not include that alleged violation in its report. The answer is apparent: *FWS* only identified one violation.

**_Fourth,_** the government's factual summary is inconsistent with the evidence. It claims the FWS officer "saw tire tracks going from Charlie Bell Pass, past signs designating

---

[4] The government also re-urges its internally inconsistent theory that the issuance of violation notices to others for similar conduct was not different treatment from what NMD members got. RB at 8. But again, this claim is at odds with the government's primary position that the referral *was* more harsh than a violation notice, but was justified. It acknowledges that had FWS issued a violation notice to Dr. Warren, he *could have* simply "paid the forfeiture collateral amount," RB at 7, but instead it referred the matter to the USAO. It argues not that this would not have been a less severe reaction, but rather that it thinks Dr. Warren would not have taken advantage of that option. RB at 7. Ultimately, the government cannot actually dispute that what FWS did with NMD members was different than what it did with others.

10

the road as limited access, and on to Charlie Bell Windmill" and that he "also saw the tire tracks continue to the west." RB at 2. The officer reported no such thing. *See* Exh. 27 at 12. Indeed, he actually reported that he traveled "down the administrative road." *Id.* As he was on a *road* used by FWS, BP, and anyone FWS granted a permit to drive there, even if there had been tire tracks, that fact would not denote illegal activity. The Government then describes the officer's encounter with Dr. Warren inconsistently with his own report: it claims "The officer then instructed the defendant and his group to leave the CPNWR by the same route they had come in. The officer later learned from the range manager that the defendant did not have the authorization to drive on the restricted administrative road." RB at 2-3. But what the officer actually reported is that he tried to reach the refuge manager by radio right then, failed, and "continued to escort" the group "to the top of the pass," where, still in their presence, he reached Slone by radio and was told he had not granted permission to use the road. Exh. 27 at 13.

**Fifth,** the government makes only a conclusory assertion that Dr. Warren has not met the requirements for discovery under *Armstrong*. It never denies that Dr. Warren has met the requirements of the *United States v. Sellers,* 906 F.3d 848, 854 (9th Cir. 2018), which holds that *Armstrong* does not apply where the claim is about the decisions of law enforcement; for discovery in a selective enforcement claim, a defendant need only present "*something more than mere speculation.*" *Id.* at 855. By failing even to cite *Sellers,* let alone argue Dr. Warren hasn't met its standard, the government has conceded that discovery is appropriate.

RESPECTFULLY SUBMITTED this 17th day of April, 2019.

                           By /s/ Amy P. Knight
                           Gregory J. Kuykendall
                           Amy P. Knight
                           531 S Convent Avenue
                           Tucson, AZ 85701
                           Attorneys for Defendant Scott Daniel Warren

CERTIFICATE OF SERVICE

I certify that on April 17th, 2019, I electronically transmitted a PDF version of this document to the Clerk of Court using the CM/ECF System for filing and for transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701