Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　Plaintiff,<br><br>vs.<br><br>SCOTT DANIEL WARREN,<br>　　　　Defendant. | ) No. 17-mj-00341-RCC(JR)<br>)<br>) **DEFENDANT'S TRIAL**<br>) **BRIEF/MEMORANDUM OF LAW**<br>) **REGARDING DEFENSES**<br>)<br>)<br>) |

## CONTENTS

Introduction………………………………………………………………………..….1
I. RFRA……………………………………………………………………...….2
II. Necessity………..…………………………………………………...….15
III. Lack of Notice………………………………………...……...…..23
Conclusion………………………………………………………………...…..26

## **INTRODUCTION**

Defendant Scott Warren submits this memorandum of law on his asserted defenses: the Religious Freedom Restoration Act, 42 U.S.C. § 2000bb-1 ("RFRA"), necessity, and lack of notice under the Due Process Clause of the Fifth Amendment. This memorandum covers both the substantive contours of each defense and the procedures necessary to ensure Dr. Warren's right to present these defenses fully while producing a complete record. Dr.

Warren specially requests that this Court "state its specific findings of fact in open court or in a written decision or opinion" regarding these defenses, pursuant to Federal Rule of Criminal Procedure 23(c).

## I.   RFRA

"Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA provides that the government may not "substantially burden a person's exercise of religion . . . unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" 42 U.S.C. § 2000bb-1(a), (b). RFRA can be raised as a "defense in a judicial proceeding," including criminal proceedings. 42 U.S.C. § 2000bb-1(c).

A RFRA defense proceeds in two parts. *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008). First, the defendant must show that the government has imposed a "substantial burden" on his religious exercise. *Id.* Second, if the defendant makes that showing, "the burden of persuasion shifts to the government to prove" that the imposition of the burden on the defendant satisfies strict scrutiny. *Id.* "If the government cannot so prove, the court must find a RFRA violation." *Id.*

Here, the government has imposed a substantial burden on Dr. Warren's sincere religious exercise by prosecuting him for his religious practice of traveling to remote locations where migrant deaths are known to have been concentrated, searching for human remains, and placing humanitarian aid supplies to prevent future deaths. And the government

cannot satisfy strict scrutiny, because it cannot show that declining to prosecute Warren would undermine a compelling governmental interest. And even if the government *could* show that allowing Dr. Warren an exception meaningfully undermines a compelling government interest, it cannot show that denying him that exception is the least restrictive means of protecting that compelling interest.

Procedurally and in order to make a clear record, this Court should take these two distinct parts one at a time. First, it should rule, at the close of Defendant's case, on whether Dr. Warren has met his burden to show that the government has imposed a substantial burden on the exercise of his sincere religious beliefs. If it so finds, it should then provide the government with the opportunity, in its rebuttal case, to present evidence that its imposition of this burden on Dr. Warren satisfies strict scrutiny. Dr. Warren must then have the chance, in a surrebuttal presentation strictly limited to his RFRA defense, to present any additional evidence tending to establish that the government's prosecution of him is *not* the least restrictive means of accomplishing the as-yet-unspecified compelling government interest. This procedure is necessary because the government is not expected to identify its compelling interest in its case in chief against Dr. Warren, nor present evidence concerning strict scrutiny, since it is the *defendant's* case that triggers that burden. Accordingly, Dr. Warren cannot present any case challenging the as-yet-unidentified interest during his case in chief; he must instead be afforded the chance to do so *after* the government's rebuttal case. For this reason the Court must clearly state, at the close of Defendant's case, its finding as to whether Dr. Warren has made his prima facie case under RFRA.

**A.  The government has imposed a substantial burden on Dr. Warren's religious**

**exercise.**

To determine whether the government has imposed a substantial burden on a defendant's religious exercise, a court must first identify the relevant religious exercise. RFRA defines a religious "exercise" to include "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A). Accordingly, courts do not assess or weigh theological questions, such as whether a defendant's religious beliefs are "mistaken or insubstantial," *Hobby Lobby*, 573 U.S. at 725; *accord Oklevueha Native Am. Church of Haw., Inc. v. Lynch*, 828 F.3d 1012, 1016 (9th Cir. 2016) (noting it is "of course correct" that "a court must not decide the plausibility of a religious claim"). Likewise, protected religious exercise under RFRA need not be "acceptable, logical, consistent, or comprehensible to others" *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007) (per curiam), and is "not limited to beliefs which are shared by all members of a religious sect." *Holt v. Hobbs*, 135 S. Ct. 853, 862-63 (2015) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 715-16 (1981)).[1] Rather, the court's role is limited to identifying "the precise scope" of a practice and asking whether it is motivated by a "religiously based" belief. *Zimmerman*, 514 F.3d at 854; *see Hobby Lobby*, 573 U.S. at 725 (describing the "narrow function" to identify "an honest conviction" (citation omitted)).

