```
 1                IN THE UNITED STATES DISTRICT COURT

 2                       DISTRICT OF ARIZONA

 3   United States of America            MJ-17-341-TUC-RCC(JR)

 4   vs.

 5   Scott Daniel Warren,                         May 6, 2019
                                                   2:35 p.m.
 6            Defendant.                       Tucson, Arizona
     _____

 7

 8             PARTIAL TRANSCRIPT OF PROCEEDINGS

 9       TESTIMONY OF SCOTT WARREN FROM BENCH TRIAL DAY 1

10          BEFORE THE HONORABLE RANER C. COLLINS
                 UNITED STATES DISTRICT JUDGE

11

12                  A P P E A R A N C E S

13   For the Government:

14        Anna Roberta Wright
          Nathaniel Jacob Walters
15        United States Attorney's Office
          405 West Congress
16        Tucson, Arizona 85701

17   For the Defendant:

18        Gregory John Kuykendall
          Amy Pickering Knight
19        Kuykendall & Associates
          531 South Convent Avenue
20        Tucson, Arizona 85701

21

22   Court Reporter:         Erica R. McQuillen, RDR, CRR
                             Official Court Reporter
23                           405 W. Congress Street
                             Tucson, Arizona 85701
24                           (520)205-4267

25        Proceedings Reported by Stenographic Court Reporter
          Transcript Prepared by Computer-Aided Transcription
```

1                         EXAMINATION INDEX

2    WITNESS FOR THE DEFENSE:

3    SCOTT WARREN
           DIRECT BY MR. KUYKENDALL . . . . . . . . . . . . . .  11
4          CROSS BY MR. WALTERS  . . . . . . . . . . . . . . .  43

5

6

7                          EXHIBIT INDEX

8    EXHIBIT NUMBER                              PAGE ADMITTED

9    102                      32

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2              (The following partial transcript of proceedings

 3              consists of the testimony of Scott Warren, Bench

 4              Trial Day 1.)

 5              MR. WALTERS:  Thank you, Your Honor.

 6              So Your Honor, after the defense's opening

 7    statement, if the Court recalls, the defense's intent with the

 8    defendant testifying is that he will testify strictly about

 9    his sincerely held religious belief and whether those beliefs

10    were substantially burdened by the Government.

11              THE COURT:  I heard him say that.

12              MR. WALTERS:  Your Honor, over lunch, the Government

13    did some quick research on that issue, and we take the

14    position that he cannot limit his testimony on cross-

15    examination, especially when he is saying that his sincerely

16    held religious beliefs are what caused him to act in a certain

17    way on June 1st of 2017.  He then cannot hide behind the Fifth

18    Amendment at that point to then say that he should not be --

19    that he doesn't have to talk about those actions on June 1st

20    of 2017.

21              And Your Honor, we did pull a case that is directly

22    on point.  I have a copy for the Court, if the Court would

23    like a copy of it, but it is the United States -- or sorry --

24    Williams v. Borg, and the cite is 139 F.3d 737.

25              The primary issue in that case was whether -- and
</pre>

1    I'm quoting from the opinion -- was whether a judge may

2    constitutionally strike a defendant's testimony if after

3    warning and after opportunity to change his mind the defendant

4    refuses to be cross-examined.

5            The issue in Borg was the exact same situation that

6    the defendant wants to now ask this Court for permission to

7    do.  The defendant gave -- and the defendant in Borg gave a

8    different story than what the Government had presented and

9    then refused to answer some questions on cross-examination.

10   The Court gave the defendant in Borg an opportunity to

11   testify, and when he still refused, the Court held him in

12   contempt and struck his testimony from the record.

13           Your Honor, this is -- what the defendant is trying

14   to ask the Court to do and allow is exactly what was outlawed

15   in Borg, and so the Government would request that either the

16   defendant choose not to testify, which is his right, but if

17   he's going to testify, which is also his right, that he not be

18   allowed to limit himself -- limit his testimony on cross-

19   examination, and we would let the Court know and the defense

20   know that, if he does do that, the Government would move to

21   strike his entire testimony.

22           MR. KUYKENDALL:  Judge, it would be egregious

23   reversible error to proceed the way the prosecution proposes

24   to proceed.  The case that they claim, I've got it here, the

25   case that they claim is on point involves a defendant who was

1    not -- he wasn't in any sort of a Simmons posture where he was

2    trying to protect one right not at the cost of another.

3         It was a defendant who refused to be cross-examined

4    on his priors.  He testified, and then he said, I'm not

5    answering questions if you ask me about my priors.  So of

6    course the judge struck his testimony and held him in

7    contempt.  You can't do that.

8         That's not at all what we're talking about here.

9    It's not at all what we've proposed.  RFRA has the force of a

10   constitutional right.  It's clear from City of Boerne that it

11   carries that amount of weight, and it's clear from the statute

12   of RLUIPA, it's clear that the forces at work that motivate

13   the right preserved by RFRA are of a constitutional variety,

14   are of constitutional force, which is why strict scrutiny is

15   required to review the Government's punitive compelling

16   interest.

17        And because of that, it's precisely the same sort of

18   situation where a defendant need not sacrifice one right in

19   order to exercise another.  Therefore, in Simmons and all of

20   the case law subsequent to Simmons, a defendant is entitled

21   pretrial to take -- to take the stand and testify about

22   whether he has standing or not regarding a Fourth Amendment

23   issue, regarding something that has been seized from him.

24        His testimony in that Fourth Amendment context

25   cannot thereafter be used against him at trial.  It's as clear

1   as can be.  That's the -- and the reasoning behind that is

2   that -- I'll just read this portion of Simmons that explains

3   it.  In terms of reversing the Court below, it said, "The Rule

4   adopted by the courts below does not merely impose upon a

5   defendant a condition which may deter him from asserting a

6   Fourth Amendment objection.  It imposes a condition of a kind

7   to which this Court has always been particularly sensitive.

8          "For a defendant who wishes to establish standing

9   must do so at the risk that the words which he utters may

10  later be used to incriminate him," and that's what Simmons

11  said is precisely what cannot be done when -- a defendant

12  cannot be forced to choose one right over another.

13          And in this case, all -- we asked for an evidentiary

14  hearing.  It was set for an evidentiary hearing by Judge

15  Macdonald.  For some reason the evidentiary hearing was

16  vacated sua sponte.  Next thing we know Judge Macdonald gets

17  off the case, and Judge Velasco takes over.  He issues an

18  order denying the RFRA motion.

19          However, he wrote, and this is his order from

20  12/27/18, he wrote, "The Court's inclined to deny the

21  defendant's motion in its entirety."  This is without hearing

22  any testimony from Mr. Warren, Dr. Warren.  "However, because

23  defendant has not had the opportunity testify in this

24  case, this denial will be without prejudice to reassert the

25  defense at trial."

1          So the prosecution as well as we have been on notice

2    since December 27th of 2018 that Dr. Warren was going to have

3    the opportunity to testify regarding RFRA.  We've asked

4    repeatedly for a pretrial hearing on this matter.  I tried to

5    explain at our -- I think it was our last status conference,

6    maybe it was at one before -- that, by virtue of the Court not

7    scheduling an evidentiary hearing on RFRA, it put us in the

8    position where we were going have to have Dr. Warren testify

9    at this trial regarding RFRA but still retain his Fifth

10   Amendment right to not testify regarding the trial, and he has

11   elected to do precisely that.

12         He has a constitutional right to present his RFRA

13   claim.  I mean, I shouldn't call it a constitutional right,

14   but it's a right that has constitutional stature.  And he

15   likewise has a constitutional right under the Fifth Amendment

16   to choose whether to testify or not, and that is the

17   fundamental problem here.

18         I would also point the Court out to -- point out to

19   the Court, rather -- United States v. Demma, D-e-m-m-a, 523

20   F.2d 981 at 984, Ninth Circuit, and in this case, the Court

21   wrote, in considering a similar not identical problem, but

22   wrote, "Continued adherence to Eastman would have generated

23   serious constitutional problems by conditioning the assertion

24   of a defense on the defendant's yielding his presumptive," I'm

25   sorry, "yielding his presumption of innocence, his right to

1    remain silent, and his right to have the Government prove the

2    elements of the crime beyond a reasonable doubt."

3            So this amounts to a standing issue.  It's the

4    equivalent from a -- if the Court's going to analyze it, it

5    breaks down to analyzing whether he has standing to assert his

6    RFRA rights, and that's what I want him to testify about, the

7    first two prongs of RFRA.

8            And I will intentionally limit my questioning of

9    him.  I've told Dr. Warren what I'm going to do, and he's

10   going to intentionally limit his answering of me to his -- to

11   his sincerely held religious beliefs and how the Government's

12   actions or threat of action has inhibited his practice of

13   those religious beliefs.

14           So I would propose that the Court do precisely as we

15   laid out in the trial memo and as I mentioned in my opening

16   statement and allow Dr. Warren to testify as I've proposed.  I

17   will limit it.  If I open the door, that's my fault.  I'll

18   accept the consequences.  But I will be careful not to open

19   that door.

20           THE COURT:  It seems to me that, if the defendant's

21   going to claim that he is excused from punishment, as it were,

22   because of a religious belief, he has to at least admit that

23   he did the acts that he's supposed to be punished for.

24           MR. KUYKENDALL:  I disagree with you.  This isn't an

25   entrapment --

1          THE COURT:  Well, you can disagree, but that's the

2   way I'm looking at it.  So you can put your client on the

3   stand and do what you wish to do.

