1           IN THE UNITED STATES DISTRICT COURT

2                  DISTRICT OF ARIZONA

3   United States of America          MJ-17-341-TUC-RCC(JR)

4   vs.

5   Scott Daniel Warren,                     May 7, 2019
                                              9:49 a.m.
6          Defendant.                     Tucson, Arizona
    _____

7

8          PARTIAL TRANSCRIPT OF PROCEEDINGS

9       TESTIMONY OF SCOTT WARREN FROM BENCH TRIAL DAY 2

10         BEFORE THE HONORABLE RANER C. COLLINS
                UNITED STATES DISTRICT JUDGE

11

12                A P P E A R A N C E S

13  For the Government:

14        Anna Roberta Wright
          Nathaniel Jacob Walters
15        United States Attorney's Office
          405 West Congress
16        Tucson, Arizona 85701

17  For the Defendant:

18        Gregory John Kuykendall
          Amy Pickering Knight
19        Kuykendall & Associates
          531 South Convent Avenue
20        Tucson, Arizona 85701

21

22  Court Reporter:        Erica R. McQuillen, RDR, CRR
                           Official Court Reporter
23                         405 W. Congress Street
                           Tucson, Arizona 85701
24                         (520)205-4267

25        Proceedings Reported by Stenographic Court Reporter
          Transcript Prepared by Computer-Aided Transcription

1                        EXAMINATION INDEX

2    WITNESS FOR THE DEFENSE:

3    SCOTT WARREN
            REDIRECT BY MR. KUYKENDALL . . . . . . . . . . . .    7

4

5                         EXHIBIT INDEX

6

7    EXHIBIT NUMBER                              PAGE ADMITTED

8    104                                                    8

9    103                                                   14

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S

2              THE CLERK:  In Criminal Matter 17-341-M, United

3   States vs. Scott Daniel Warren, on for bench trial day two.

4              Counsel, please state your appearances.

5              MS. WRIGHT:  Good morning, Your Honor.  Anna Wright

6   and Nathaniel Walters on behalf of the United States.

7              THE COURT:  Good morning.

8              MS. WRIGHT:  With us at counsel table is our case

9   agent, U.S. Fish and Wildlife Officer Joseluis Valenzuela.

10             THE COURT:  Good morning.

11             MS. WRIGHT:  Good morning, Your Honor.

12             MR. KUYKENDALL:  Good morning, Judge.  Greg

13  Kuykendall and Amy Knight on behalf of Dr. Scott Warren, who

14  is present, out of custody, and along at counsel table is

15  Josie Shapiro.

16             THE COURT:  Good morning.

17             There was something you guys wanted to put on the

18  record about the next trial coming up?