Here, Dr. Warren's religious practice consists of traveling to remote locations where migrant deaths are known to have been concentrated, searching for human remains,

---

[1] *Holt* involved the Religious Land Use and Institutionalized Persons Act (RLUIPA), which applies "the same standard as set forth in RFRA." *Holt*, 135 S. Ct. at 860 (quoting *Gonzales v. O Centro Espírita Beneficente Uniõ do Vegetal,* 546 U.S. 418, 436 (2006)).

notifying authorities of those remains,[2] and placing humanitarian aid supplies to prevent future deaths. He has identified this practice as deriving from a religious belief that all beings and things have a life force owed dignity and respect, and that dignity and respect for living beings requires the provision of assistance to those in immediate need. Any challenge the government may mount to the religious nature of Dr. Warren's belief is misplaced. Appellate courts consistently conclude religion is not defined by theism, but by "'address[ing] fundamental and ultimate questions having to do with deep and imponderable matters'" and "often . . . address[ing] a reality which transcends the physical and immediately apparent world" such as "souls." *United States v. Meyers*, 95 F.3d 1475, 1483 (10th Cir. 1996) (quoting *Africa v. Com. of Pa.*, 662 F.2d 1025, 1032 (3d Cir. 1981)).

Notably, a belief does not lose its religious character merely because it coincides with a particular political belief. *Rigdon v. Perry,* 962 F.Supp.150, 164 (D.D.C. 1997) (priest's "desire to urge his Catholic parishioners to contact Congress on legislation that would limit what he and many other Catholics believe to be an immoral practice—partial birth abortion—is no less religious in character than telling parishioners that it is their Catholic duty to protect every potential human life by not having abortions and by encouraging others to follow suit."); *see also Hobby Lobby,* 537 U.S. at 721 (opposition to provision in healthcare law recognized as religiously motivated regardless of whether others hold similar views for non-religious reasons).

In addition to identifying the religious practice, courts may in some cases be called

---

[2] This practice permits the proper recovery of the remains by law enforcement personnel, which facilitates their identification and allows the notification of loved ones who may then obtain some degree of solace and closure, as well as dignified burial.

upon to determine whether the religious motivation for a particular practice is "sincerely held." *Zimmerman*, 514 F.3d at 854; *see Holt*, 135 S. Ct. at 862-63 (religious exercise "must be sincerely based on a religious belief and not some other motivation"). The question in the sincerity inquiry is not whether the religious belief is "tru[e]," but whether it is "truly held." *Cutter v. Wilkinson*, 544 U.S. 709, 725 n.13 (2005) (RLUIPA) (citation omitted). That is, RFRA defendants do not receive protections when their alleged religious motivation is "obviously [a] sham[]," *AA ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 876 (S.D. Tex. 2009) (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)), *aff'd*, 611 F.3d 248 (5th Cir. 2010), or where the conduct is rooted in "'purely secular' philosophical concerns," *Zimmerman*, 514 F.3d at 853 (citation omitted); *see also Betenbaugh*, 611 F.3d at 261 (noting that in the sincerity inquiry, "courts are reticent to draw a line" based on their own expectations of the ordinary expression of a religious belief). But even practices with mixed secular and religious motives can be sincerely religious. *See Hobby Lobby*, 573 U.S. at 721 (rejecting the view that RFRA-invoking objectors to regulation could alternatively comply with law by dropping health insurance for all employees, when their provision of coverage was due to both "religious beliefs" and "conventional business reasons").

Finally, once the court has identified a sincere religious practice, it must determine whether the government has imposed a "substantial[ ] burden" on that practice. 42 U.S.C. §2000bb-1(a). In the Ninth Circuit, a "substantial burden" occurs "when individuals are forced to choose between following the tenets of their religion and receiving a governmental benefit (*Sherbert*) or coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions (*Yoder*)." *Navajo Nation*, 535 F.3d at 1069-70. The latter is most relevant

here. In *Wisconsin v. Yoder*, the government required Amish parents to send their children to high school or else face a $5 criminal fine. 406 U.S. at 208. The Court held that this "severe" and "inescapable" burden "affirmatively compel[led]" Amish parents to violate their religious beliefs. 406 U.S. at 218; *see also United States v. Antoine*, 318 F.3d 919, 921-23 (2003) (finding "the burden on religion is inescapable" where act with 'religious significance" faced penalty of fine up to $5,000, jail up to a year, or both); *Warsoldier v. Woodford*, 418 F.3d 989, 996 (9th Cir. 2005) (reduced prison privileges and "additional duty hours" qualified as a "substantial burden" where "punishments [served] to coerce a religious adherent to forgo her or his religious beliefs").