4          MR. KUYKENDALL:  I'm only telling you I disagree not

5   because I want to fight with you but because --

6          THE COURT:  Okay.  I'm not fighting with you either.

7   I'm just telling you how I see things.

8          MR. KUYKENDALL:  And I'm only telling you the way I

9   see things in order to properly make the record, but I think

10  that this is error to allow the prosecution -- it's

11  fundamental error to allow the prosecution to put him in a box

12  where he has to elevate the decision to choose one right over

13  the decision to choose another.

14         THE COURT:  I will agree with you that, had we had

15  the evidentiary hearing other than at a time than today, you

16  would not be in this box.  I will agree with you on that.

17         MR. KUYKENDALL:  And why am I in that box, Your

18  Honor?

19         THE COURT:  It's the way it happened.

20         MR. KUYKENDALL:  I'll you why.

21         THE COURT:  It's the way it happened.

22         MR. KUYKENDALL:  It happened because the magistrate

23  judge sua sponte vacated a previously scheduled evidentiary

24  hearing for no reason that we know of.  Then he got off the

25  case, and then the next judge for no reason that we can divine

1  decided to decide the case on -- decide the issue on the

2  pleadings rather than an evidentiary hearing, as is prescribed

3  by United States v. Christie, a Ninth Circuit case.

4            I mean, that's how it's done.  You have to have a

5  pretrial hearing.  And fortunately we don't have a jury either

6  here or sitting outside waiting for us to decide this, but

7  that's precisely why we can actually accommodate the rights

8  that Dr. Warren has and that are at issue in this case at a

9  bench trial.  It's a procedure that is not difficult, but it's

10  a procedure that --

11            THE COURT:  I didn't say it was difficult.

12            MR. KUYKENDALL:  -- I'm asking you to do it.

13            THE COURT:  I didn't say it was difficult.  I'm

14  saying, I'm telling you how I see it.  You're telling me how

15  you see it.  Let's proceed.

16            MR. KUYKENDALL:  I'll call Dr. Warren.

17            Can I have just a moment, Judge?

18            THE COURT:  You can.

19            MR. KUYKENDALL:  If it's all right, I'm going to

20  walk outside with Dr. Warren.

21            THE COURT:  Go ahead.

22            MR. KUYKENDALL:  I just want to have a moment to

23  speak with him.

24            (Off the record from 2:47 p.m. to 2:48 p.m.)

25            THE COURT:  That was quick.

 1          MR. KUYKENDALL:  Yeah, she'll swear you in, Scott.

 2   Scott, why don't you come over here.

 3          THE COURT:  Just raise your right hand.  You can do

 4   it there.

 5                  SCOTT WARREN, WITNESS, SWORN

 6          THE CLERK:  Thank you.  Please be seated.

 7          Please pull the microphones over to you.  Speak

 8   directly into them.  State your full name for the record and

 9   spell your last name.

10          THE WITNESS:  My name is Scott Warren.  That's

11   W-a-r-r-e-n.

12                      DIRECT EXAMINATION

13   BY MR. KUYKENDALL:

14   Q.   Scott, will you explain to the judge a little bit about

15   who you are.  Act like it's -- like you're telling him about

16   your CV.

17   A.   Sure.  I am a geographer, an academic geographer, and I

18   live in Ajo, Arizona, and in Ajo, I practice my academic

19   geography through teaching, through research, and I also put

20   my geography into action by volunteering with various

21   humanitarian aid organizations in and around the Ajo area.

22   Q.   Are you originally from Arizona?

23   A.   I'm not originally.  I'm from California.

24   Q.   Where did you go to school?

25   A.   I went to school in Nevada at University of Nevada-Reno,

1  and I also went to school in Montana, and then I went to

2  school at Arizona State University, and I did my Ph.D. there.

3  Q.   And explain to the judge how it is that you -- how old

4  are you?

5  A.   36 years old.

6  Q.   How is it you wound up in Ajo?

7  A.   I was living in Phoenix where I was pursuing my Ph.D.

8  work in geography and with a focus on the on U.S.-Mexico

9  border region, and I came to Ajo officially through my

10 research.  I was going down to Organ Pipe Cactus National

11 Monument in 2009 to camp there, and I passed through the

12 community of Ajo on my way there, and something about the

13 place captivated me and pulled me in there.

14      I continued to visit Ajo over the years, and in 2013 I

15 moved there full-time, rented a house there, and I've been

16 living in Ajo ever since.

17 Q.   Did you finish up your dissertation while you were in

18 Ajo?

19 A.   I did, yes.

20 Q.   And what did you write your dissertation on?

21 A.   My dissertation was about the historical geography of Ajo

22 and the border region.  It was a historical geographical

23 narrative of the ways that borders have been drawn and redrawn

24 and changed over time in that part of southwestern Arizona and

25 northwestern Sonora.

1    Q.   Do you consider yourself in the scheme of things to be

2    pretty knowledgeable about the history of Ajo?

3    A.   I consider myself to be pretty knowledgeable.  I'm also

4    always a student, always learning.

5    Q.   So how long have you lived in Ajo permanently now?

6    A.   Six years.

7    Q.   And while in Ajo, did you begin doing some work with some

8    community groups?

9    A.   I did, yeah.  Shortly after I moved to Ajo, I began

10   volunteering with Ajo Samaritans and No More Deaths and other

11   groups that do humanitarian work there.

12   Q.   Can you describe a little bit of your work with the Ajo

13   Samaritans.

14   A.   Yeah, the Ajo Samaritans works to end death and suffering

15   in the desert.  It's a group of people motivated by faith and

16   conscience to act to prevent death and suffering in the

17   desert, and the group provides humanitarian aid to people who

18   are walking through the desert in the form of water, food, and

19   medical care.

20        The group engages in search and rescue, search and

21   recovery work of migrants who have died in the desert, and the

22   group also does education and sort of community awareness

23   events as well.

24   Q.   In addition to working with Ajo Samaritans, what other

25   groups do you work with?

1   A.   I volunteer with No More Deaths as well.  I've also been

2   out on trips in the desert on missions with Aguilas del

3   Desierto, Armadillos, Humane Borders as well.

4   Q.   So by my count, I've got you working with five different

5   groups of volunteers that go out into the desert.  Is that

6   accurate?

7   A.   That's accurate, yeah.

8   Q.   Now, do each of those groups, despite differences they

9   may have between themselves, do each of those groups do

10  similar things?

11  A.   Yeah, there's quite a bit of overlap.  Some groups will

12  specialize in search and rescue, search and recovery work, and

13  other groups specialize in getting water out to the desert

14  primarily.  But there's quite a bit of overlap in sort of that

15  effort to address both the humanitarian crisis in the border

16  region and the missing persons crisis in the border region.

17  Q.   So you've said search and rescue as well as search and

18  recovery.  What's the difference?

19  A.   Search and rescue occurs when there's a search for

20  somebody who is presumed to be living and actively lost, and

21  then search and recovery work is when it's assumed that

22  somebody has died, and so the search is for the person's body

23  or oftentimes scattered skeletal remains.

24  Q.   Your work with No More Deaths, does that include both

25  search and rescue and search and recovery?

DIRECT EXAMINATION OF SCOTT WARREN

1    A.    It does.

2    Q.    Does it also include the provision of humanitarian aid?

3    A.    It does.

4    Q.    Can you explain to the judge why a handsome 36-year-old

5    man is wandering around the desert with all these humanitarian

6    aid groups outside of Ajo.

7    A.    My motivation for doing this work comes from my

8    relationship to place.

9            THE COURT:  I didn't hear what you said.

10   Relationship to?

11           THE WITNESS:  Relationship to place.

12           THE COURT:  Place?

13           THE WITNESS:  Correct.

14   BY MR. KUYKENDALL:

15   Q.    What do you mean by that?

16   A.    Place to me is the sum total of human and natural

17   factors, both living and dead, that inhabit a particular place

18   and make it what it is.

19   Q.    I know what you mean when you say living factors make a

20   place what it is, but what do you mean when you say dead

21   factors make a place what it is?

22   A.    To me, a place like Ajo and the desert around Ajo is

23   really imbued with the people and places that came before and

24   the people who suffered and the people who died in that place,

25   and their presence continues there.  Their spirit continues to

DIRECT EXAMINATION OF SCOTT WARREN

1    dwell in that place.

2         And to me, it's that long association, that continued

3    residence of people who have come before and died, that make

4    it what it is.

5    Q.   And don't get me wrong.  I'm not for a second questioning

6    the reasonableness of your beliefs.  I'm just trying to flesh

7    them out.  Does -- are you saying that, because a number of

8    people, a large number of people, have died in and near

9    Ajo, that that factor alone makes Ajo important to you?

10   A.   It does.  It's the people who have died, and it is the

11   violence upon the land, really, that exists there.

12   Q.   What do you mean by the violence upon the land?

13   A.   It is a long, long history of dispossession and violence

14   in that part of the continent, and particularly in Arizona,

15   and that continues today in the way that we see dozens of

16   migrants dying, as far as we know, that's a minimum, in the

17   border region and in the desert around Ajo.

18        So there's a connection there to these longer stories and

19   the longer struggle, and it's really, to me, out of that

20   struggle and out of that sacrifice that those people's essence

21   and their spirit continues to dwell in that place.