19             MS. WRIGHT:  Yes, Your Honor.  If I -- if I could.

20             For the felony matter, we have the evidentiary

21  hearing set for this coming Monday.  There has been some

22  suggestion I think that defense counsel's considering

23  submitting on the record.  The Government was considering

24  calling witnesses.  Everything's a little bit in flux, so we

25  wanted to raise that for the Court so we could get an idea of
```

1    how the Court wants to go forward and plan accordingly.

2              THE COURT:  I plan on being here on Monday.

3              MS. WRIGHT:  All right, Your Honor.  Thank you.

4              THE COURT:  If you want to submit on the record, you

5    can.  If you don't, I'll be here.

6              MR. KUYKENDALL:  So it's clear, Judge, the defense

7    is willing, in the criminal, I'm sorry, in the felony matter,

8    the defense is willing to submit on the record in the same

9    manner that it submitted on the record for the selective

10   enforcement motion in the misdemeanor matter, and if the

11   prosecution is going to call their witnesses anyway --

12             THE COURT:  You'll be here anyway too.

13             MR. KUYKENDALL:  -- I will be here.

14             THE COURT:  All right.

15             MR. KUYKENDALL:  But I wanted the record to reflect

16   that that's our offer.

17             THE COURT:  Okay.

18             MS. WRIGHT:  And, Your Honor, if I -- oh, I'm sorry.

19   I didn't mean to interrupt.

20             THE COURT:  No, go ahead.

21             MS. WRIGHT:  Your Honor, the issue for the

22   Government is that, just like with the misdemeanor matter, we

23   object to these exhibits that were attached to the motion

24   being admitted as evidence.  And Your Honor, to make the

25   record here, that's because those exhibits would not be

1   admissible at a hearing even with the relaxed rules that apply

2   to a pretrial evidentiary hearing.  So we do object to that.

3              I would ask that, if the Court is inclined to allow

4   that --

5              THE COURT:  You mean like I already have?

6              MS. WRIGHT:  Something like that, Your Honor.

7              THE COURT:  You think I might change my mind?

8              MS. WRIGHT:  Your Honor, I always have hope in my

9   advocacy, but if the Court's inclined to allow that process,

10  we would ask, just like with the last -- with the misdemeanor

11  and with the Court's consideration of that, if the Court's at

12  all inclined to take a negative inference to the Government

13  from those documents, that we be given notice and call our

14  witnesses so that we can deal with that.

15             So if the Court accepts those exhibits and admits

16  it, we would ask the Court to let us know if the Court is at

17  all considering drawing a negative inference towards the

18  Government from those so that we can put on the witnesses we

19  need to, and this is the issue we raised with the Court at the

20  misdemeanor.

21             THE COURT:  All right.

22             MS. WRIGHT:  If that makes sense to the Court.

23             THE COURT:  It makes sense.

24             MS. WRIGHT:  Thank you.

25             THE COURT:  Dr. Warren, if you'll return back to the

1   stand.

2              MR. KUYKENDALL:  Could I just say for the record --

3              THE COURT:  Sure.  As he's walking up, go ahead.

4              MR. KUYKENDALL:  Can I just say, that doesn't make

5   sense to me.  That's kind of like three bites at the apple.

6              THE COURT:  Two.  Only two.

7              MR. KUYKENDALL:  It depends on how you count

8   them, but it's -- anyway.

9              SCOTT WARREN, WITNESS, PREVIOUSLY SWORN

10             THE COURT:  Dr. Warren, have a seat.  You're still

11  under oath, and when we concluded yesterday, I had just asked

12  you a number of questions, and as usually happens overnight, I

13  thought about a couple more I want to ask you before I give

14  you back to your attorney.

15             The area where you were contacted by the agent in

16  this case near Charlie Bell Pass, is that the only area you

17  feel where you can practice your religion?

18             THE WITNESS:  So I would say that I have

19  participated in finding bodies or people who have died or

20  providing humanitarian aid in places other than the Growler

21  Valley, but the Growler Valley is the area of highest and most

22  immediate need, and so to me, not going to the Growler Valley,

23  not going to that particular location, for instance, would be

24  not practicing my faith in a full and honest and authentic

25  way.  It would be in some ways a kind of hollow expression of

1  it to not go to the place where people are dying in greatest

2  number and have such an immediate need.

3          THE COURT:  Do you have to drive on prohibited roads

4  to practice your faith?

5          THE WITNESS:  In order to reach these locations, I

6  do, yes.