Dr. Warren faces a far more significant burden on his religious exercise than the parents in *Yoder*. He faces prison time of up to a year as well as hundreds of dollars in fines, *see* 16 U.S.C. § 668dd(f)(2). That easily qualifies as a substantial burden. *See Antoine*, 318 F.3d at 923 (maximum of a year in jail "inescapabl[y]" a substantial burden); *Navajo Nation*, 535 F.3d at 1070 ("threat of civil or criminal sanctions" suffices, as with *Yoder*'s $5 fine).

It is no answer for the government to say that Dr. Warren can still practice his religion in other ways, such as by searching for human remains in areas accessible on foot or by supporting other methods of saving migrant lives. In *Holt*, for example, a Muslim prisoner requested permission to grow a half-inch beard. 135 S. Ct. at 861. Although the prison denied his request, the District Court found there was no substantial burden because "he had been provided a prayer rug and a list of distributors of Islamic material, he was allowed to correspond with a religious advisor, and was allowed to maintain the required diet and observe religious holidays." *Id.* at 862. The Supreme Court rejected that argument,

explaining that whether an individual is "able to engage in other forms of religious exercise" has no relevance to whether the government has "substantially burdened" the specific religious practice at issue in a case. *Id.*; *accord Oklevueha*, 828 F.3d at 1017 (availability of "other forms of religious exercise" does not affect RFRA analysis (citation omitted)).

So too here. Dr. Warren faces criminal prosecution for his specific religious practice of traveling to remote locations where he knows migrant deaths to have been concentrated, searching for human remains, and placing humanitarian aid supplies to prevent future deaths. That is a substantial burden even if the practice is not compelled by his faith or the *only* way to live out his beliefs. *See* 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A) (protecting religious practices "whether or not compelled by, or central to, a system of religious belief"); *Holt*, 135 S. Ct. at 862 ("error" to find a burden insubstantial because petitioner testified that "his religion would 'credit' him for attempting to follow his religion, even if that attempt proved to be unsuccessful" due to government restrictions). Thus, under *Holt,* the government may not justify imposing restrictions that deprive Dr. Warren of his particular religious practice simply because the belief system accommodates doing the best he can within the restrictions the government imposes on him.

Further, it would be incorrect to say that Dr. Warren could have avoided the sanction had he applied for a special use permit to drive on limited access roads. The evidence establishes that representatives of No More Deaths specifically requested permission from the Fish and Wildlife Service to undertake these very actions (driving on administrative roads for the recovery of human remains, as well as placement of life-saving supplies) just over a month before Dr. Warren was stopped in the refuge. As the Refuge Manager testified

this past January, he firmly denied this permission. Dr. Warren thus faced a choice when undertaking his religiously motivated work in the refuge: he could either turn back when reaching the wilderness boundary, limiting himself to accessing by foot an area where human remains had rarely been found and virtually guaranteeing that his efforts would be ineffective, *or* he could continue on, using the truck that was necessary to carry supplies across several extremely rugged miles of administrative road in the June desert heat to the area where the deaths were clustered, but risk criminal prosecution. That forced choice is the epitome of a substantial burden.

**B. The government cannot satisfy strict scrutiny.**

Once Dr. Warren has shown a substantial burden on his religious exercise, the burden shifts to the government to prove that burdening his religious exercise is the "least restrictive means of advancing a compelling interest." *O Centro,* 546 U.S. at 423 (citing 42 U.S.C. § 2000bb-1(b)). This is "the most demanding test known to constitutional law." *City of Boerne v. Flores*, 521 U.S. 507, 534 (1997). This test has several components.

**1. The government cannot show that this prosecution furthers a compelling interest.**

First, the government must identify a "compelling" interest. A compelling interest is an interest "of the highest order." *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 546 (1993) (citations and alterations omitted). A "law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Id.* Thus, if the law includes exceptions for various reasons, the interest is by definition not compelling. *See O Centro*, 546 U.S. at 433-34

("well-established peyote exception" demonstrated strength of interest was overstated).

Second, the government's actions must actually "further[]" its allegedly compelling interest. 42 U.S.C. § 2000bb-1(b). That is, the government must show that its action—here, prosecuting Dr. Warren—prevents "harms" that "are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (intermediate scrutiny); *Holt*, 135 S. Ct. at 865 (prison failed to show allowing requested beard would cause "meaningful increase in security risk" where it allowed similar beards for medical reasons).