22   Q.   Well, just to make sure we're talking about the same

23   thing, are you suggesting that the experience that you have in

24   Ajo is distinct because of the numbers of people that have

25   passed through there and died in the process of passing

1   through there, distinct from, say, Palm Desert?

2   A.   It is very distinct.  The place is unique in that regard.

3   Q.   And how do you, from your belief system, how do you react

4   to the fact that there have been so many dead people, so many

5   people dying in that general region of Ajo?

6   A.   It is unconscionable to me, and it requires me to act and

7   to do something.

8   Q.   If you can, I'd like to get you to flesh out a little bit

9   more some of what I'll call the general character of your

10  beliefs.  All right?

11      Can you -- do you have a belief relative to whether life

12  is sacred?

13  A.   Yes.  To me, all life is sacred, and places are sacred as

14  well.

15  Q.   And what you do you mean by sacred?

16  A.   For me, the sense of sacredness is in the continued

17  presence and the sort of life force of people and of the

18  places and the struggle that people undergo in that particular

19  place, and to me that creates a thing that is quite sacred and

20  needs to be honored as such.

21  Q.   And don't get me wrong.  I'm not trying to argue with

22  you, but I'm just trying to pinpoint this.  You said "life

23  force."  Is that something that, like, somebody like me is

24  necessarily going to be able to see?

25  A.   I don't know, frankly.  To me, it's less of a -- it's a

 1  bit hard to pin down, but it is something that I feel and I

 2  sense when I'm in these places, when I'm in a place like Ajo.

 3  Q.   Is that a feeling and a sensation that you have when

 4  you're in a place like Ajo that doesn't exist, for instance,

 5  in Phoenix?

 6  A.   That's correct.

 7  Q.   Doesn't exist, for instance, in Tucson?

 8  A.   For me, no.

 9  Q.   And are you testifying that you think that you know the

10  source of that life force?

11  A.   I have a sense of its general contours, maybe, emanating

12  from the place, and I can't say that I can completely dissect

13  and name it, but I have a sense for what it feels like.

14  Q.   And again, I'm not trying to dispute your beliefs or make

15  you defend them, but for the purposes of this hearing and this

16  trial, we need for you to state as specifically as you can

17  your beliefs, whether they're crazy-sounding or not.  That

18  part doesn't matter.  But I'm just trying to get a better idea

19  of your beliefs.

20       So do you believe that, say, on the Cabeza Prieta, in the

21  wilderness of the Cabeza Prieta, do you believe that the rocks

22  out there have life force?

23  A.   I do, yes.

24  Q.   Do you believe the plants have this life force?

25  A.   Yes.

1   Q.   The soil?

2   A.   Yes.

3   Q.   And from your perspective, where does that life force

4   come from?

5   A.   It comes from something that's both -- that's both sort

6   of a mix of everything that's in that place and also something

7   -- something extra, something else that's endowed there.

8   Q.   Do you believe that any of the force that you're

9   describing is a consequence of the many deaths that have

10  occurred out there?

11  A.   Yes.  Absolutely.

12  Q.   And why do you say absolutely?

13  A.   Because I think it's in the sacrifice of those people and

14  their deaths and particularly that their deaths happened when

15  they were alone in most of these cases.

16  Q.   Why is that a big deal?

17  A.   Because there was nobody there to witness them when they

18  died.

19  Q.   I know that, but -- and again, I'm not trying to be

20  disrespectful.  I just want to put as many words to it as

21  possible.  You don't even know these people.  Why is it

22  important to you that their deaths be witnessed?

23  A.   To me, that act of witnessing where somebody has died in

24  the desert is an act of spiritual completion for them, and

25  when we can witness where somebody died, that to me is the

 1  thing that makes their -- their soul live on in that place.

 2  Q.   So let's say that this is the place, you know, these 10

 3  square meters around where I'm standing is the place, and I'm

 4  out actually in the Cabeza wilderness, and I die right there

 5  in those 10 square meters on the Cabeza.

 6       Does that place take on any special importance for you?

 7  A.   Yes.

 8  Q.   Explain to the judge what that is.

 9  A.   That's the last place that that person would have seen

10  and would have experienced when they were living, and they

11  would have felt it.  They would have felt it in their hands

12  and under their feet, and they would have felt it as they lied

13  down.  And when we -- when we come upon those areas, we feel

14  that place as well.

15  Q.   And you have come upon those areas; is that right?

16  A.   Yes.  That's correct.

17  Q.   Tell the judge how many human remains you've

18  found, you've personally been involved in discovering.

19  A.   I've been involved now in 18 cases of human remains

20  recovery and body recoveries.

21  Q.   And when you have discovered human remains in the

22  desert, do you assume that that death took place while the

23  person was alone?

24  A.   It's my sense that that's how it happened, yes.

25  Q.   And again, them dying alone, does that have particular

 1  importance to you?

 2  A.   It does.  It certainly does.  In some cases people no

 3  doubt die with their family with them or friends who are also

 4  perhaps crossing, or companions, but I think in many cases if

 5  not most people die alone, yes.

 6  Q.   Do you have a belief that, when a person dies alone,

 7  something distinct occurs with their soul as compared to when,

 8  say, a person dies in hospice surrounded by friends and loved

 9  ones?

10  A.   I do.

11  Q.   Explain that to the Court.

12  A.   I think that when somebody dies alone in the context of

13  the desert, Cabeza Prieta or anywhere around Ajo, the places

14  that I know, it's as if they sort of remained in a kind of

15  in-between state until they can be witnessed.

16  Q.   Do you know what the bardo is?

17  A.   No.

18  Q.   Okay.  I should have asked you that out in the hallway.

19  A.   You should have.

20  Q.   So is this a correct statement:  By you bearing witness

21  to the human remains of a person that in all likelihood died

22  alone out there in the desert, by bearing witness to them, you

23  do something that impacts beneficially their soul?

24  A.   Yes, that's correct.

25  Q.   And do you believe that their soul is actually there?

1  A.   Yes.

2  Q.   Do you create a connection -- does your belief -- is it

3  your belief that you create a connection between your soul and

4  that deceased person's soul?

5  A.   Yes.   There is most definitely a connection that's

6  created there.

7  Q.   And in your belief system, how long does that connection

8  last?

9  A.   Forever.

10 Q.   Have you written on this notion?

11 A.   I have, yeah, uh-huh.

12 Q.   Have you published an article regarding it?

13 A.   I did, yeah.   In 2015 we published an article that was

14 titled "Afterlives of Found Objects in the Arizona Sonoran

15 Borderlands."

16 Q.   When did you begin working on that article that was

17 published 2015?

18 A.   I initially began research and fieldwork, you could say,

19 on that beginning as early as 2011.

20 Q.   This belief system that you've been testifying to the

21 judge, am I correct to assume that it existed at least to

22 2011?

23 A.   That's correct, yes.

24 Q.   There are some rituals that you engage in, if I

25 understand you right, relative to the work that you perform

1   with No More Deaths; is that right?

2   A.   That's correct, yes.

3   Q.   Well, let's start with on a weekly basis.  Is there any

4   kind of weekly meeting?

5   A.   Yeah.  In Ajo, Ajo Samaritans, we have weekly meetings.

6   We begin those meetings with moments of silence, and we end

7   those meetings with moments of silence.

8   Q.   And where does that meeting take place?

9   A.   Every other week it takes place in the Federated Church.

10  Q.   And what -- what goes on in your mind during that moment

11  of silence at the Federated Church?

12  A.   For me during that time I convene, I guess, reflect on

13  those people in particular that I've witnessed who have -- who

14  have died while crossing.

15  Q.   And I wanted to ask you, when you do put water -- well, I

16  should back up.  Do you engage in putting out water and supply

17  drops?

18  A.   I do, yes.

19  Q.   And when you do that, when you're actually putting them

20  in the place where you hope the migrants will find them, do

21  you perform or do any particular ritual or thought process as

22  you're doing that?

23  A.   I do.  Everywhere that we put water is either where

24  somebody has died in that immediate vicinity or very close by,

25  so that ground to me is sacred any time we go there, and I

1   take a moment to reflect on and to sort of, in my own way,

2   bless those things that we put out, those gallons of water and

3   other kinds of humanitarian supplies, yes.

4   Q.   You bless them, did you say?

5   A.   Yeah.  You could call it that, yeah.

6   Q.   And as specifically as you can, tell the judge what goes

7   through your mind as you're in the act of putting supplies

8   down in these what you call death sites.

9   A.   Because it is sacred ground where people have died, to

10  me, that act of putting down a gallon of water, say, and

11  knowing that it goes from my hand onto the ground, sacred

12  ground where someone has died, and somebody else will pass

13  through there at some point on that same sacred ground and

14  pick that gallon of water up, is to me a connection as well.

15  Q.   Well, let me leap into something on the more practical

16  side for a moment.  Did you say that you put the water where

17  you know people have died?

18  A.   Yes.

19  Q.   How do you know that?

20  A.   Personally, in many cases, they are places where I have

21  found bodies and skeletal remains of people.  We also know

22  where bodies have been recovered based on the maps that are

23  produced by Humane Borders and Ed McCullough using data from

24  the Pima County Office the Medical Examiner on where remains

25  and bodies of migrants have been found in the desert.

1   Q.   Do you know just because of those red dots that I was

2   showing earlier or do you actually know what the GPS

3   coordinates are of where these human remains have been found?