7          THE COURT:  Can you just hike out to the location?

8  I know it would be quite a trek, and you'd have to take

9  supplies and maybe go overnight, but you could do that, could

10  you not?

11          THE WITNESS:  No.  In the summer it's impossible to

12  carry enough water.

13          THE COURT:  Okay.  I think that's it.  Go ahead.

14                      REDIRECT EXAMINATION

15  BY MR. KUYKENDALL:

16  Q.  Scott, just to orient ourselves in relation to Judge

17  Collins' question, I'm going to show you Exhibit 104 and ask

18  if you can identify that.  And I will -- I'm sorry.  I don't

19  think I can get it zoomed out any farther than that, but it

20  says Exhibit 104 at the top.

21      What is that?

22  A.  That's a topographic map of the Growler Mountains on the

23  east side of that map, and then to the west, that's the

24  Growler Valley, and those red dots indicate places where human

25  remains have been found and recovered.  Some of those dots

1    indicate multiple recoveries, so you can see where there's a

2    date, but then in some cases there's, like, a 2.

3        So in those places, that would be where, you know, two

4    bodies or sets of remains were found.  So this is a map that

5    is -- and this one's cumulative or -- yeah, this is fiscal

6    year 2017.  And this is one of the kinds of maps that Ed

7    McCullough produces on a regular basis that's, as I said

8    yesterday, based off of that data from the Pima Medical

9    Examiner.

10            MR. KUYKENDALL:  I'd move for the admission of

11   Exhibit 104.

12            MR. WALTERS:  No objection, Your Honor.

13            THE COURT:  It can be admitted.

14   BY MR. KUYKENDALL:

15   Q.  And I want you to be sure and tell me if I get my

16   directions wrong in my question, but I'm going to point to the

17   east side of Charlie Bell Pass here.  You see where I'm

18   pointing?

19   A.  Yes.

20   Q.  And this is where the access road is that says you can't

21   access it to go down to the west; correct?

22   A.  Yes.  That's the beginning of the administrative portion

23   of the road.

24   Q.  And by the way, are you aware of -- at this point, has

25   there -- well, I'll strike that question.  Anyway, this is

1  where the trucks, the two -- well, one red truck and one gray

2  SUV were parked on June 1; right?

3  A.    Correct.

4  Q.    Just to follow up on the judge's question, could you --

5  why can't you hike into the desert over to the west side of

6  the Growler Mountains from where my pen is, where the red

7  truck was and the gray truck was on June 1?

8  A.    Well, that road, the Charlie Bell Pass Road, provides the

9  only access into the Growler Valley for about anywhere, I

10 would say, about 10 to 15 miles to the north and anywhere

11 20, 20-plus miles to the south, and the reason for that is

12 because the Growler Mountains themselves are, the kind of

13 western face of the mountains, the western escarpment, is

14 incredibly steep and rugged.

15       And so there's no other access, really.  There's a --

16 there's one other place called Temporal Pass, which is about

17 10 miles south, which is an extremely rough footpath that goes

18 over the mountains, and other than that, that's the only

19 access.

20 Q.    I assume you learned something about map reading in your

21 Ph.D. and studies; is that fair?

22 A.    That's very fair.

23 Q.    Okay.  Good.  And I'm intentionally not calling you a

24 geologist this entire trial, but what do these tight squiggly

25 lines mean on this topographic map?

REDIRECT EXAMINATION OF SCOTT WARREN

1   A.   Those are contour lines, and the tighter and more

2   squiggly, the more rugged that terrain is, the steeper that

3   terrain is.

4        Essentially what you're seeing here at this scale, really

5   everything on that west side of the Growler Mountains, so

6   facing up against where the line of red dots is, is

7   essentially a band of cliff, a cliff face, that runs north and

8   south there.  It is also the reason why people are funneled up

9   through there, and you have that line of deaths that's right

10  along the base of the mountains.

11  Q.   I'm going to show you what's been marked as

12  Government's -- well, it's been marked as Exhibit 2.

13           MR. KUYKENDALL:  I believe this was admitted, was it

14  not?

15           MR. WALTERS:  It was.

16  BY MR. KUYKENDALL:

17  Q.   And I think this was the picture taken by Officer

18  Valenzuela on June 1, and can you describe -- up there at

19  Charlie Bell Pass.  Can you describe what's in the background.

20  A.   Yeah, the background there is -- those are the Growler

21  Mountains, and so that gives a good indication of the kind of

22  topography that's on either side of that pass, and it extends

23  several miles north and south of the pass.

24  Q.   So the peak in Exhibit 2 would correspond with the --

25  this area to the west and north of where it says Charlie Bell