Third, the government must establish its interest with specificity, and must show not only that the regulation generally supports that interest, but that *this particular prosecution* meaningfully furthers the interest. It is not enough to identify a compelling interest "in very broad terms." *Hobby Lobby*, 573 U.S. at 726-28. Rather, "RFRA requires a "'more focused' inquiry." *Id*. at 726 (citation omitted). The government must show that "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened"—furthers the asserted compelling interest. *O Centro*, 546 U.S. at 430-31 (quoting 42 U.S.C. § 2000bb-1(b)); *accord Zimmerman*, 514 F.3d at 855. In other words, the government cannot simply show that enforcing this law furthers its interest as a general matter; it must prove that its denial of this claimant's particular requested exception *itself* advances the compelling interest. This analysis requires "look[ing] to the marginal interest in enforcing [the law] in these cases" and "scrutiniz[ing] the asserted harm of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27 (citation omitted); *accord Holt*, 135 S. Ct. at 863; *cf. Brown v. Entm't Merchs.*

*Ass'n*, 564 U.S. 786, 803 n.9 (2011) ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced."). This is true even where the interest is "paramount" and "admittedly strong." *O Centro*, 546 U.S. at 431 (example of well-being of children, quoting *Yoder*, 406 U.S. at 213, 236).

Here, the government asserts only a very broad interest in protecting the wildlife refuge and wilderness area. That does not satisfy the "more focused" inquiry of RFRA, as it does not demonstrate that the "marginal interest" in preventing Dr. Warren's behavior specifically is sufficiently compelling to preclude an exception or justify this prosecution. *Hobby Lobby*, 573 U.S. at 726.

Moreover, the government's allegedly compelling interest is undermined by a variety of exceptions. For example, the government permits access to the refuge, including administrative roads in wilderness areas, by all-terrain vehicles for camping and hunting purposes. Even if these activities had a 100% compliance rate with leave-no-trace regulations—a doubtful proposition—it is implausible that the occasional leaving of water bottles or driving on already-established roads by Dr. Warren would pose any "meaningful increase" in damage to the overall integrity of the national refuge, *see Holt*, 135 S. Ct. at 865. Indeed, the government has never presented evidence of emergency supplies themselves specifically causing any harm to wildlife. Moreover, the Border Patrol is broadly permitted to drive in the refuge, on the administrative trails, and in the wilderness. If the interest in protecting the wilderness were really so compelling that making a tightly limited exception for Dr. Warren's religious exercise would meaningfully compromise it, Congress would not have written this massive exception into the statute (The Arizona Desert

Wilderness Act of 1990) creating this wilderness area.[3] And the refuge staff not only permits, but encourages the placement of CBP rescue beacons in the wilderness; these structures, visible for miles, include lights, mirrors, and sometimes telephones, and thus undermine the "wilderness character" of the refuge far more than jugs of water tucked under trees.

Finally, the government has never even attempted to identify its "marginal interest" in enforcing the law against Dr. Warren specifically, much less identified any specific harms that would follow from not prosecuting Dr. Warren. It may well recognize that it is implausible that the placing of limited quantities of lifesaving supplies or travel of his church-owned vehicle on established administrative trails will do any appreciable harm to a national wildlife refuge, which is why the Border Patrol is directed "to not tamper with humanitarian aid." Associated Press, *Arizona group: Border Patrol agents have emptied water bottles left for migrants* (Jan. 22, 2018), https://www.abc15.com/news/region-phoenix-metro/central-phoenix/arizona-group-border-patrol-agents-have-emptied-water-bottles-left-for-migrants. Nor can it produce a shred of evidence to support the notion that these small acts of religious practice have any effect on the flow of migration through the area, as it has occasionally speculated. Indeed, the government's own analysis conducted in the past has concluded directly the opposite. Thus, it cannot show that prosecuting Dr. Warren furthers a compelling interest under RFRA.

**2.  The government's prosecution is not the least restrictive means.**

---

[3] This is not to suggest that the interest in border enforcement is not compelling; rather, it shows that the interest in protecting the Wilderness is not as compelling as the government might suggest, as it gives way to other interests where necessary. If it can give way for a law enforcement interest, then it can give way for religious exercise by one individual creating no identifiable harm.

Even assuming prosecuting Dr. Warren furthered a compelling interest "of the highest order," the government still must show that prosecuting Dr. Warren is the "least restrictive means" of furthering its interest. 42 U.S.C. § 2000bb-1(b)(2). That is, the government must show that it "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Hobby Lobby*, 573 U.S. at 728.

The government's power to use other means is not confined to what the executive branch can do unilaterally; rather, "both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs," even though funds must be allocated by the legislature on the state and federal level. *Hobby Lobby*, 573 U.S. at 729-30. Moreover, the government "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier*, 418 F.3d at 999. If the solutions adopted in other contexts demonstrate that the government's interests can be served by means that would not impose a substantial burden, then it has not met the least-restrictive-means standard. *Hobby Lobby*, 573 U.S. at 730-32 (agency "has demonstrated that it has at its disposal an approach that is less restrictive" of religious practice that would equally "protect the asserted needs" at issue in the case); *Warsoldier*, 418 F.3d at 999 (government failed to explain why success of "other prison systems . . . [in] meet[ing] the same penological goals" without challenged restriction could not be replicated). Likewise, if the government cannot demonstrate that an obvious alternative, or an alternative posed by the religious party, would not suffice to serve its interests, again, it cannot meet the least-restrictive-means standard. *Holt*, 135 S. Ct. at 864

(declining to defer to prison officials' security expertise when Department "offered no sound reason" that beard could not be searched for contraband as readily as hair or clothing).