4   A.   We have specific GPS coordinates at each of those cases.

5   Q.   And that's where the water and supply drops go?

6   A.   Yeah, in places where there's concentrations of human

7   remains recoveries.

8   Q.   Let me ask you about what happens, what you cause to

9   happen when you discover human remains in the desert.  You

10  said 18 times you found them?

11  A.   That's correct.

12  Q.   What do you actually do?

13  A.   Well, we're often in a group of volunteers, and there

14  will be a whole set of logistical technical considerations for

15  documenting the site eventually, but to me, first and

16  foremost, it's important that we take time to honor the person

17  who died there and to also honor ourselves in that space, in

18  that place.

19       I personally take a long moment of silence and encourage

20  those who are with me to do the same, to engage in whatever

21  spiritual practice, whatever reflection is in keeping with

22  their own tradition and their own sense of what to do.

23       I personally will face the person or face the remains of

24  the person and offer a kind of silent acknowledgment, and then

25  I turn away from the site, and I will kneel down and pick up

1  two handfuls of dirt or rocks, whatever kind of soil it is,

2  and I'll hold that in my hands, sort of mash it together, let

3  it fall out of my hands.

4       And in my -- in my mind, that's the act of holding --

5  holding that ground, holding that place in my hands, holding

6  it, holding it tight, and letting go of it.  That is both sort

7  of an act of, like, holding the person and then releasing,

8  releasing them.

9  Q.   At that moment, after you've performed that ritual, in

10 your belief system, have you accomplished something with that

11 soul?

12 A.   Yeah.  To me, that is my personal process, an

13 acknowledgment, I would say, of witnessing and sort of

14 holding the violence and the trauma of that particular event

15 and sort of symbolically releasing it so that that person's --

16 so that person's soul can be free of that, that pain.

17 Q.   And you called it violence and trauma.  Is it fair to

18 assume -- you're not thinking that a migrant lies down in the

19 desert and goes to sleep forever; is that right?

20 A.   That's correct, yes.

21 Q.   And why do you say that?

22 A.   Because we know that there is a crisis of death and

23 disappearance in the border that, for anybody who engages in a

24 crossing of that desert on foot, they not only face any number

25 of hazards from the environment, but they are also being

1  actively pursued and hunted as well, so they are in a contest

2  of a highly militarized space, a kind of militarization that

3  to me is profane, really, and their deaths are occurring in

4  the context of that violence and trauma.

5  Q.   You didn't mention it earlier, but in your training, did

6  you receive any sort of medical or paramedic type training?

7  A.   I'm a wilderness first responder, which is an 80-hour

8  certification in kind of basic wilderness medicine.

9  Q.   Are you familiar with what happens to a person as they

10  become more and more dehydrated?

11  A.   Yes, I am.

12  Q.   Explain to the judge what that process is.

13  A.   Well, in the desert, people die often when they are

14  separated from their groups and they've been injured.  They

15  are already dehydrated.  In many cases, when they're at a

16  point when they start thinking about looking for help, they

17  have been without water for a day or two days or even more.

18  They are becoming severely dehydrated, and part of that is

19  also an effect of people's mental faculties.

20       So it's a very insidious thing that, as you become more

21  and more dehydrated, it becomes more and more difficult to

22  think, to navigate, to self-rescue, basically.  Everyone will

23  have to self-rescue if they want to make it out of that

24  desert.

25       And the longer you go without water, food as well, the

1   more difficult if not impossible that becomes, and death by

2   dehydration in that desert is excruciatingly painful.

3   Q.   Knowing that it's excruciatingly painful and that it was

4   excruciatingly painful for the souls that you're intent on

5   finding, does that impact your belief that you need even

6   more -- I'm saying it really badly, but does that have an

7   impact on your perception of your need to find those souls?

8   A.   Yes, it does.

9   Q.   You probably heard Officer Valenzuela testify that the

10  truck that you were driving on June 1st was registered to the

11  Universalist Unitarian Church.  Is that right?

12  A.   Yes, I heard that testimony.

13  Q.   What's the connection between No More Deaths and

14  Universalist Unitarian?

15  A.   The Unitarian Church considers No More Deaths a ministry

16  of theirs, and they provide financial sponsorship, I guess you

17  could say, with their nonprofit status.

18  Q.   And do you know what the aim of the -- officially what

19  the aim of No More Deaths is?

20  A.   No More Deaths' like Samaritans' aim is to end death and

21  suffering in the border region.

22  Q.   You've discussed why you seek to find the bodies of the

23  people who have perished in the desert.  Can you explain to

24  the judge why you provide other -- I mean why you provide

25  humanitarian aid in the form of water and food to migrants.

1  A.   To me it's not water and food.  That is both a clear

2  humanitarian need of people who are suffering and dying in the

3  desert, and to me, it also, I think, as I mentioned earlier in

4  terms of the, like, transmission of a water bottle from my

5  hand to the place to someone else, that that provision of

6  humanitarian relief to people, that kind of direct care for

7  people, is equally as sacred as witnessing where people have

8  died.

9  Q.   Why do you say that?  Why is that -- why is that equal in

10  terms of a spiritual action or a spiritual belief as to

11  finding the bodies and celebrating/witnessing the souls of

12  those who have perished?

13  A.   Because to me it's both witnessing the death and the

14  suffering.  In working to end death and suffering, we witness

15  death and suffering every day, and those are really two sides

16  of the coin of kind of like a practice for me.

17  Q.   In your volunteer work, do you have occasion to work with

18  kind of recognizable religious figures that are doing similar

19  work to you?

20  A.   Yes.  There are many people who are motivated by their

21  faith or their religious traditions that are doing this work

22  as well, and I work alongside them.

23       MR. KUYKENDALL:  Judge, I see that it's 3:30, and I

24  could break now if you want, or I can keep going ahead.

25       THE COURT:  It's up to you.

 1          MR. KUYKENDALL:  How long will we go today?

 2          THE COURT:  Until close to 5:00.

 3          MR. KUYKENDALL:  Okay.  Am right to assume there

 4  will be a break this afternoon?

 5          THE COURT:  You are.  You are right.

 6          MR. KUYKENDALL:  Okay.  I'll --

 7          THE COURT:  If you want to take it now, we can take

 8  it now.

 9          MR. KUYKENDALL:  Why don't we take it now, and I'll

10  probably be about 30 minutes more with him after that.

11          THE COURT:  15 minutes.

12          MR. KUYKENDALL:  Thank you.

13          THE COURT:  15-minute break.  Thank you.  You may

14  step down.

15          (Off the record from 3:31 p.m. to 3:50 p.m.)

16  BY MR. KUYKENDALL:

17  Q.   Scott, I'm going to show you something that's been marked

18  as Exhibit 102.  Can you see that?  Oh, let me zoom out.

19  A.   Yes, I can see it.

20  Q.   Why don't you tell the judge what that is.

21  A.   It's an RHR, recovered human remains, map for 2011-2018

22  fiscal years showing locations of human remains recoveries in

23  the area to the west and south of Ajo.  Each of those dots

24  indicates at least one and in some cases more than one human

25  remains recovery incident.

1    Q.   I'm going to point to a spot and ask you, is the tip of

2    my pen at approximately what known place on the -- on the

3    Cabeza Prieta?

4    A.   That's approximately Charlie Bell Pass.

5    Q.   And then, if I move my pen a tiny bit to the left --

6              MR. KUYKENDALL:  Actually, I should move for the

7    admission of Exhibit 102.

8              THE COURT:  Any objection?

9              MR. WALTERS:  Yeah, Your Honor, we have objection

10   based on foundational and hearsay grounds.  He's not the one

11   that gave the data for each one of those points, so there's a

12   foundation issue about --

13             THE COURT:  Lay some foundation on how he's familiar

14   with what this document shows.

15   BY MR. KUYKENDALL:

16   Q.   How are you familiar with this document?

17   A.   This document is compiled by -- so this particular map is

18   made by Ed McCullough, who is a geologist and a GIS expert who

19   volunteers with Samaritans and Humane Borders, and he and a

20   team of people put these maps together which are based off of

21   data that they compile from the Pima County Office of the

22   Medical Examiner, as well as other law enforcement agencies,

23   but everything, since all recoveries of human remains go

24   through the Pima County Medical Examiner, they rely heavily on

25   the Medical Examiner.

DIRECT EXAMINATION OF SCOTT WARREN                    32

1    The Medical Examiner codes these as being deaths or

2    recovery sites of undocumented border crossers, so they have a

3    rubric, a set of decisions that they go through that they use

4    to sort of code these recoveries as being undocumented border

5    crossers.

6    Q.   And are you -- do you receive maps that look similar to

7    this?

8    A.   I do.  I receive these maps every month.  Ed McCullough

9    sends them out and shows locations of recoveries every month.

10            THE COURT:  Were you receiving those back in June of

11   2017?

12            THE WITNESS:  Yes, I was, Your Honor.

13            THE COURT:  All right.  Objection's overruled.  It

14   can be admitted.

15   BY MR. KUYKENDALL:

16   Q.   So if we -- again, the tip of my pen is on the east side

17   of the Growler Mountains; is that correct?

18   A.   That's correct, yes.

19   Q.   And this red line that goes back near Ajo, what do you

20   call this road?

21   A.   So that line is the Charlie Bell Pass Road, but the

22   routing of the Charlie Bell Pass Road is actually different

23   from that particular red line on the map.

24   Q.   Is it actually up here a little ways?

25   A.   That's correct.  It starts as what's Rasmussen Road,

1  which is just north of Ajo.