1  Pass on Exhibit 104?

2  A.    Yeah.  The photo looks like it's the topography that's

3  just between Sheep Peak and Growler Peak there, so that ridge.

4  Q.    And is it your testimony that that's what you can't hike

5  over in order to access the Growler Valley and practice your

6  religion?

7  A.    Yes, although I would say that that peak is actually less

8  rugged than the cliffs that are to the south of that area.

9  Q.    And just to be clear, the place where you encountered

10  Officer Valenzuela on that administrative road, that was

11  approximately 2.3 miles west of where the administrative road

12  begins on Charlie Bell Pass; right?

13  A.    Yeah, it was about two-and-a-half miles west.

14  Q.    And if you take a look at Exhibit 2, the pass, the

15  administrative road, goes down the hill off to the left of

16  this picture; correct?

17  A.    Correct.

18  Q.    Would you describe that as a gentle incline?

19  A.    No, no.  Calling it a pass is frankly a misnomer.  It's

20  more like kind of a headwall that, I mean, back in, like, the

21  '20s and '30s, prospectors and ranchers that used that area

22  carved a rough access road to get into that part of the

23  Growler Valley.

24        So it's been used since then, but it's a pretty

25  precipitous drop down the face of this basically just low

1    point in the mountains, low point in those cliffs.

2    Q.   Is it -- is it a fair statement to say that the last mile

3    walking or driving from west to east, the easternmost point

4    being the top of the pass, that last mile is uphill?

5    A.   Yes.  It's several hundred feet to climb that, and it's

6    uphill, yeah.

7    Q.   On the date that you were stopped, or I'm sorry, the date

8    that you encountered Officer Valenzuela 2.3 miles to the west

9    of Charlie Bell Pass, could you have walked out to where you

10   were stopped?  I'm sorry.  Could you have walked out to that

11   area where you encountered Dr. -- not Dr. -- where you

12   encountered Officer Valenzuela?

13   A.   I could have physically walked to that location, yeah,

14   where the truck was parked, yeah.

15   Q.   But what -- from where you parked the truck on June

16   1, did you walk off of the administrative road?

17   A.   We did.  We continued hiking south from that point.

18   Q.   And you did that in order to look for human remains?

19   A.   We did.  Yes.

20   Q.   Would you have been able to hike from Charlie Bell Pass

21   where the administrative road starts all the way to where you

22   encountered Officer Valenzuela and then continued to the hike

23   the distance that you did looking for human remains if you'd

24   -- if you'd walked the whole way?

25   A.   No, we could not.

1    Q.   And as I understood your testimony yesterday in

2    responding to Judge Collins' questions, did you have to choose

3    between doing what your spiritual beliefs entail or doing what

4    the regulations dictate?

5    A.   Yes.  I felt that that was a choice I had to make.

6    Q.   And Judge Collins also asked you about the length of time

7    that you had held these spiritual beliefs and where you

8    believed that they came from, and you referenced your parents

9    in the course of doing that.

10       Is that right?

11   A.   That's right, I did, yes.

12   Q.   So the belief system that you have is something that has

13   evolved somewhat over time but began with values that were

14   instilled by your parents; is that right?

15   A.   That's correct.

16   Q.   And are they here in the courtroom today?

17   A.   They are here in the courtroom.

18   Q.   Where are they?

19   A.   They're sitting right in the front row.

20   Q.   You've described00, I'm going to show you Exhibit 104.

21   Actually, while I'm at it, I'm going to show you Exhibit 103

22   and ask if you can identify that.

23   A.   Yeah, that's another map that's one of these maps

24   produced by Ed McCullough based on the Pima County Medical

25   Examiner data for recovered human remains of migrants, again,

1  fiscal year 2017, and -- or not the entire fiscal year, I see

2  that, but October to May.

3       And then this is a zoomed-out, a smaller-scale map than

4  the previous one showing a larger area, including Organ Pipe

5  Cactus National Monument in Ajo and the Growler Valley.

6            MR. KUYKENDALL:  And I'd move for the admission of

7  Exhibit 103.

8            MR. WALTERS:  No objection.

9            THE COURT:  It'll be admitted.

10 BY MR. KUYKENDALL:

11 Q.   So Exhibit 104 is just a zoomed-in version of Exhibit

12 103?

13 A.   Yeah, that's correct.

14 Q.   So to your knowledge, what are -- well, let me just ask

15 it this way.  To your knowledge, does the remoteness of this

16 valley contribute to its dangerousness?

17 A.   Yes, it certainly does.

18 Q.   And to your knowledge, is part of the reason that people

19 are dying in this remote valley because they're not near any

20 recognizable road?