Here, the government has many less restrictive means of preserving the refuge. Most obviously, it could simply decline to prosecute religiously motivated water drops and wilderness travel for search-and-recovery purposes, given the *de minimis* impact on the refuge and the fact that it *already* instructs Border Patrol to not disturb "water stations, food, and other resources." Rafeal Carranza, *Border Patrol accused of vandalizing water aid stations in the desert*, AZ. CENTRAL (Jan. 17, 2018), https://www.azcentral.com/story/news/politics/border-issues/2018/01/17/border-patrol-accused-vandalizing-water-aid-stations-desert/1041532001/. If it is concerned primarily about the small amounts of trash emergency supplies might leave behind, it could simply work a little bit harder to collect and remove trash from the refuge (although the evidence will show that No More Deaths volunteers already do this quite effectively). If it believes too many people are driving on the administrative roads, it could issue fewer special use permits to recreational hunters to reduce the driving, rather than prosecuting Dr. Warren's religious exercise. The government has not shown that these alternatives are ineffective—much less that it "actually considered and rejected" them before prosecuting Dr. Warren. *Warsoldier*, 418 F.3d at 999. Accordingly, it has not carried its burden under RFRA.

Because Dr. Warren will demonstrate a substantial burden on his exercise of religion, and because the government can show neither a compelling interest in this specific prosecution nor that prosecution is the least restrictive means of accomplishing its asserted interests, the charges must be dismissed.

Again, this Court should make an explicit ruling at the close of the defense case in chief as to whether Dr. Warren has established a substantial burden on his exercise of a sincerely held religious belief. After finding this burden met, the Court should hear the government's evidence of compelling interest and least restrictive means during its rebuttal case, and then must afford Dr. Warren the opportunity to rebut this evidence in a surrebuttal limited to the RFRA defense. A surrebuttal presentation will allow Dr. Warren to respond to any evidence the government offers of its putative compelling interests and the least restrictive means for accomplishing them, evidence it has thus far avoided disclosing.

## II.   NECESSITY

The necessity defense "justifies criminal acts taken to avert a greater harm, maximizing social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. . . . Pursuant to the defense. . . a person lost in the woods could steal food from a cabin to survive." *United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1992). The Ninth Circuit has expressed these requirements as a four-part test: a defendant must prove "(1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law." *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125-26 (9th Cir. 2001).

### A. Political protest cases distinguished.

The necessity defense has often been asserted unsuccessfully in cases of political protest. It is crucial to understand the difference between those cases and what is occurring here. In

15

the protest cases, the actors' goal is either to disrupt a course of government action the protestor views as harmful, or to generate political attention through breaking laws with the ultimate goal of securing policy change. In such cases, the defense generally fails, either because the defendant's actions could not reasonably be believed to actually avert the harm asserted, because the defendant had the legal alternatives of using the political process instead, or both. Thus, in *United States v. May,* 622 F.2d 1000 (9th Cir. 1980), protesters climbed over a fence into a naval base, and were charged with unlawfully entering. The Court rejected a proffered necessity defense because the defendants' actions would not avert the harm they had identified as flowing from the missile program they were protesting. Similarly, in *United States v. Dorrell*, 758 F.2d 427, 430-31 (9th Cir. 1985), the defendant went onto an Air Force base and spray-painted its missile assembly building, acting out of concern about nuclear war. The Court refused to allow him to present his evidence of necessity because alternative courses of action existed and because he could not establish he reasonably anticipated his actions would prevent nuclear war.

The Ninth Circuit has also discussed politically motivated action specifically. In *United States v. Schoon,* 971 F.2d 193 (9th Cir. 1992), the defendants, who claimed their actions were necessary to avoid further bloodshed in El Salvador, were convicted of obstructing activities of an IRS office and failing to comply with an order of a federal police officer after they entered the office, chanted, splashed fake blood, and failed to disperse when instructed. The Court refused a necessity defense because the actions would not abate the evil, and legal alternatives existed (i.e., the political process). The Court discussed the issue of civil disobedience as it relates to the necessity defense, drawing a clear distinction between

indirect civil disobedience (breaking laws to attract attention to an issue and spur policy change) and direct civil disobedience (breaking laws that the actor considers unjust for the purpose of ultimately changing those very laws). The court ultimately created a blanket rule that *indirect* civil disobedience could never support a necessity defense.