2  Q.   (Indicating.)

3  A.   A little bit south.

4  Q.   (Indicating.)

5  A.   A little more south.

6  Q.   Okay.

7  A.   And then cuts due west basically across the desert.  And

8  then right there, yeah, juts to the south and connects with

9  that red line.

10  Q.   Okay.  So it's more like the road is kind of on this

11  directly east-west path from a little north of Ajo to Charlie

12  Bell Pass?

13  A.   Yeah, that's correct.

14  Q.   And obviously there's some twists and turns, but it's

15  pretty much a straight road?

16  A.   Yes.

17  Q.   And it's your understanding that the public can be on

18  that road; is that correct?

19  A.   That is correct, yes.

20  Q.   And south of that road, is that wilderness?

21  A.   Not exactly.  The wilderness boundary, Cabeza Prieta is

22  861,000 --

23          THE COURT:  Excuse me.  Take a break.  I'll be right

24  back.

25          (Off the record from 3:55 p.m. to 3:57 p.m.)

 1              THE COURT:  I'm sorry.  Go ahead.

 2   BY MR. KUYKENDALL:

 3   Q.   So Scott, it appears that, on the west side of the

 4   Growler Mountains, there are not a whole lot of human

 5   recovered -- human remains recovered in relation to the east

 6   side of the Growler Mountains.

 7        Is that correct?

 8   A.   That is correct.

 9   Q.   And the administrative road begins as you dip into the

10   Growler Mountains, as you ahead east into that valley east of

11   the Growler Mountains?

12   A.   Yeah, the administrative road begins at the pass right

13   when the road drops down and to the west.

14   Q.   Where -- in order to practice your spiritual belief,

15   where do you look for human remains?

16   A.   Particularly in the Growler Valley, on the west side of

17   the Growler Valley, or excuse me, on the west side of the

18   Growler Mountains, on what is essentially that -- you can see

19   by the line of dots trending from south to north there a

20   series of trails and routes that follow the base of those

21   mountains.

22   Q.   That's a series of trails that are drivable on or

23   walkable on?

24   A.   Those are basically all walking -- long walking routes

25   that migrants and undocumented border crossers are using.

 1            MR. KUYKENDALL:  Judge, I'm just checking on you.

 2   Are you okay?

 3            THE COURT:  I'm fine.  I'm just tying my shoe.

 4            MR. KUYKENDALL:  Okay.  You scared me.  You just had

 5   a coughing fit, and now I can't see you.  I didn't want to

 6   have to declare a mistrial all on my own.

 7            THE COURT:  You don't have to.

 8            MR. KUYKENDALL:  Good.  I'm glad you're all right.

 9   BY MR. KUYKENDALL:

10   Q.   So Scott, how far in 100 degree heat, how far can you

11   walk?

12   A.   Well, personally, when I'm carrying a heavy backpack,

13   enough water for myself on a day like that, which is two

14   gallons per person just for drinking, you can maybe cover a

15   mile in an hour and a half.

16   Q.   So you could -- in a three-hour time period, you could

17   walk a mile and turn around and come back?

18   A.   Yeah, correct, yeah, round trip.

19   Q.   Okay.  And in a four-hour time period with no breaks, you

20   could walk two miles and then turn around and come back?

21   A.   That's about right, yeah.

22   Q.   Six hours you'd be getting in the neighborhood of about

23   three hour -- three miles in, three miles back?

24   A.   Yeah, that's the idea.

25   Q.   And is there any particular reason why you don't search

1   for human remains over here on the east side of Growler

2   Mountains and instead search for them on the west side of the

3   Growler Mountains?

4   A.   The main reason why we search on the west side of the

5   Growler Mountains is that, on average, every time we go there

6   we find human remains.

7   Q.   And is there any particular reason that you feel

8   compelled to put out humanitarian supplies on the west side of

9   the Growler Mountains instead of the east side of the Growler

10  Mountains?

11  A.   In our experience and in our volunteer work out there, we

12  find vastly more sets of human remains and bodies of people

13  who have died on that, on the west side of the Growler

14  Mountains.

15  Q.   And without sounding trite, are you making some

16  assumptions that where the human remains are is where the need

17  is greatest?

18  A.   That is the assumption that we're making, yes.

19  Q.   Do you -- when you do your work either putting out

20  supplies or searching for human remains, do you work with a

21  group?

22  A.   Yes.

23  Q.   And does -- how does the group -- well, how big of a

24  group, typically?

25  A.   It varies.  I would say, you know, we could be anywhere

1  from 4 to 12 people.

2  Q.   Does the group have some type of -- well, what does the

3  group make its decisions based upon?

4  A.   Decisions about where to do humanitarian aid or where to

5  search?

6  Q.   Right.

7  A.   Those decisions are made a variety of ways, but one of

8  the main things that we rely on are these maps, these

9  recovered human remains maps, and that in conjunction with the

10  time that we spend out in these areas on patrol and the things

11  that we witness, those are all the factors that come into

12  play.

13  Q.   Is it fair to say that part of your practice, your

14  spiritual practice, is to go where the need is the greatest?

15  A.   That's fair to say, yes.

16  Q.   And have you identified the Growler Valley, this area to

17  the west of the Growler Mountains?  Have you identified this

18  Growler Valley as any particular thing?

19  A.   Yes.  That is the area of greatest need.  You can clearly

20  see that corridor of recoveries here on this map, and that's

21  where the greatest need is in the areas west of Ajo.

22  Q.   And based on your own health and stamina and

23  capacities, what would you say your maximum range is if you're

24  going to carry just enough water for yourself?  What's your

25  maximum range of walking?

1   A.   For me, on a summer day, probably five miles one way,

2   maybe six on a good day.

3   Q.   And looking at this map, Exhibit 102, you can see down

4   here that between my two fingers is 10 miles; right?

5   A.   That's correct.

6   Q.   And can you see from this map, Exhibit 102, approximately

7   how many miles is this human remain that I'm pointing to up

8   here from the administrative road?

9   A.   Well, you moved the scale bar off the screen there, but

10  it's -- that particular one up there is probably something

11  like eight miles, maybe six to eight miles north as the crow

12  flies.

13  Q.   And I noticed that there are very few human remains

14  discovered north of this last red dot that's connected to all

15  these other red dots just to the north, well, I guess eight

16  miles to the north of the little green flag.

17       Do you know why that is?

18  A.   Well, north of that area, it's a long ways to walk from

19  Charlie Bell Road, but that's also where the Barry Goldwater

20  bombing range begins.

21  Q.   Is it possible to hike out around on the Barry Goldwater

22  bombing range?

23  A.   That part of the bombing range, no.  You have to get a

24  special permit from the military to do that.

25  Q.   And likewise, I noticed that there seems to be a gap

DIRECT EXAMINATION OF SCOTT WARREN

 1    between this last southernmost dot that's connected to these

 2    other dots on the map before, down here, where there's a

 3    dot -- seems like it's on the border of the Organ Pipe

 4    National Monument.

 5         Do you have an idea of why that would be?

 6    A.   Well, there are many, many factors, but in a place like

 7    that, it's my assumption that not that people have not died

 8    there, but people's bodies have not been found in those areas

 9    because of the difficulty of the terrain and the difficulty of

10    access and largely the difficulty of access for volunteer and

11    civilian search and recovery groups.

12    Q.   Would it comport with your beliefs, your beliefs relative

13    to either searching for human remains or your beliefs relative

14    to putting out supplies for migrants, would it comport with

15    your religious beliefs to turn around at the wilderness

16    boundary?

17    A.   Turn around because?

18    Q.   Because you don't have permission to be on the wilderness

19    road.

20    A.   No.  I mean, my beliefs in that sense really compel me to

21    go further.

22    Q.   Even if you know that it's a violation of Forest Service,

23    I'm sorry, Fish and Wildlife Service regulations?

24    A.   Yes.

25    Q.   Would neglecting the area of greatest need be consistent

1  with your religious or spiritual beliefs?

2  A.    No, it would not be consistent with those beliefs.  To

3  neglect that area of greatest need to me would be sort of just

4  engaging in a hollow performance of what's really needed in

5  the witnessing and the practice that I undertake.

6  Q.    Have you ever driven on roads closed to the public in the

7  wilderness for any reason other than to exercise your faith?

8  A.    I have not, no.

9             MR. KUYKENDALL:  May I have one minute, Judge?

10            THE COURT:  Take your time.

11  BY MR. KUYKENDALL:

12  Q.    Scott, I asked you about how far you could walk if you

13  were only carrying water for yourself.  Do you remember?

14  A.    Yes.

15  Q.    And what did you say your range was?  Maybe five miles in

16  one direction?

17  A.    In a day, yeah, that's right about right.

18  Q.    Okay.  I intended to ask as well, how far could you walk

19  if you also were carrying some supplies that you would put out

20  for migrants, in other words, wearing a pack and carrying some

21  water?

22  A.    Well, that would vary on how much, how much weight I was

23  carrying, but it would shorten that distance.  You know, I

24  think typically for me a distance of three to four miles when

25  carrying lots of supplies over that kind of rugged terrain and

1    in that heat is about my limit.

2    Q.    And normally what you would do is put supplies out with a

3    group of other people working with you; is that right?

4    A.    That's correct, yeah.

5    Q.    And when you've put supplies out in the past, do you put

6    them right on the road, like, an administrative road, or would

7    you put them off of the road a ways?