21            MR. WALTERS:  Objection, Your Honor.  Calls for

22 speculation.

23            THE COURT:  Overruled.

24 BY MR. KUYKENDALL:

25 A.   Yes.  In my experience and my expertise, it certainly is

1   one of the contributing factors.  This is a very remote area.

2   There's irregular access to it for civilian humanitarian aid

3   and search and rescue/search and recovery groups.  It

4   contributes to the existence of deaths and the fact that there

5   are many bodies and remains that are found in these areas.

6   Q.   And by the way, yesterday, when I showed you Exhibit --

7   actually, I showed you Exhibit 102, and you indicated that up

8   here, where my finger is pointing at the top, one of the top

9   red dots, that up there is where the Barry Goldwater bombing

10  range begins.

11  A.   Yeah, roughly.  It basically follows that line, but it

12  does kind of jut to the south a bit in the Growler Valley.  It

13  has kind of a piece that comes down.  But that's about the

14  boundary, yeah.

15  Q.   And actually, what this green line is right there, what

16  is that line?

17  A.   That's indicating the county boundaries, so to the north,

18  that's the Pima County and Maricopa County boundary, and then

19  to the west, it's the Pima and Yuma County boundary.

20  Q.   So the reason that the dots are inside this green

21  boundary is because these are dots compiled by the Pima County

22  Medical Examiner, or not dots compiled by, but these reference

23  human remains examined by the Pima County Medical Examiner;

24  right?

25  A.   Yeah, in my understanding and experience, the Pima County

1    Medical Examiner does an outstanding job compiling

2    information, but there's difficulties with these county

3    boundaries, particularly with Yuma County and to some degree I

4    think with Maricopa County in terms of compiling all that

5    information.

6         So you tend to see these kinds of hard boundaries on

7    county lines not indicating that people have necessarily died

8    there but that -- different jurisdictions and the difficulty

9    of compiling all that information in a single place.

10   Q.   And showing you again Exhibit 104, just so we can kind of

11   zoom in on the area where you were cited, I think that you

12   testified that this X is approximately where Officer

13   Valenzuela stopped you or spoke with you.

14        Does that sound right?

15   A.   Yeah, I mean, that happens to be in about the spot where

16   we encountered Officer Valenzuela, yes.

17   Q.   And the date that you were encountered by Officer

18   Valenzuela at approximately this spot, your mission was

19   walking with others searching for human remains in this

20   southerly direction, southerly from the administrative road?

21   A.   That's correct, yes.

22   Q.   I believe you testified yesterday that you started that

23   mission in Ajo at about 6:00 in the morning or sunrise; is

24   that right?

25   A.   Yeah, we left just before sunrise.

1  Q.   And you encountered Officer Valenzuela in the 1:30 range?

2  A.   Yeah, I can't say exactly what time it was, but it was in

3  the afternoon, mid-afternoon.

4  Q.   On a summer day like that, are you physically capable of

5  staying out, hiking all day?

6  A.   No.  That's a time of day we need to either be back or

7  we'll find shade or air conditioning or something.  It's very

8  punishing to be out at that time.

9  Q.   At the time that Officer Valenzuela encountered you, you

10  were returning to the vehicle after having looked for human

11  remains; is that right?

12  A.   That's correct, yeah.

13  Q.   And also on that date -- I'm sorry.  Let me back up.

14      Also on that date you were involved in putting out

15  humanitarian supplies?

16  A.   That's correct, yeah.

17  Q.   Do you care if the people that used the supplies you drop

18  off as part of your religious practice, if they're illegal

19  aliens, in quotation marks?

20  A.   I do not care about that.

21  Q.   Are you striving to put water into the hands of a

22  particular status of person?

23  A.   No.  It's an absolutely essential directive of our work

24  that humanitarian aid is provided on the basis of need and

25  need alone, and so that's why we're out there and providing

1    that humanitarian aid.

2    Q.    Judge Collins asked you yesterday, I can't remember

3    exactly how he put it exactly, but it was something like, I

4    don't suppose you were going to get a permit, a special use

5    permit.

6          Do you recall that?

7    A.    I do recall that, yeah.

8    Q.    Okay.  And just to put a little finer point on it, have

9    you attempted to get a special use permit so that you can

10   drive on those administrative roads and practice your

11   religion?

12   A.    I personally haven't ever filled out the paperwork.  I

13   have had conversations with Sid Slone and Mary Kralovec where

14   they told me that we would not get a permit, we would not get