Crucially, the actions alleged here do *not* constitute civil disobedience (direct or indirect), and are not a form of political protest. It is undisputed here that the purpose of the placement of water and other supplies is to directly prevent the deaths of individual migrants crossing the particular area where the supplies are placed, and that the purpose of driving on administrative roads is to access the remote areas where migrant deaths have been clustered, thus allowing the placement of supplies in the areas where they are most likely to used by people who need them. The end goal of these actions is not a change in the law—it is the direct prevention of individual deaths. No evidence exists that Dr. Warren or any other No More Deaths volunteer has any problem with the refuge regulations generally, and the harm they are seeking to avert (death of migrants) is not caused by the regulations. Nor are they using law-breaking as a means to attract attention; indeed, the evidence shows that No More Deaths went to some lengths to attempt to undertake their necessary actions *without* breaking the law by seeking permission from FWS. Accordingly, this Court must analyze the elements of the defense on the evidence presented, and must not simply lump it in with cases presenting the very different situation where defendants intentionally broke a law because they wanted to *change* that law.

**B. The Four Requirements of the Necessity Defense.**

1. Choice of evils

The Ninth Circuit has not discussed at length the first element, but the primary question is whether the harm the defendant sought to avert constitutes an "evil" the law recognizes is worth averting, even at the cost of strict compliance with laws. Thus, in *Schoon,* the Court explained that "the mere existence of a constitutional law or governmental policy cannot constitute a legally cognizable harm. . . . The most immediate harm the appellants sought to avert was the existence of the government's El Salvador policy, which is not in itself a legally cognizable harm. Moreover, any harms resulting from the operation of this policy are insufficiently concrete to be legally cognizable as harms for purposes of the necessity defense." 971 F.2d at 198.

Contrast that with the harm here: the documented and likely preventable deaths of over a hundred migrants in the Arizona desert each year, often from exposure (which includes dehydration). Indeed, evidence will show that decisions on where to place water are made shortly before the trips begin, using data collected at least monthly from the Pima County Office of the Medical Examiner. This is concrete and specific; No More Deaths volunteers base these decisions on current data about the human remains recovered in different areas in any given period. Thus, they are not merely speculating; they are responding to reliable information about where people are likely to be dying. The choice between breaking the law and allowing someone to die is the quintessential "choice of evils." The Court must accordingly find this element satisfied.

2.  Imminent harm

Courts do not recognize a necessity defense if the asserted harm is not genuinely imminent. Thus, in *United States v. Perdomo-Espana,* 522 F.3d 983 (9th Cir. 2008), when

the defendant claimed illegal re-entry after deportation was necessary because he was about to have a stroke due to lack of insulin, the Court relied on a doctor's testimony "that Perdomo was in no immediately dire medical condition when he was treated in the emergency room soon after crossing the border; thus Perdomo's crossing was not averting any objective, imminent harm, causing his defense to fail on the second element." *Id.* at 988. In *United States v. Cervantes-Flores,* 421 F.3d 825 (9th Cir. 2005), the defendant was also convicted of illegal re-entry. His necessity defense was that he was dying from HIV/AIDS and was attempting to locate his children in the United States before he died. The Court explained "that Cervantes' testing positive for HIV did not constitute imminent harm. He failed to demonstrate that the disease created a threat of death or other serious, immediate harm.  For the same reason, Cervantes did not show that he was in imminent danger of losing his final opportunity to speak to his children." *Id.* at 829.

Here, reliable evidence shows that migrants are regularly dying of exposure in these areas. This is especially true in the summer months. While of course some migrants survive the journey, it is beyond dispute that many do not. This is the "threat of death or other serious, immediate harm" that was lacking in *Cervantes-Flores*.  The threat here should be considered particularly immediate in light of the vastness and remoteness of the area; getting word to those who could help at the last moment when any particular specific death could be averted is obviously not feasible and would be ineffective, given how long it would take for anyone to locate and travel to the imperiled person. In other words, under these circumstances, the Court can readily assume that deaths *are* imminent in the remote areas where Dr. Warren and other No More Deaths volunteers are placing supplies.

3. <u>No available options</u>

The law also requires the absence of legal avenues for averting the harm. Where the defendant can address the need through legal avenues, the requirement is not met. Thus, in *United States v. Richardson*, 588 F.2d 1235 (9th Cir. 1978), defendants, were convicted of smuggling a cancer drug into the U.S. They smuggled it because the FDA had classified it as a "new drug" which would require an approval process, and it had not issued the approval; accordingly, when defendants attempted to import the drug, it was seized at the border. Defendants could not prove necessity because rather than smuggling it, they could have appealed the FDA's classification or mounted a legal challenge to the FDA's seizure of the drug at the border; they also could have manufactured the drug in the U.S. Similarly, in *United States v. Arellano-Rivera,* 244 F.3d 1119 (9th Cir. 2001), the defendant attempted to assert a necessity defense, apparently claiming that he had to re-enter the United States to get treatment for his advanced AIDS. The claim was rejected because the law provided a specific remedy for precisely that situation: he could petition the he Attorney General for permission to re-enter due to his medical needs, "an alternative Arellano-Rivera never attempted." In other words, it was not necessary for him to cross illegally, because the government provides a process by which he may have been able to do so legally.