8    A.    Usually we would put them off of the road a ways, yeah.

9    Q.    So would it require hiking off of the administrative road

10   a distance in order to exercise your faith and put out

11   supplies for migrants in need?

12   A.    It does require that, yes.

13   Q.    And I may have asked you this, I apologize, but can you

14   exercise your faith by putting supplies out -- I'm sorry.  I

15   said that wrong.

16        Can you exercise your faith by not putting supplies out

17   for migrants that are in need?

18   A.    No.  I would say that realistically I cannot do that,

19   can't exercise my faith by not leaving out supplies for people

20   in need, for migrants in need.

21   Q.    And can you adequately exercise your faith by putting out

22   supplies for migrants in need or a migrant that might pass by

23   in need in a place other than where the red dots are on the

24   human remains map?

25   A.    No.  To me, like I said before, that would be kind of a

 1  hollow, meaningless performance and not the actual, to me, the

 2  actual sacred act of putting those things where they are

 3  needed.

 4  Q.   So what happens if you face a choice, a choice between

 5  neglecting an area of the greatest need, which violates your

 6  beliefs, or breaking the law by violating the regulations out

 7  on the -- on the Cabeza?

 8  A.   If I were faced with that choice, I would go to those

 9  areas of greatest need to deliver those supplies and risk

10  violating those laws, yes.

11           MR. KUYKENDALL:  May I have one more moment, Judge?

12           THE COURT:  Sure.  Take your time.

13  BY MR. KUYKENDALL:

14  Q.   I asked you earlier if you'd ever driven on roads for any

15  reason -- I'm sorry -- if you'd ever driven on roads closed to

16  the public in the wilderness for any reason other than to

17  exercise your faith, and you said no.

18       And I meant to follow up and also ask you if you had ever

19  put out supplies for migrants other than in an exercise of

20  your faith?

21  A.   You're asking if I've ever put out water/supplies outside

22  of the exercise of my faith?

23  Q.   Right.

24  A.   No, I haven't.

25           MR. KUYKENDALL:  I believe that's all my questions,

 1  Judge.  Let me check with my co-counsel.

 2          THE COURT:  Sure.

 3          MR. KUYKENDALL:  That is all my questions.

 4          THE COURT:  She said it was all your questions?

 5          MR. KUYKENDALL:  She let me off the hook.

 6          THE COURT:  Mr. Walters or Ms. Wright, who's going

 7  to do it?

 8          MR. WALTERS:  Me, Your Honor.

 9                       CROSS-EXAMINATION

10  BY MR. WALTERS:

11  Q.   Sir, do you consider yourself to be a person who cares

12  about details?  Is that fair?

13  A.   Yeah, I think that's generally a fair assessment, yeah.

14  Q.   And I'm certainly no expert in geography, but I would

15  imagine that career requires you to pay at least some

16  heightened level of attention to details.

17       Is that fair?

18  A.   Yeah, that's fair to say, yeah.

19  Q.   You went to the Cabeza Prieta National Wildlife Refuge on

20  June 1st, 2017; correct?

21          MR. KUYKENDALL:  I'm going to object at this point,

22  Judge.  This goes beyond the scope.  This violates his Fifth

23  Amendment right to not testify, and I would ask the Court to

24  reconsider the arguments that I made earlier regarding Mr. --

25  Dr. Warren's right to both exercise his right to put on a RFRA

 1   defense as well as exercise his right to the Fifth Amendment.

 2            THE COURT:  Objection's overruled.

 3            THE WITNESS:  Yes, I --

 4            MR. KUYKENDALL:  I should just add, I'm sorry --

 5            THE COURT:  You can have a continuing objection.

 6            MR. KUYKENDALL:  I'll have a -- I'd like that, but

 7   I'd also like to add that, even if you find that the Fifth

 8   Amendment doesn't obtain in these case, in these

 9   circumstances, you've still got the discretion to limit the

10   cross to the scope of the direct, and my direct was limited to

11   his RFRA beliefs and did not -- did not bring up what occurred

12   on the 1st of June.

13            THE COURT:  I was quite aware of that.  Objection's

14   overruled.  You danced around everything except the day in

15   question.

16            MR. KUYKENDALL:  And when I spoke of the day in

17   question, I only spoke of it in relation to Valenzuela's

18   testimony that he overheard.

19            THE COURT:  I agree.

20            MR. KUYKENDALL:  So you agree that Mr. Walters is

21   going beyond the scope --

22            THE COURT:  I agree that you did that, but I

23   overruled your objection.

24            MR. KUYKENDALL:  But just for the record, is it the

25   Court's understanding that the Government can go beyond the

 1   scope of my direct?

 2            THE COURT:  Yes, exercising my discretion.

 3            MR. WALTERS:  Thank you, Your Honor.

 4   BY MR. WALTERS:

 5   Q.   So again, you went to the Cabeza Prieta National Wildlife

 6   Refuge on June 1st of 2017; right?

 7   A.   That's correct, yes.

 8   Q.   And you drove a truck?

 9   A.   I did.

10   Q.   A white truck?

11   A.   Yes.

12   Q.   You drove to the Cabeza Prieta National Wildlife Refuge

13   with two other cars; correct?

14   A.   Yes, I believe that's correct.

15   Q.   And between the three cars that was in your group, there

16   were about 12 to 13 -- 12 or 13 people; right?

17   A.   That's right, yeah.

18   Q.   Did you all take part in loading those cars with supplies

19   that day?

20   A.   Yeah.  As far as I remember, everyone participated in

21   that.

22   Q.   Did you all meet at Cabeza Prieta, or did you meet

23   somewhere else and then all travel to Cabeza Prieta?

24   A.   You know, I don't know if we all met there or met

25   somewhere else, but between in town and the wild refuge.

CROSS-EXAMINATION OF SCOTT WARREN

1    Q.   Did you all load up at the same location?

2    A.   We probably loaded up most of those trucks in Ajo at a

3    place we use called the Barn.

4    Q.   What time did you all leave that morning, if you

5    remember?

6    A.   It would have been early.  It was a hot day, so we left

7    around sunrise, I think.

8    Q.   Okay.  So in terms of where you were going on Cabeza

9    Prieta, you planned that; right?

10   A.   Yes.

11   Q.   It wasn't random?

12   A.   That's correct, yeah.

13   Q.   You planned where you were going to leave those supplies;

14   right?

15   A.   So we planned which areas to go to, and it was -- as I

16   recall, it was really kind of -- at that point we had the

17   maps, the death maps, and we had been out there on foot a few

18   times, so we sort of understood in a general sense of where we

19   needed to go and where we needed to sort of put the water and

20   other kinds of, yeah, humanitarian supplies.

21   Q.   So is that a yes, you planned where to put those

22   supplies?

23   A.   Yeah.  And -- yeah.

24   Q.   And that wasn't random either?

25   A.   Yep.  That's fair to say.

 1  Q.   You did in fact leave supplies on the refuge that day;

 2  correct?

 3  A.   We did service, yeah, a number of water drops that

 4  day, yeah.

 5  Q.   So when you first got to the refuge, you went to Charlie

 6  Bell Pass; right?

 7            THE COURT:  Slow down just a tad.

 8            MR. WALTERS:  I'm sorry.

 9  BY MR. WALTERS:

10  Q.   Do you need me to repeat?

11  A.   Sure.

12  Q.   When you first got to the refuge, you went to Charlie

13  Bell Pass; right?

14  A.   That was the destination of our drive.  The entrance to

15  the refuge was about eight miles before that, but yes, we went

16  to Charlie Bell Pass, yeah.

17  Q.   And from there you drove down to Charlie Bell Well?

18  A.   That's correct, yeah.

19  Q.   Showing you what's been admitted as Exhibit 8.  That's

20  the truck you drove down to Charlie Bell Well; correct?

21  A.   It is, yes.

22  Q.   It's actually the truck that you drove beyond Charlie

23  Bell Well; correct?

24  A.   Correct.

25  Q.   And you knew prior to traveling west beyond Charlie Bell

CROSS-EXAMINATION OF SCOTT WARREN

1  Pass that that road was off limits to the public; correct?

2  A.   Yeah.  It was an administrative road.

3  Q.   There are signs that specifically tell you that that's an

4  administrative only road; correct?

5  A.   There's -- yeah, as I recall, there's two signs at the

6  top of the pass there, kind of the Department of Interior sign

7  markers, yeah.

8  Q.   And then once you get past Charlie Bell Well, there's

9  another sign that says that unauthorized access is prohibited;

10  correct?

11  A.   Yeah, Charlie Bell Well, there's an administrative -- a

12  sign that says administrative road, yeah.

13  Q.   Did you see the signs that day?

14  A.   The signs at the pass, absolutely, yeah.  I will say,

15  though, that sign at the well is actually a bit harder to see,

16  and so I don't think I saw that sign, but I suspect that it

17  kind of doesn't matter.  We saw the signs at the top of the

18  pass, yeah.

19  Q.   So your testimony is today that you saw the signs that

20  day; correct?

21  A.   Yeah, the two signs I mentioned at the top of the

22  pass, yes.

23  Q.   Do you recall speaking to Officer Valenzuela that day?

24  A.   I do.

25  Q.   He specifically asked you if you saw the signs at Charlie

1    Bell Pass; correct?

2    A.    No.

3    Q.    He didn't?

4    A.    No.  He asked if we had seen the sign at Charlie Bell

5    Well, and he was a bit confused about where the wilderness

6    boundary was and had initially told us it was at Charlie Bell

7    Well, and so that's I think where the confusion was about when

8    he asked, did you see the wilderness boundary at Charlie Bell

9    Well and I said no, I was thinking the wilderness boundary was

10   at Charlie Bell Pass.