15   a special use permit, we would not get permission to drive on

16   those administrative roads, even in the event of doing human

17   remains recovery, even in the event of leading the sheriff's

18   deputies to the site where human remains had been found so

19   that the sheriff's deputies can do a full recovery.

20   Q.    So Sid Slone the refuge manager personally told you you

21   would not get a permit?

22   A.    That's correct.

23   Q.    And you asked him for a -- you told him that you wanted

24   to get permission to drive on those roads specifically for the

25   purpose of looking for human remains?

1    A.    That's correct.

2    Q.    And specifically for the purpose of providing life-saving

3    humanitarian supplies?

4    A.    That's correct.

5    Q.    And he said no?

6    A.    That's correct.

7    Q.    Were you aware of a meeting that occurred between No More

8    Deaths' lawyer Margo Cowan and other members of No More Deaths

9    and the refuge manager and some of his staff in April of 2017?

10   A.    Yeah, I'm aware of that.  I had met with Sid and -- or

11   Sid Slone and Mary Kralovec earlier that year, and I was aware

12   of that meeting as well that you're referencing in April,

13   yeah.

14   Q.    And at that meeting, is it your understanding that an

15   attempt was made to get special use permits for precisely what

16   you've described is your religious practice?

17   A.    Yes, it's my understanding that another attempt was made

18   then.

19   Q.    And what was the outcome of that meeting, to your

20   knowledge?

21   A.    To my knowledge, that they were told the same thing, that

22   No More Deaths would not be getting any special use permit and

23   would not be given permission to drive those roads.

24   Q.    Now, the prosecutor asked you some questions yesterday

25   also about your intent behind leaving -- leaving I believe it

1    was water bottles, specifically, but humanitarian supplies,

2    and he asked whether you left them as a gift or donation for

3    other human beings.

4         Do you recall that?

5    A.   I do recall that.

6    Q.   And can you expand on your intention behind -- behind

7    putting the water supplies down and the other humanitarian

8    supplies?

9    A.   My intention with that is so that people who need, in

10   this case water, who are thirsty, will be able to drink

11   water, they'll be able to find that, and they'll be able to

12   drink that water and live.

13   Q.   In your experience, do you find the water bottles that

14   you've left typically to be left in the same place that you --

15   that you set them down?

16   A.   Yeah, that's very typical that we'll find that people who

17   have come to a location like that, they've consumed the water

18   there or they've poured it into bottles that they're already

19   carrying, bottles that they prefer to carry, and they leave

20   the empty bottles in that location or in the immediate

21   vicinity, typically.

22   Q.   What are you talking about when you say bottles that they

23   brought with them or that they prefer to be carrying?

24   A.   In my experience, it's like -- really it's a specially

25   manufactured black water bottle, nothing super special about

1  it, but it's a heavier-duty plastic that people can purchase,

2  you know, all across northern Mexico, and those bottles are

3  quite a bit more durable than the water bottles that we're

4  able to put out, and so I think folks prefer to, you know,

5  just either drink the water that we leave behind or maybe pour

6  that into an existing container that they have.

7  Q.   So when you go back to the places where you've made the

8  humanitarian supply drops, do you typically find as many

9  bottles of water there as you left?

10  A.   We do, yeah.

11  Q.   And when you walk on your hikes as far as you can hike

12  off of the administrative roads in your search for human

13  remains, do you periodically see a water bottle that was of

14  the type that No More Deaths leaves in the desert?

15  A.   Yeah, we do find those, those things, and we always pick

16  them up and pack them out as trash when we find them.

17  Q.   Is part of your protocol related to picking up trash in

18  the desert?

19  A.   Yeah, that's absolutely part of the procedure in going

20  out and maintaining these drops and picking up trash that we

21  find and packing it out and leaving fresh water.

22  Q.   Do you carry any kind of receptacle with you routinely on

23  these missions in order to pick up the trash?

24  A.   Yeah, most commonly we'll carry large heavy-duty black

25  trash bags, and also it's convenient to carry a length of

 1   twine or cord for tying empty bottles together and then

 2   carrying them out that way.

 3   Q.   So you're not leaving the bottles of water and supplies

 4   behind unwanted.  You specifically intend them as a gift to

 5   people who need them to drink?