Notably, the *Schoon* Court recognized that while use of legal and political processes provide viable alternatives in many of the protest cases, "we cannot say that this legal alternative will always exist in cases of direct civil disobedience, where protestors act to avert a concrete harm flowing from the operation of the targeted law or policy."  971 F.2d at 197. The Court explicitly recognized that where there is a harm actively occurring, the

existence of courses of action which might serve to eventually abate the harm does not defeat the defense if the harms are occurring right now, but the proposed solutions would take time: "A prisoner fleeing a burning jail, for example, would not be asked to wait in his cell because someone might conceivably save him; such a legal alternative is ill-suited to avoiding death in a fire. In other words, the law implies a reasonableness requirement in judging whether legal alternatives exist." *Id* at 198. This formulation is especially relevant here, given that alternative solutions such as the installation of permanent water stations and more rescue beacons takes time, and in the interim, individual migrants were continuing to die. Indeed, the evidence in this case shows that FWS agreed more beacons were needed in the Growler Valley—but additional beacons were not added until about a year after Dr. Warren was cited. Thus, in June 2017, they were not there to prevent the deaths that were occurring right then, even if they would prevent some future deaths. The government cannot claim the actions were unnecessary to prevent the deaths of the migrants crossing in June, 2017 by showing that it took some action to prevent others from dying over a year later.

Additionally, the particular harm Dr. Warren's actions were directed at is not harm being worked directly by the government, and thus, such solutions as filing lawsuits and seeking injunctive relief would not prevent the harm. *Cf. United States v. Aguilar,* 883 F.2d 662 (1989) (alleged harm was deportation by U.S. government, and defendants should have sought judicial relief). And indeed, this Court has previously ruled in another case that the government—and specifically, the Fish and Wildlife Service operating in the Cabeza Prieta National Wildlife Refuge—has no duty to aid the migrants crossing its harsh terrain. *Ambros-Marcial v. United States,* 377 F.Supp.2d. 767 (D. Ariz. 2005).

Here, the government has repeatedly insisted that the placement of emergency humanitarian supplies is not justified because CBP has rescue beacons, which are also intended to save lives. The efficacy of the beacons is in dispute (i.e., whether they are consistently and swiftly responded to), but what is *not* in dispute is that even with rescue beacons in and around the refuge, the *yearly* acknowledged death toll has been over a hundred. Thus, beacons or no beacons, there are still hundreds of lives being lost. That is imminent harm.

Finally, this Court should note that the evidence will show that No More Deaths volunteers *did* attempt to secure legal authorization for its emergency life-saving work. Thus, unlike the defendants in *Richardson* and *Arellano-Rivera,* they did not eschew a legal process; no process was available, and certainly not with the immediacy necessary to prevent the deaths that were actively occurring on the refuge while they sought permission.

4. Direct causal relationship

Finally, a defendant asserting necessity must prove that he reasonably believed his actions would actually abate the harm. Thus, in the protest cases, the defense generally fails in part because the illegal acts themselves would not prevent the harm. For instance, in *Dorrell*, the defendant "offer[ed] no indication of how he expected his conduct [breaking onto an Air Force base and spray-painting a missile assembly building] to bring about a change in the MX missile program or a reduction in the risk of nuclear war. He cannot demonstrate that he reasonably anticipated a direct causal relationship between his acts and the harm he sought to remedy." 758 F.2d at 434. Courts have emphasized proof not of perfect efficacy, but that a defendant "reasonably anticipated" the direct causal relationship "to exist

between the defender's action and the avoidance of harm." *United States v. Simpson,* 460 F.2d 515, 518 (9th Cir. 1972). It is reasonable to anticipate that provision of water in areas where people routinely die of dehydration would avoid deaths. This is particularly clear given the evidence of the water being drunk and the empty bottles remaining. As the *Schoon* Court put it, "[o]rdinarily it is the volitional illegal act alone which, once taken, abates the evil." 971 F.2d at 198. That is the case here—providing water directly prevents death by dehydration.