11   Q.    So your testimony is that this sign right here was hard

12   to see when you were driving west on Charlie Bell or towards,

13   I'm sorry, beyond Charlie Bell Well?

14   A.    Yeah, that sign is actually located in an arroyo, and

15   there's a lot of plant growth and palo verdes, so this

16   picture, which as I recall was maybe taken in 2016 --

17   Q.    I think the testimony was it taken in 2017.

18   A.    This photo?

19   Q.    Yes.

20   A.    Okay.  Yeah, as I recall, like, at that time of year

21   there was a lot of growth, and so I don't remember that

22   particular sign, but I'm not -- certainly not saying that I

23   didn't see the signs at the pass.

24   Q.    This is you driving the truck back towards Charlie Bell

25   Well, back towards Charlie Bell Pass; correct?

1  A.   I believe so, yes.

2  Q.   And this right here is the sign that you're saying was

3  difficult to see; right?

4  A.   Yes.

5  Q.   And that sign is right off the road.  Would you agree

6  with me?

7  A.   In that photo, from behind, it is, yes.

8  Q.   When you went to Cabeza Prieta on June 1st of 2017, you

9  also knew that you needed a special use permit to operate a

10  motor vehicle in the wilderness area; correct?

11  A.   Yeah, I was generally familiar with that, yes.

12  Q.   And despite knowing this, you deliberately drove on an

13  administrative road?

14  A.   I did drive on the road, yes.

15  Q.   A road you knew to be off limits to the public?

16  A.   Correct.

17  Q.   Do you recall being asked by Officer Valenzuela that day

18  if you knew you were in wilderness area?

19  A.   So I'll offer some context there, which is that Officer

20  Valenzuela had asked me if I knew that there was the

21  wilderness boundary at Charlie Bell Well, and initially he was

22  confused and thinking that that was where the wilderness

23  started and that we would need to drive back to Charlie Bell

24  Well, which was a surprise to me, because I was, as is rightly

25  the case, operating under the assumption that the wilderness

 1    boundary was at the top of the pass.

 2         So it's not to -- I absolutely knew that that was all

 3    generally wilderness, but the conversation we had was one

 4    where Officer Valenzuela was initially confused about where

 5    the wilderness boundary started, and so that's why we had that

 6    exchange.  But I knew full well that we were in wilderness.

 7    Q.   You and your group had a large amount of supplies that

 8    day.  Is that fair to say?

 9    A.   Yeah, that is fair to say.

10    Q.   It included green milk crates?

11    A.   Yeah, green milk crates, and each one has about six

12    gallons of water in it.

13    Q.   Various other supplies?

14    A.   Yeah, we also would have had food and medical supplies as

15    well.

16    Q.   I'm showing you Exhibit 3.  Are those some of the

17    supplies that you brought with you that day?

18    A.   You're talking about the water and beans on the base of

19    the beacon there?

20    Q.   Yes.

21    A.   Most likely, yes.  I can't say 100 percent, but virtual

22    certainty, yeah.

23    Q.   So those are sitting on the foundation of a rescue

24    beacon, are they not?

25    A.   Correct.

1    Q.   And as a leader in No More Deaths, you are aware of what

2    the rescue beacons are; correct?  You're aware of what they

3    are?

4    A.   I'm aware certainly of their existence and their intended

5    function.

6    Q.   Sure.  That's what I'm asking.  You know what their

7    intended purpose is?

8    A.   So in my research and training, I am aware of a couple of

9    different purposes.

10   Q.   Okay.  So that's a yes, you know what their intended

11   purpose is; correct?

12   A.   Yes.

13   Q.   Thank you.

14        Showing you what's been marked as Exhibit 8, again,

15   that's the truck you drove; right?

16   A.   That's correct, yeah.

17   Q.   And on the ground are several -- several gallon jugs of

18   water; correct?

19   A.   Yeah, it looks like three gallons of water on the ground

20   and then the single gallon on the bumper.

21   Q.   That's what I see too.

22        And your intent was to strategically place those jugs of

23   water in selective locations.  Is that fair?

24   A.   No.  This is a pretty common practice in the desert

25   there, which is that, when you park your car, you make sure

1    you leave water outside of your car.  That was first

2    recommended to me by Fish and Wildlife personnel with the

3    purpose being that people, if they need water, they could

4    easily see that, and they wouldn't, you know, try to break

5    into the car and get food or water.

6    Q.   When you drove down beyond Charlie Bell Well, was your

7    intent to then take supplies, hike into the desert, and put

8    them in a strategic place?

9    A.   Yes.

10   Q.   And you did that that day; correct?

11   A.   We did, yeah.

12   Q.   And your intention leaving those supplies was that

13   someone in need was going to pick up those supplies and

14   perhaps even carry that with them on their journey north or

15   back to the refuge center or wherever it may be; right?

16   A.   Well, I don't know what people's intent would be when

17   they find the supplies, but the supplies are placed there so

18   that people who need water can have that water, can drink

19   water, and they don't die in those locations, yeah.

20   Q.   Sure.  Sure.  So let me rephrase.  So you would have been

21   perfectly fine had a person come and picked up that water and

22   carried it with them to some other location?

23   A.   Yeah, I personally would be fine with that, sure.

24   Q.   And you were okay with that?  You were okay with

25   relinquishing that right to those jugs at that point for the

1  need of somebody else?  Is that fair?

2  A.   I'm not sure I understand the question of relinquishing

3  the right.

4  Q.   You were okay with giving up your right to possess those

5  water jugs so that somebody else could have them; right?

6  A.   It was certainly my intent that people who needed that

7  water would find it and drink it, so it sounds like we're on

8  the same page.

9  Q.   Sure.  You also left a large amount of supplies at

10 Charlie Bell Well; correct?

11 A.   Well, yeah.  As I recall, we unloaded supplies there, and

12 the idea was that people could sort of take those, excuse

13 me, take those supplies out to, you know, places where they

14 were most needed, yeah.

15 Q.   And it was a large stash of water, beans, other medical

16 supplies, skin care products; correct?

17 A.   I would say in my experience it was fairly large, yeah.

18 Q.   You testified on direct that your intent was for someone

19 to come along and take either the water, the beans, the other

20 products at some point; correct?

21 A.   Yeah, I think that's fair to say.

22 Q.   Did you have any information on June 1st, 2017, of

23 someone who was in immediate harm at that particular time?

24 A.   Yeah, that's a great question.

25 Q.   I know.

1   A.   So I would say -- I would say no in the sense of, like, I

2   could see a person or something who was -- who was

3   straggling, so no in that sense, but I would say yes in the

4   sense that, at that particular time of year, it's some of the

5   hottest and driest weather, and we know people to be out in

6   that area and the need for water to be -- to be the greatest.

7        So you know, in that sense, I would say there's a general

8   ongoing everyday need, you know, in the context of that

9   humanitarian crisis I guess, yeah.

10  Q.   Sure.  So correct me if I'm wrong, but what I

11  essentially -- tell me if you would agree with me.  You have

12  no idea when someone -- an exact point in time when someone

13  would come across that stash of water that you left and drink

14  that water.

15       Is that a fair statement?

16  A.   It's not quite a fair statement.  We certainly don't know

17  in a sense of, like, day, hour, minute, second, but because we

18  service drops I would say on average every two weeks, so we

19  have a sense that, you know, water has been used in this time,

20  and sometimes it's even -- it could be even a week or less.

21       So in many cases we have a really good sense I would say

22  of, like, you know, at this particular location, every week,

23  you know, 30 gallons maybe gets used.  So yeah.

24  Q.   So my point was it could have been an hour before

25  somebody came and saw and found that stash of water; right?

1   A.   It could have been an hour.

2   Q.   Could have been a day?

3   A.   Could have been a day, yeah.

4   Q.   A week?

5   A.   Could have been a week.

6   Q.   Up to two weeks, according to your testimony just now;

7   correct?

8   A.   It could be even longer, frankly, but sir, my point with

9   that is just saying, because we service those drops, we have a

10  general sense of frequency, but --

11  Q.   Sure.  When you spoke to Officer Valenzuela that day, you

12  didn't tell him anything about anyone needing immediate

13  medical attention; correct?

14  A.   Like in terms of an imminent search and rescue type

15  situation?

16  Q.   Yes.

17  A.   No, there wasn't.

18  Q.   If you did know of someone in a search and rescue type of

19  situation, Officer Valenzuela would have been a good person to

20  tell, would you agree?

21  A.   Like a person who needs immediate medical care?

22  Q.   Yes.

23  A.   Yeah.  In a general sense that would be true, yeah.

24  Q.   Because he can call for help; right?

25  A.   No.

 1    Q.   He can't call for him?

 2    A.   No, he would have to -- from there -- and this happened

 3    that day.  Radios don't work there, so he would have to go --

 4    from there it's probably, I don't recall, maybe a 30 to 40 --

 5    maybe not 40 minutes, but 30 minutes at least drive to get up

 6    to the top of Charlie Bell Pass where there is reception and

 7    that sort of thing.

 8    Q.   What I -- and I understand that, but what I'm saying is

 9    he has the ability to call for people who are specifically

10    trained on how to deal with issues of people needing aid in

11    the desert; right?