 6   A.   That's correct, yeah.  They're intended for people that

 7   need them to use them to drink.

 8   Q.   So you have an intention behind what you do with those

 9   bottles when you leave them in the desert?

10   A.   Yes, I would say so.

11   Q.   And you have reason to believe that you're leaving them

12   in a place where thirsty people will find them?

13   A.   That's correct.

14   Q.   What's that reason?

15   A.   The reason is that, where we leave water, these are

16   locations where people have died or very near to locations

17   where people have died, and from these maps and from the

18   information that get eventually from the Pima County Medical

19   Examiner, we know that in many cases the cause of death is

20   dehydration, exposure to the elements.

21       So we know that people are dying of dehydration.  We know

22   that people are dying of exposure.  They're dying for lack of

23   access to water.  They're dying for a lack of salts in their

24   system, hyponatremia.  All kinds of things contribute to their

25   deaths, and so we know that, if people can get a drink of

1  water, they will live longer than people who can't get a drink

2  of water.

3  Q.   And with what regularity do you check the sites where

4  you've left the water and other supplies?

5  A.   It varies.  I'd say every two weeks is typical.

6  Q.   And if you come back and find that supplies have not been

7  used at the site that you left them, what happens then?

8  A.   We'll pick up the supplies and often move them to

9  different locations or we'll pack them out.

10  Q.   Is it your intention that the supplies that you leave in

11  the desert stay there in the refuge indefinitely?

12  A.   No.  That's certainly not my intention.

13  Q.   Is it your intention for somebody else to pick it up and

14  carry it away unused, out of the area?

15  A.   No.  That's not my intention either.  If that happens,

16  then it's no longer available for the people that need it

17  most.

18  Q.   So you leave the water specifically for somebody who

19  needed to use it?

20  A.   That's correct.

21  Q.   Now, the prosecutor was also asking you some questions

22  about -- about -- I don't know how he phrased it exactly but

23  your -- your awareness of a particular individual needing

24  assistance at that moment that you leave the -- that you leave

25  the supplies in the desert.

1      Do you know what I'm talking about?

2   A.   I remember that, yeah.

3   Q.   Okay.  Based on your knowledge, research, and experience,

4   did you make any reasonable inference about the potential for

5   immediate harm coming to individuals in the Growler Valley

6   where you've left supplies?

7   A.   Yes.  Absolutely.  And as we discussed yesterday, you

8   know, while we certainly can't say that somebody will come

9   take a drink of water at this day, at this hour, at this

10  minute, at this second, we know, for instance, based on these

11  maps, based on our own experience, based on the experience of

12  law enforcement officials that work in this area, that do the

13  recoveries, that in the summer months, June, July, August,

14  September, for instance, it's fair to say that a recovery of a

15  body or human remains on average happens every week in the

16  sort of larger Growler Valley corridor.

17      So knowing that people are potentially out there dying

18  every week, to put water in a particular location to revisit

19  that at a frequency of two weeks, you know, to me is sort of

20  addressing that particular question and that particular issue.

21  We know that it's not a person dies every other year out

22  there.  We know that it's a high frequency in the summer

23  months.

24      And so to me, that's a perfectly reasonable way to sort

25  of assess the need that there needs to be, you know, water at

1    particular locations for at least, like, a two-week period or

2    even longer.

3              MR. KUYKENDALL:  May I have one minute, Judge?

4              That's all my questions.  Thank you, Judge.

5              Thank you, Dr. Warren.

6              THE COURT:  You may step down.

7              (Partial transcript of proceedings concludes at

8              11:15 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3         I, Erica R. McQuillen, Federal Official Realtime

 4  Reporter, in and for the United States District Court for the

 5  District of Arizona, do hereby certify that, pursuant to

 6  Section 753, Title 28, United States Code, the foregoing is a

 7  true and correct transcript of the stenographically reported

 8  proceedings held in the above-entitled matter and that the

 9  transcript page format is in conformance with the regulations

10  of the Judicial Conference of the United States.

11         Dated this 9th day of May, 2019.

12

13                          s/Erica R. McQuillen
                        Erica R. McQuillen, RDR, CRR
14                      Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```