In sum, necessity has four requirements, all of which Dr. Warren will establish. This type of direct lifesaving aid is manifestly different from the political protest cases in which courts have found the defense to be inapplicable. Providing water to prevent dehydration-related deaths in areas where they are reliably known to occur is a direct and immediate action which the volunteers reasonably believe will prevent imminent deaths. Although longer-term solutions are valuable, in June 2017, they were manifestly incomplete, allowing a significant number of deaths to continue to occur. Accordingly, direct, immediate intervention was and is necessary, other attempts to save lives notwithstanding.

## III.   LACK OF NOTICE/DUE PROCESS

The due process clause of the Fifth Amendment "requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). Courts specifically require that "the defendant had notice that his conduct was *criminal*" at the time. *Pauling v. McKenna,* 2005 U.S. Dist. LEXIS 33595 at *14 (W.D. Wash. 2005) (emphasis added); *see*

also *Bouie v. Columbia,* 378 U.S. 347, 350 (1964) (requiring statute to "give fair warning of the conduct that it makes *a crime*") (emphasis added). This principle also requires that where court interpretation expands the scope of a criminal prohibition, conduct covered by that expansion may not be penalized if it was committed prior to the issuance of the expanded interpretation. *United States v. Potts,* 528 F.2d 883 (1975).

Although notice is typically analyzed in terms of the text of a statute, courts consider the requirements of agency regulations in light of the direction provided by agency personnel. *See, e.g., United States v. True,* 946 F.2d 682, 687 & n.5 (9th Cir. 1991) (considering admonition by Forrest Service officer in analyzing closure order under governing regulation; court must consider "any limiting construction that a[n]. . . enforcement agency has proffered"); *see also Grayned v. City of Rockford,* 408 U.S. 104, 110 (court may consider "to some degree. . . the interpretation of the statute given by those charged with enforcing it."). Here, two sources are relevant: the regulation itself, and the document the government distributes to all individuals entering the refuge (and requires them to sign), often referred to as the "permit application," spelling out what refuge users agree to do and not do.

A. Lack of Notice of Conduct Covered

The regulation at issue here states only that "Abandoning, discarding, or otherwise leaving any personal property in any national wildlife refuge is prohibited." 50 CFR 27.93. It is not at all clear from this minimal text that this regulation encompasses placement of emergency humanitarian supplies for use by others in the near future. Indeed, the only existing judicial interpretation as of June, 2017 was in *United States v. Walker,* 2006 U.S. Dist. LEXIS 45542 (S.D. Ill. June 22, 2006), where the Court concluded that a boat moored

in a refuge and unclaimed long after a rental period expired was abandoned personal property. Thus, neither the regulation on its face nor any judicial interpretation of it provided notice that it encompassed emergency supplies belonging not to individuals but to an NGO, intended for human use in the near future.

The actions of FWS officials at Cabeza Prieta confirm that the officials themselves realized the scope of the prohibition was unclear when considering both the regulation and the permit application, as the evidence will show that they added clarifying language to the permit application *after* the incident involving Dr. Warren, specifically because the existing text of the application together with the regulation did not adequately advise refuge visitors of what was and was not allowed. The agency's expanded interpretation of what constitutes abandoning personal property may *now* serve to advise the public of what would be prohibited, but that interpretation did not exist at the time of Dr. Warren's conduct, and it would violate due process to apply it to him retroactively.

B.  Lack of Notice of Criminality

The Supreme Court has explicitly recognized that important differences exist between enactments providing for civil penalties and those that provide for criminal punishment. *See Hoffman Estates v. Flipside, Hoffman Estates,* 455 US. 489, 498-99 (1982) ("The Court has also expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). Accordingly, advising individuals that their conduct is subject to civil penalties does *not* constitute notice that their conduct may also be considered *criminal*, and this difference is significant to the due process analysis. Indeed, advising them of the opposite—that conduct entails only civil

25

penalties when in fact criminal penalties may inure—eliminates any notice the regulation may have provided.

The permit application in use on June 1, 2017 advised refuge users that "Anyone granted a range permit for access and use who violates the parameters of their permit is subject to judicial penalties to include a fine, civil action, and debarment." This advisement served to indicate to users that any penalties they may incur would be civil. Thus, refuge users were absolutely not provided with the notice required by the due process clause that the placement of emergency humanitarian supplies for the use of others in the near future may be criminal. Accordingly, the due process clause forbids a criminal conviction on this basis.

## **CONCLUSION**

This memorandum identifies the required elements for each of three defenses Dr. Warren asserts here. It also identifies the procedures necessary to ensure full and fair opportunity for Dr. Warren to present his defense and a clear record. This Court should consider the evidence at trial in light of these requirements and should find Dr. Warren not guilty on both charges.

RESPECTFULLY SUBMITTED this 3rd day of May, 2019.

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott Daniel Warren

CERTIFICATE OF SERVICE

I certify that on May 3rd, 2019, I electronically transmitted a PDF version of this

document to the Clerk of Court using the CM/ECF System for filing and for transmittal of

a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701