12    A.   I don't know what his --

13    Q.   You don't know if Border Patrol or Fish and Wildlife had

14    that capability --

15           MR. KUYKENDALL:  Objection.  He should be allowed to

16    answer the question --

17           THE COURT:  Whoa, whoa, whoa, whoa.  Objection's

18    sustained.

19           He was with Fish and Wildlife.

20           MR. WALTERS:  Huh?

21           THE COURT:  He was with Fish and Wildlife, not

22    Border Patrol.

23           MR. WALTERS:  Well, that's what I was getting to.

24    BY MR. WALTERS:

25    Q.   Okay.  Do you know that Wildlife has the ability to call

1  Border Patrol to get help?

2  A.    Oh, absolutely.

3  Q.    Okay.  And you know that Border Patrol has helicopters

4  that they can use to find someone?

5  A.    In Ajo sector they have a single helicopter that I'm

6  aware of, and they have other -- or I'm sorry, Ajo area of

7  operations, area of responsibility, they have that

8  helicopter, but yeah, in general.

9  Q.    And they have ATVs and people who are specifically

10  trained to administer medical assistance; correct?  Do you

11  know that?

12  A.    Absolutely, yeah.  Border Patrol has -- I think frankly

13  it's relatively few in terms of percentage, but they do have

14  folks that are EMTs and paramedics, yeah.

15  Q.    And that day you never told Officer Valenzuela where you

16  left your supplies once you got back from hiking in the desert

17  and when you returned to your truck; right?

18  A.    I never said that, no.

19  Q.    Do you recall your answer about -- I think you were

20  talking about the violence of the desert or something similar

21  like that.  You said that one of the factors is that people

22  are pursued and hunted; right?

23  A.    Yeah, that's right.

24  Q.    Did you mean by Border Patrol?

25  A.    I would say, yeah, in that area it's primarily Border

1    Patrol, sort of their loosely called chase and scatter

2    apprehension techniques and tactics, yeah.

3    Q.   You also talked about some of the aims or goals of No

4    More Deaths; correct?  I think you actually talked about one;

5    correct?

6    A.   I did, yes.

7    Q.   And you're widely regarded as a leader figure in No More

8    Deaths; is that fair?

9    A.   Yeah.

10   Q.   Okay.  That's fine.  And how we know that is you receive

11   maps from Mr. McCullough; correct?

12   A.   Oh, I mean, hundreds of people receive maps --

13   Q.   Okay.

14   A.   -- but I do as well, yeah.

15   Q.   Thank you.

16        So you're also aware that one of the aims of No More

17   Deaths, then, is to build a global movement; correct?

18   A.   I think that is --

19        MR. KUYKENDALL:  I'm going to object on relevance

20   grounds.

21        THE COURT:  Sustained.

22        MR. WALTERS:  Your Honor, this directly goes to his

23   ability to discuss whether this is a sincerely held religious

24   belief as opposed to a political belief, and if he's doing

25   this on behalf of No More Deaths, and his testimony was that

 1  the only aim -- the way it was presented is that the only aim

 2  of No More Deaths is to end death and suffering in the desert,

 3  that's not accurate, because there are also political things

 4  No More Deaths does as well.

 5          THE COURT:  The objection's sustained.

 6          MR. WALTERS:  Thank you.

 7  BY MR. WALTERS:

 8  Q.   In terms of -- well, strike that.

 9          MR. WALTERS:  Your Honor, may I have a minute?

10          THE COURT:  Sure.

11          MR. WALTERS:  Your Honor, I have no further

12  questions.

13          THE COURT:  I'm going to ask the questions that I

14  have right now.  Then I'm going to break and let him finish

15  tomorrow, if you have any redirect.

16          How long have you held these faith-based beliefs

17  that you have?

18          THE WITNESS:  About, I'd say -- I'd say I sort of

19  had it as an articulated sense since about 2013, probably,

20  when I moved to Ajo.

21          THE COURT:  How did it start?

22          THE WITNESS:  For me, I would say it began as a

23  child and the experiences that I had growing up and with my

24  family in nature and the sense that nature is sacred and that

25  land is sacred, and that was very, very important to us.

1           As I -- as I got older and found geography as an

2     academic discipline, I think I developed more of a framework

3     for understanding kind of a spirituality that really spoke to

4     me about -- about place and about its meaning and significance

5     and sort of how my life intersects with that place.

6           THE COURT:  Are you aware of others who have the

7     same faith-based belief that you do?

8           MR. KUYKENDALL:  Judge, I'm going to object to that

9     as irrelevant, but I don't expect you to sustain it.

10           THE COURT:  Not on one of my own questions, no.

11           MR. KUYKENDALL:  I just mean from -- the case law is

12     clear that that's an irrelevant inquiry.

13           THE COURT:  You can answer.

14           THE WITNESS:  Sure.  I think that the sort of

15     particulars of my experience and my, like, my rituals and how

16     I believe that, like, history and geography have a place to

17     be -- to be attached to my spirituality with that place, I

18     think there is particulars there in how I do it.

19           In the larger, like, a broad brush, I think there's

20     many people that see nature as a sacred place, that see a

21     spiritual connection with the land, you know, with the

22     environment.  And even within my discipline, my academic

23     discipline of geography, there's a strong spiritual, I guess

24     you could say, teaching, a reflection about one's -- one's

25     connection to place through experience and, yeah, that

 1   spiritual connection.

 2          THE COURT:  There were 11 or 12 other people with

 3   you on the day in question?

 4          THE WITNESS:  Yeah.

 5          THE COURT:  Did they know that you were doing this

 6   yourself because of your faith?

 7          THE WITNESS:  I don't know.  I can't say if they

 8   knew.  I'm pretty private in general, and with a matter like

 9   this, it feels like a very kind of personal thing.  When I'm

10   out with groups and we find human remains when we're doing

11   this work, I think others are aware of my spiritual process,

12   like, when I'm actually engaging in those rituals.

13          THE COURT:  I guess my question would be how they

14   are aware that you are engaging in a spiritual process if you

15   don't tell them.

16          THE WITNESS:  I certainly don't tell every person

17   that I go out with about my spirituality or my spiritual

18   process.  There are certain folks that know that, yeah.

19          THE COURT:  You spoke earlier that you have a

20   ritual; correct?

21          THE WITNESS:  Yes.

22          THE COURT:  And you do it every time?

23          THE WITNESS:  I do.  Yeah.

24          THE COURT:  I guess my question is, on how many

25   occasions has someone asked you, what are you doing?

1          THE WITNESS:  Well, in the example of finding a body

2    or human remains, skeletal remains, the experience, I mean,

3    what I've experienced is kind of an overwhelming sense of

4    reverence that is not necessarily, you know, talked about ad

5    nauseam or in detail, and people have their own particular

6    practices that they do.

7          I've essentially been involved in cases where for a

8    whole variety of reasons we've come together and we've marked

9    the event, we've marked the occasion in some kind of way as a

10   group, but typically it's a very personal thing, and for me

11   it's done really in private.  It's not so much a group

12   activity.

13         THE COURT:  Lest there be no mistake about it, your

14   testimony has been, you were on the road, you knew it was

15   prohibited to be there, you left supplies, but you did all of

16   those things because your religion compels you to do so?

17         THE WITNESS:  My spirituality, as I would call it,

18   compels me to do that, to be out in those places, yes.

19         THE COURT:  This may seem like a weird question, but

20   your spirituality does not demand that you share it with

21   others?

22         THE WITNESS:  No, it does not.

23         THE COURT:  Mr. Walters made a question about

24   reference to a permit, I think, if I remember the question

25   correctly.  You knew that you could get a permit theoretically

```
 1   to do what you were doing?

 2              THE WITNESS:  This is the special use permit?

 3              THE COURT:  Yes.

 4              THE WITNESS:  Yeah, yeah.  Theoretically they're

 5   available.

 6              THE COURT:  I did say theoretically.

 7              THE WITNESS:  Yep, you're right.

 8              THE COURT:  They weren't going to give you one, were

 9   they?

10              THE WITNESS:  They were not.

11              THE COURT:  All right.  I think that's all I have

12   for now.  If you think you can finish, go ahead.  Otherwise,

13   you can wait until tomorrow.

14              MR. KUYKENDALL:  He's got to be here anyway.

15              THE COURT:  Yeah, he does.

16              MR. KUYKENDALL:  How about tomorrow?

17              THE COURT:  How about 9:45, 9:45 --

18              MR. KUYKENDALL:  You're the judge.

19              THE COURT:  -- when we break from my morning

20   calendar.  9:45.  I'll see you then.

21              MR. KUYKENDALL:  Thank you.

22              THE COURT:  Thank you.

23              (Proceedings conclude at 4:49 p.m.)

24

25
```

```
 1                    C E R T I F I C A T E

 2

 3          I, Erica R. McQuillen, Federal Official Realtime

 4    Reporter, in and for the United States District Court for the

 5    District of Arizona, do hereby certify that, pursuant to

 6    Section 753, Title 28, United States Code, the foregoing is a

 7    true and correct transcript of the stenographically reported

 8    proceedings held in the above-entitled matter and that the

 9    transcript page format is in conformance with the regulations

10    of the Judicial Conference of the United States.

11          Dated this 9th day of May, 2019.

12

13                         s/Erica R. McQuillen
                         Erica R. McQuillen, RDR, CRR
14                       Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```