Gregory J. Kuykendall, Bar # 012508
Amy P. Knight, Bar # 031374
KUYKENDALL & ASSOCIATES
531 S Convent Avenue
Tucson, AZ 85701
(520) 792-8033
greg@kuykendall-law.com
amyknight@kuykendall-law.com
*Pro Bono* Attorneys for Defendant Scott Daniel Warren

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br>　　　　　Plaintiff,<br><br>vs.<br><br>SCOTT DANIEL WARREN,<br>　　　　　Defendant. | No. 17-mj-00341-RCC(JR)<br><br>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

Defendant Scott Daniel Warren submits proposed findings of fact and conclusions

of law based on the evidence presented at the trial in this matter conducted May 6-8, 2019.

## I.    FINDINGS OF FACT

### A. BACKGROUND

1. From 2000 through the end of 2017, the Pima County Office of the Medical Examiner

(PCOME), which has jurisdiction over three of the four Arizona counties that border

Mexico (Day 2[1] at 5), received over 2,800 recovered human remains of people it believes

to be undocumented border crossers (Day 2 at 14; Exhibit 101). Many of these deaths

---

[1] The defendant testified over the course of two days; a number of other witnesses also testified on both days and on a third day. The Court Reporter prepared transcripts of the defendant's testimony separately (and separately paginated) from other witnesses. For clarity, the transcripts will be cited simply as "Day 1" which refers to other witness testimony on May 6, 2019; "Def. Day 1," which refers to the defendant's testimony on May 6, 2019; "Day 2" and "Def. Day 2," which refer to the testimony on May 7, 2019, and "Day 3," which refers to the testimony on May 8, 2019.

are attributable to exposure, which includes hyperthermia and dehydration (Day 2 at 18-19). Recoveries of remains have generally spiked during the extremely hot summer months (Day 2 at 16). Only about half of the remains are discovered by law enforcement; the rest are found by others, including humanitarian groups (Day 2 at 12). In all probability many more human remains exist that have never been recovered.

2. A number of humanitarian groups formed in Southern Arizona in the early 2000's to respond to these deaths and attempt to prevent them from occurring. Those groups include the Samaritans, No More Deaths (NMD), and Humane Borders (Day 2 at 37-38). They use a combination of strategies to reduce death and suffering, including placing large water barrels in the desert, placing blue flags on existing non-potable water sources, placing one-gallon jugs of water, canned food, and medical supplies in the desert in areas heavily traveled by migrants, conducting search-and-rescue operations, and searching for the remains of people who have died to facilitate their recovery by authorities, identification, notification of the families, and dignified burial.

3. PCOME provides data about the number and location of recovered remains to the public (Day 2 at 42). Dr. Ed McCullough, a retired geology professor and volunteer with the Samaritans, creates maps showing where remains have been found each month, and provides them to NMD (Day 2 at 44-45). NMD uses this information to decide where to conduct their work (Day 2 at 63).

4. The crisis of migrant deaths that has continued since the PCOME began compiling its data in 2000 is concentrated in certain, often remote areas where large numbers of deaths cluster. One such area with a particularly large number of deaths is the Growler Valley (Def. Day 2 at 6; Exhibits 102, 103, 104; Day 2 at 45), which is within the Cabeza Prieta National Wildlife Refuge (CPNWR).

5. The CPNWR is a vast expanse of federal land to the West of Tucson and the Tohono O'Odham Nation Reservation and to the East of Yuma. The refuge borders on the town of Ajo. It encompasses over 860,000 acres, including 56 miles of border with Mexico (Day 3 at 4-5). 806,000 acres of the CPNWR are designated as a wilderness area,

2

meaning it is subject to a specific set of more restrictive rules and regulations concerning its use (Day 3 at 4). The entire refuge, including the wilderness area, is under the jurisdiction of the United States Fish and Wildlife Service (FWS). FWS officers find human remains within the refuge (Day 2 at 52), although they do not keep track of the number of deaths in their jurisdiction (Day 2 at 102).

6. To enter the CPNWR, members of the public are required to obtain a permit (Day 1 at 14). This permit allows access to the refuge, and allows driving on public roads, but not on so-called "administrative" roads in the designated wilderness (Day 1 at 27). The boundaries of the wilderness area, and the restrictions on access to those roads, are clearly marked with signs (Day 1 at 32). To obtain the permit, visitors must sign a "Hold Harmless Agreement" (Day 1 at 49). This document advises visitors that the CPNWR "is one of the most extreme environments in North America" (Day 1 at 51). According to one FWS officer who testified, it is "terribly dangerous to be out on the refuge without sufficient water" (Day 1 at 61). In June, 2017—*after* Dr. Warren was cited in the CPNWR—the government changed the language on this agreement, adding an explicit requirement to remove all items brought onto the refuge, with a list specific items visitors were not allowed to leave behind, including water, food, blankets, and medical supplies (Day 2 at 115). The purpose of this change was to make the rules clear (Day 2 at 114).

7. Since 2013, defendant Dr. Scott Warren has resided full-time in Ajo, where he is an active volunteer with both Ajo Samaritans and NMD (Def. Day 1 at 12-13). Dr. Warren holds a Ph.D. in geography and completed his doctoral dissertation about Ajo (Def. Day 1 at 12). In 2014, Dr. Warren made contact with NMD, and, due to the need he had observed there, encouraged them to extend their work to the Ajo region (Day 2 at 61).

8. NMD volunteers regularly conduct "missions" or "patrols" on which they place food, water, and other supplies and also search for human remains (Day 2 at 64). The supplies are not placed randomly, but at specific "water drop" sites they identify, maintain, and carefully log using GPS coordinates (Day 2 at 65). The "water drops" are intentionally located where migrants are known to have died. (Day 2 at 74). They also inventory what

3

remains from their last visit to assess the effectiveness of each site (Day 2 at 74). They bring large trash bags with them on their patrols and collect empty water bottles and trash from their sites (Day 2 at 21-22; 66); they also collect any other trash they find (Day 2 at 21). They bring loads of trash and recycling to the Ajo dump "at least once or twice a week" (Day 2 at 72). If their supplies have not been used, they remove them or move them to a different location; they do not intend for them to remain in the refuge indefinitely (Def. Day 2 at 23). They never drive off-road in the refuge (Day 2 at 73).

B.  FINDINGS OF FACT REGARDING DR. WARREN'S RELIGIOUS BELIEFS

9.  Dr. Warren testified at length about his beliefs, and his testimony was credible. His manner appeared sincere, and he testified to having written and published about some of these beliefs for years prior to these charges (Def. Day 1 at 22). His belief system has evolved over time from values initially instilled by his parents. (Def. Day 2 at 13).

10. Dr. Warren testified that "all life is sacred, and places are sacred as well" (Def. Day 1 at 17). By this he means "the sense of sacredness is in the continued presence and the sort of life force of people and of the places and the struggle that people undergo in that particular place, and to me that creates a thing that is quite sacred and needs to be honored as such" (Def. Day 1 at 17). "Life force," in his belief system, is "something that I feel and I sense when I'm in these places, when I'm in a place like Ajo" (Def. Day 1 at 18). Dr. Warren believes a place gets imbued with "life force" especially when people die there alone, with "nobody there to witness them when they died" (Def. Day 1 at 19).

11. Finding human remains is a spiritual experience for Dr. Warren: "the act of witnessing where somebody has died in the desert is an act of spiritual completion for them, and when we can witness where somebody died, that to me is the thing that makes their— their soul live on in that place" (Def. Day 1 at 19-20). Dr. Warren believes that when someone dies alone in the desert, "it's as if they sort of remained in a kind of in-between state until they can be witnessed" (Def. Day 1 at 21). He believes that bearing witness to the remains of a person who likely died alone creates a connection between his soul and

4

the soul of the deceased person, and that connection lasts forever (Def. Day 1 at 22). Many if not most of the people who die crossing the desert die alone (Def. Day 1 at 21).

12. Dr. Warren also attaches spiritual significance to the placement of water and supplies in the desert. He testified, "that act of putting down a gallon of water, say, and knowing that it goes from my hand onto the ground, sacred ground where someone has died, and somebody else will pass through there at some point on that same sacred ground and pick that gallon of water up, is to me a connection as well" (Def. Day 1 at 24). In his belief system, "that provision of humanitarian relief to people, that kind of direct care for people, is equally as sacred as witnessing where people have died" (Def. Day 1 at 29).

13. Dr. Warren engages in rituals in connection with this work, including a moment of silence at the beginning and end of weekly meetings (Def. Day 1 at 23). The places he puts water are "either where somebody has died in that immediate vicinity or very close by, so that ground to me is sacred any time we go there, and I take a moment to reflect on and. . . bless those things that we put out, those gallons of water and other kinds of humanitarian supplies" (Def. Day 1 at 23-24). When he finds remains, he will take a long moment of silence, then "face the remains of the person and offer a kind of silent acknowledgment, and the I turn away from the site, and I will kneel down and pick up two handfuls of dirt or rocks, whatever kind of soil it is, and I'll hold that in my hands, sort of mash it together, let it fall out of my hands. . . That is both sort of an act of, like, holding the person and then releasing, releasing them" (Def. Day 1 at 25-26). Dr. Warren believes that this allows that person's soul to be free from the pain of his death (Def. Day 1 at 26). Another witness, a Franciscan Friar who has accompanied Dr. Warren on a desert trip, testified that he has observed Dr. Warren engage in spiritual ritual upon finding a human skull (Day 2 at 150-51). In addition, NMD as a group, while non-denominational, engages in spiritual and ceremonial activity, including what one volunteer referred to as "reconsecrat[ing]" their space in a ceremony led by clergy at a place that is their "spiritual center" (Day 2 at 68).

14. The choice of location for this work is far from arbitrary; Dr. Warren's beliefs attach a

special significance to Ajo and the surrounding desert, which he explained "is very distinct. The place is unique in that regard" (Def. Day 1 at 17). He testified that the large number of people who have died in and near Ajo makes that place in particular important to him (Def. Day 1 at 16). For Dr. Warren, in the CPNWR specifically, rocks, plants, and soil all have "life force" (Def. Day 1 at 18-19).

15. Dr. Warren and his colleagues choose locations based on where he has personally found bodies, as well as based on the PCOME data and maps NMD receives. Water drops are made "in places where there's concentrations of human remains recoveries" (Def. Day 1 at 25). This choice of location is an essential part of his religious exercise. As he testified, "[t]o neglect that area of greatest need to me would be sort of just engaging in a hollow performance of what's really needed in the witnessing and the practice that I undertake" (Def. Day 1 at 40). Searching for remains or leaving water and other supplies in *other* places, where remains are not concentrated, does not satisfy Dr. Warren's religious beliefs. He testified that he could not "adequately exercise [his] faith by putting out supplies for migrants in need or a migrant that might pass by in need in a place other than where" the remains were concentrated, and that is "not the actual, to me, the actual sacred act of putting those things where they are needed" (Def. Day 1 at 41-42).

16. Dr. Warren can only hike limited distances under the prevailing conditions in the areas where his beliefs require that he do this work. FWS recommends that anyone hiking in the refuge carry two gallons of water per person per day (Day 2 at 118); this is in addition to the supplies Dr. Warren needs to carry to leave for people in danger. He testified that "typically for me a distance of three to four miles when carrying lots of supplies over that kind of rugged terrain and in that heat is about my limit" (Def. Day 1 at 40-41). Hiking this distance from the wilderness boundary—the point up to which a person may drive without violating any law—would get him only to the very edge of the critical areas.

C. FINDINGS OF FACT REGARDING JUNE 1, 2017

17. On June 1, 2017, Dr. Warren drove a white dodge truck belonging to the Unitarian

Universalist Church of Tucson to the CPNWR, along with two other vehicles in a group totaling 13 individuals, all volunteering with NMD (Def. Day 1 at 45). The group loaded up the three trucks together with supplies and left from Ajo early in the morning (Def. Day 1 45-46).

18. Dr. Warren had a valid permit to be on the refuge; it was the pre-revision version, and it did not allow him to be on the restricted roads (Day 1 at 26; Day 2 at 112-113).

19. Dr. Warren drove the truck along the public portion of Charlie Bell Road to Charlie Bell Pass, where the public road ends, and then continued driving on the road after it entered the designated wilderness, where it was closed to the public, to Charlie Bell Well and farther still, until he parked the truck just off the administrative road approximately eight tenths of a mile beyond Charlie Bell Well (Day 1 at 21), with full knowledge that he was in a wilderness area on a road closed to the public (Def. Day 1 at 47-48). There are no public roads by which the truck could have reached that location (Day 1 at 22). FWS Officer Joseluis Valenzuela observed the white truck at that location (Day 1 at 22); subsequently, four individuals arrived including Dr. Warren, and Dr. Warren admitted to being the driver (Day 1 at 28). The location where Officer Valenzuela encountered Dr. Warren is right in the middle of a very pronounced cluster of locations where human remains have been found in the Growler Valley (Day 2 at 46; Exhibit 102).

20. Dr. Warren and the other volunteers placed supplies at a number of sites on the refuge that day, all of which were established "water drop" sites (Def. Day 1 at 47). The supplies included gallon jugs of water, food, and medical supplies (Def. Day 1 at 51).

## II.    CONCLUSIONS OF LAW

A. ABANDONMENT OF PROPERTY

21. To establish a violation of 50 CFR 27.93, the government must prove Defendant abandoned, discarded, or otherwise left personal property in a national wildlife refuge. "Abandon" means leaving something behind with no intention of removing it. *See United States v. Walker,* 2006 U.S. Dist. LEXIS 45542 (S.D. Ill. June 22, 2006); *see also Tait v. United States,* 763 F. Supp. 2d 786, 796-98 (E.D. Va. 2011) (abandonment

requires an intentional relinquishment of rights in private property *with no intention to return to that property at a later time.*" (emphasis added). Ninth Circuit precedent explicitly excludes the placement of bottles of potable water for human consumption from the definition of "discard." *United States v. Millis,* 621 F.3d 914, 917 (9th Cir. 2010). "Otherwise leave" is not defined, and is ambiguous; it obviously cannot encompass all instances of setting down some property and walking away for a time, as the refuge permits camping. Moreover, FWS officials thought text was unclear on its face, as they changed the language on their agreement to include items such as bottles of water and medical supplies *after* the June 2017 incident with Dr. Warren specifically for the purpose of *making* it clear. "The rule of lenity 'requires courts to limit the reach of criminal statutes to the clear import of their text and construe any ambiguity against the government.'" *Millis,* 621 F.3d at 916-17. Because, especially absent the government's subsequent explicit interpretation, it is ambiguous whether, with the phrase "abandon, discard, or otherwise leave," this regulation encompasses the placement of emergency supplies specifically for the use of other human beings, with the intention of returning for the supplies if they were not used, or for the empty containers if they were used, this Court must interpret it against the government. Placing emergency supplies for the use of others with the intent to return at a future time, rather than leaving them behind permanently as unwanted, does not constitute abandonment of property.

22. NMD volunteers log the location and amount of supplies they place, and return to the sites to collect and remove empty containers, as well as full ones that have gone unused. Dr. Warren testified that he routinely finds as many empty water bottles as full ones he had left (Def. Day 2 at 21). Dr. Warren also testified that in placing the supplies, he is not discarding them; rather, he intends them as a gift for people that need them to use them to drink" (Def. Day 2 at 21). Although one giving a gift may also intend to relinquish any ownership rights, that is clearly not the same thing as abandonment. Accordingly, in placing supplies for others' use with the intent to return

for the containers, Dr. Warren did not violate the prohibition on abandonment of property.

### B.  OPERATING A MOTOR VEHICLE IN A WILDERNESS AREA

23. 50 CFR 35.5 provides that there shall be no use of motorized vehicles within a wilderness unit. Dr. Warren drove a pickup truck on  a restricted road within a designated wilderness area. This constitutes a violation of 50 CFR 35.5.

### C.  THE RELIGIOUS FREEDOM RESTORATION ACT

24. "Congress enacted RFRA in 1993 in order to provide very broad protection for religious liberty." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 693 (2014). RFRA provides that the government may not "substantially burden a person's exercise of religion . . . unless the Government 'demonstrates that application of the burden to the person—(1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.'" 42 U.S.C. § 2000bb-1(a), (b). RFRA can be raised as a "defense in a judicial proceeding," including criminal proceedings. 42 U.S.C. § 2000bb-1(c).

25. A RFRA defense proceeds in two parts. *Navajo Nation v. United States Forest Serv.*, 535 F.3d 1058, 1068 (9th Cir. 2008). First, the defendant must show that the government has imposed a "substantial burden" on his religious exercise. *Id.* Then, "the burden of persuasion shifts to the government to prove" that the imposition of the burden on the defendant satisfies strict scrutiny. *Id.*

Exercise of a sincerely held religious belief

26. The Ninth Circuit has adopted the Supreme Court's view from *United States v. Seeger*, 380 U.S. 163, 185 (1965), and *Welsh v. United States*, 398 U.S. 333, 339 (1970), that religion should be defined in light of "the richness and variety of spiritual life in our country." *Seeger*, 380 U.S. 163, 174. Protected beliefs not be "acceptable, logical, consistent, or comprehensible to others," *United States v. Zimmerman*, 514 F.3d 851, 854 (9th Cir. 2007) (per curiam), and protection is "not limited to beliefs which are shared

by all members of a religious sect." *Holt v. Hobbs*, 135 S. Ct. 853, 862-63 (2015). Belief in God or a Supreme Being is not required; rather, "[r]eligious beliefs . . . are those that stem from a person's 'moral, ethical, or religious beliefs about what is right and wrong' and are 'held with the strength of traditional religious convictions.'" *United States v. Ward*, 989 F.2d 1015, 1018 (9th Cir. 1992) (quoting *Welsh*, 398 U.S. at 340). In *Ward*, the defendant "[did] not describe his beliefs in terms ordinarily used in discussions of theology or cosmology" and even "at one point use[d] the term 'atheistic[.]'" *Ward*, 989 F.2d at 1018. Nonetheless, given the strength with which Ward held his beliefs and the risks he shouldered to pursue them, the court held his beliefs were religious. *Id.* at 1019. "The task is to decide whether the beliefs professed . . . are, in [the person's] own scheme of things, religious." *Id.* at 1018; *see also Hobby Lobby*, 573 U.S. at 725 (Court's task is to identify "an honest conviction").

27. RFRA protects "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. §§ 2000bb-2(4), 2000cc-5(7)(A); *see also United States v. Antoine*, 318 F.3d 919, 921 (9th Cir. 2003) (recognizing protection where "activities held religious significance to [defendant]").

28. The religious beliefs must also be "sincerely held." That is, defendants do not receive protections under RFRA when their alleged religious motivation is "obviously [a] sham[]," *AA ex rel. Betenbaugh v. Needville Indep. Sch. Dist.*, 701 F. Supp. 2d 863, 876 (S.D. Tex. 2009) (citing *Wisconsin v. Yoder*, 406 U.S. 205 (1972)), *aff'd*, 611 F.3d 248 (5th Cir. 2010).

29. Dr. Warren's actions constitute an exercise of sincerely held religious beliefs. The beliefs he described involve souls living on after death, and his own soul connecting with those souls and also with the souls of those who will pass through a place, and are thus indisputably religious in nature. While he does not participate in a traditional organized religion, the beliefs he described occupy a place in his life akin to that occupied by traditional religion. No indication exists that his long-held and well-documented beliefs are anything other than sincere. His testimony was explicit that both placing water and

10

other humanitarian supplies and searching for human remains, specifically in particular areas where large numbers of deaths have occurred, are acts with religious significance for him.

<u>Substantial burden</u>

30. A substantial burden exists where a person is "coerced to act contrary to their religious beliefs by the threat of civil or criminal sanctions." *Navajo Nation*, 535 F.3d at 1069–70; *see also Antoine*, 318 F.3d at 921-23 (finding "the burden on religion is inescapable" where act with 'religious significance" faced penalty of fine up to $5,000, jail up to a year, or both). It occurs when a person is forced "to choose between obedience to their religion and criminal sanction." *Oklevueha Native Am. Church of Haw., Inc. v. Lynch,* 828 F.3d 1012, 1016 (9th Cir. 2016).

31. The penalized or prohibited action need not be the actual religious practice itself, so long as it is necessary for engaging in the religious exercise. Thus, where a prison refused to allow Native American inmates access to traditional foods for a powwow ceremony, it substantially burdened their exercise of religion, even though it did not outlaw the ceremony itself. *See Haight v. Thompson,* 763 F.3d 554 (6th Cir. 2014) ("The greater restriction (barring access to the practice) includes the lesser one (substantially burdening the practice)").

32. A substantial burden does not exist where some available, legal substitute is "capable of serving the *exact same religious function* as" the prohibited activity. *Oklevueha*, 828 F.3d at 1017 (emphasis added). In such a case, the defendant is not faced with the binary choice of neglecting his religious practice or breaking the law; he has a third option of undertaking the same religious practice in a manner that does not break the law. However, the availability of *other* religious practices does not eliminate the substantial burden. *See Holt v. Hobbs,* 135 S.Ct. 853, 862 (2015) (noting that the "'substantial burden' inquiry asks whether the government has substantially burdened religious exercise. . . not whether the RLUIPA[2] claimant is able to engage in other forms of

_____

[2] RLUIPA, or the Religious Land Use and Institutionalized Persons Act, employs the same

religious exercise.").

33. Regarding abandonment of property, if this Court were to construe the regulation to prohibit the provision of humanitarian aid supplies with the intent to return at a later time, the regulation would outlaw the exact practice which, for Dr. Warren, is indisputably religious: the leaving of water and other supplies in desert areas marked by the heaviest loss of life. Dr. Warren's beliefs entail doing this activity in places where the highest concentrations of human remains have been found (Def. Day 1 at 37), and the evidence showed that the CPNWR contains an area accurately described by one witness as a "trail of death" along the Western edge of the Growler Mountains (Day 2 at 50; Exhibits 102, 103, 104). On the day for which he has been charged, Dr. Warren was working in the "area of greatest need," as his beliefs require, and as the maps generated by data from the PCOME corroborate. Moreover, Dr. Warren's religious beliefs place a special significance on the desert immediately surrounding his home of Ajo, Arizona; undertaking this practice elsewhere would not serve the "exact same religious function" as doing it in the CPNWR. *See also Navajo Nation,* 535 F.3d at 1070 (recognizing that denial of access to sacred area, unlike alteration to its character, would be a substantial burden). Dr. Warren thus faces a choice: violate a law, or refrain from this exercise of his religion. This forced choice constitutes a substantial burden.

34. Regarding the motor vehicle use, the law does not actually outlaw Dr. Warren's religious practice of locating human remains to allow a release of the soul. It does, however, effectively deny him access to the areas where those remains are concentrated (i.e., the "area of greatest need"), and thus significantly interferes with his ability to locate them. It also denies him access to areas where, per his beliefs, he needs to place water and other supplies. He believes these areas are especially sacred not only for practical reasons, but because of the accumulation of death there; thus, even if he could find occasional bodies in other places, that would not serve the "exact same religious function." Although FWS

standards as RFRA. *See Hobbs,* 135 S.Ct. at 862 (relying on *Hobby Lobby,* a RFRA case, in analyzing a RLUIPA issue).

12

does allow visitors to access wilderness areas on foot, given the steep, treacherous terrain and extreme summertime heat, it is not possible to reach the crucial areas by foot while carrying any significant amount of supplies for the religious practice of placing them for use by people in need (Def. Day 2 at 7). Dr. Warren explicitly testified that he had to drive on the restricted roads to reach those locations where he can practice his faith (Def. Day 2 at 7) and that he could not have hiked all the way to the site of his practice on the day he encountered the FWS officer (Def. Day 2 at 12). Effectively, to prohibit driving is to prohibit access.

35. Dr. Warren cannot carry out this exercise of his religion only in areas that are not subject to this restriction. The desert surrounding Ajo has unique significance to him. He testified that stopping at the wilderness boundary would not comport with his religious beliefs, and that his beliefs "really compel [him] to go further" (Def. Day 1 at 39). Moreover, areas deep in the wilderness are so dangerous for people crossing them in part *because* they are so remote; people are more likely to be rescued, or their remains discovered, in areas accessible by public road, and those people do not need his assistance. Doing these acts in the "area of greatest need" is a crucial component of the religious practice, and the evidence showed that that area is in the designated wilderness within the CPNWR. Thus, any alternative areas do not serve "the exact same religious function."

36. Dr. Warren could not avoid this forced choice by obtaining special permission for his practice from FWS. Dr. Warren and other members of NMD had sought permission from the Refuge Manager to drive on the administrative roads in the designated wilderness, and were unequivocally denied (Def. Day 2 at 18). Although he did not file a formal permit application, the official who unilaterally decides whether to approve or deny permission confirmed that he would not grant permission (Day 2 at 112).

37. The federal government, through FWS, effectively denied Dr. Warren access to the "area of greatest need," which is a necessary component of his religious practices of searching for human remains and placing water and other supplies. Dr. Warren confirmed that he had "to choose between doing what [his] spiritual beliefs entail or doing what the

regulations dictate" (Def. Day 2 at 13). This constitutes a substantial burden on his exercise of religion.

<u>Advancing a Compelling Government Interest</u>

38. Because Dr. Warren has established a substantial burden on the exercise of his sincerely held religious beliefs, the government must prove that burdening his religious exercise is the "least restrictive means of advancing a compelling interest." *O Centro,* 546 U.S. at 423 (citing 42 U.S.C. § 2000bb-1(b)). The first component of this test requires proof that burdening Dr. Warren's exercise of religion "advanc[es] a compelling interest."  This requirement itself essentially has two sub-parts: the interest served must be compelling, and the enforcement of the laws in this manner against this particular individual must meaningfully advance that interest.

39. An interest is only compelling if it is "of the highest order," *Lukumi Babalu Aye,* 508 U.S. at 546. Examples include prison security (*Holt*); guaranteeing cost-free contraceptive access (*Hobby Lobby*); preventing diversion of dangerous drugs (*O Centro*); and preparing citizens to participate in our democracy (*Yoder*).

40. The government must also prove that its action *advances* the compelling interest. This inquiry is particularized to this application, rather than generalized to the existence of the regulations. It is not enough to show that a law advances a compelling interest "in very broad terms." *Hobby Lobby*, 573 U.S. at 726-28. The government must show that "application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened"—furthers the asserted interest. *O Centro*, 546 U.S. at 430-31 (quoting 42 U.S.C. § 2000bb-1(b)).

41. Another way of putting this is that the government must prove that the identified interest "would be seriously compromised" by allowing the defendant's religious practice. *Holt*, 135 S. Ct. at 864. This analysis requires "scrutiniz[ing] the asserted harm" not of eliminating the regulation, but rather "of granting specific exemptions to particular religious claimants." *Hobby Lobby*, 573 U.S. at 726-27 (citation omitted); *see also Holt*, 135 S. Ct. at 863-64 (asking whether "denying petitioner" his exception "actually

furthers the Department's interest"). To satisfy these requirements, the government must show that its action prevents "harms" that "are real, not merely conjectural," and it "will in fact alleviate these harms in a direct and material way." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994) (describing requirements for lower intermediate scrutiny standard in related First Amendment context); *Holt*, 135 S. Ct. at 865 (prison failed to prove allowing beard for religious reasons would cause "meaningful increase in security risk"). Theoretical harms are not enough; the government must identify actual "harms posed by the particular use at issue here," and prove its compelling interest in preventing those real harms. *O Centro,* 546 U.S. at 432.

42. A "law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *Lukumi Babalu Aye,* 508 U.S. at 546. In *Holt,* for instance, the Supreme Court recognized that allowing a religious exception to the no-beards rule in a prison could *not* cause serious harm because the prison *did* find it feasible to allow medical exceptions. 135 S. Ct. at 865. Similarly, in *O Centro,* the Supreme Court recognized that the fact that the Controlled Substances Act "contains a provision authorizing the Attorney General to 'waive the requirement for registration of certain manufacturers, distributors, or dispensers if he finds it consistent with the public health and safety' . . . The fact that the Act itself contemplates that exempting certain people from its requirements would be 'consistent with the public health and safety'" was strong evidence that exemptions were feasible. 546 U.S. at 433-34. The statute's existing exception for peyote "also fatally undermine[d]" the government's contention that making an additional limited exception would damage its interests. *Id.* at 434.

43. In *O Centro*, the Supreme Court held that the government may not speculate about other possible RFRA claims to justify denial. 546 U.S. at 435–36 (rejecting "slippery-slope" argument that "echoe[d] the classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions"); *see also United States v. Christie*, 825 F.3d 1048, 1060-61 (9th Cir. 2016) (rejecting as

"insufficient" a "slippery-slope concern that could be invoked in response to any RFRA claim.").

44. The burden is on the government to identify and prove its compelling interest. It never clearly articulated precisely what goal it is pursuing through enforcing these regulations. While it presented testimony about the general principles it abides by in seeking to preserve wilderness character, it never explained what the goal or purpose of this preservation was. The Wilderness Act of 1964 explains that it seeks "to secure for the American people of present and future generations the benefits of an enduring resource of wilderness." Thus, here, too, Congress appears to treat wilderness preservation as a good in and of itself. The government also presented testimony about the general purpose of the CPNWR, where the abandonment of property regulation applies both inside and outside the designated wilderness[3]: "to provide wildlife and forage resources, and in particular, for the desert bighorn sheep" (Day 2 at 174). Thus, the government appears to be asserting that it has compelling interests in (1) preserving wilderness character and (2) to provide resources for the desert bighorn sheep.

45. No precedent dictates whether these particular interests are "compelling," but courts' treatment of related claims provides some guidance. In *United States v. Vasquez-Ramos,* 531 F.3d 987 (9th Cir. 2008), a defendant asked the Ninth Circuit to determine that after bald eagles were removed from the Endangered Species List, their protection was no longer compelling. The Court ruled that it *was* still compelling, but only specifically because that particular bird was the subject of a statute, the Bald and Golden Eagle Protection Act, premised not only on its scarcity but also on its status as our national symbol. *Id.* at 991. Similarly, in *United States v. Adeyemo,* 624 F.Supp.2d 1080, 1089 (N.D. Cal. 2008), the Court ruled the protection of a specific endangered leopard species was compelling based on Congress's explicit direction in the Endangered Species Act

---

[3] Not all of the supplies observed by Officer Valenzuela were inside the designated wilderness, and the government made no attempt to limit its prosecution to the items found in the wilderness. Accordingly, it must justify its enforcement of the abandonment of property regulation against Dr. Warren in the non-wilderness areas.

that made protection of those particular animals a compelling interest. *See also United States v. Jim,* 888 F.Supp. 1058 (D. Ore. 1995); *United States v. Billie,* 667 F.Supp. 1484 (S.D. Fla. 1987). In *United States v. Abeyta,* 632 F.Supp.1301, 1307 (D. N.M. 1986), the Court explained that protecting *golden* eagles (which do not have special patriotic status) was *not* a compelling interest because "[t]he golden eagle is not an endangered species" and "[t]he uncontradicted testimony at trial established that some eagles could be taken without harmful impact on the remaining population." Here, the identified interest in maintaining the CPNWR—the protection of desert bighorn sheep—is not compelling. Indeed, the refuge manager testified that he issues permits for people to *hunt* bighorn sheep (Day 2 at 130). The government presented no evidence that they were in any way threatened or endangered, and, as in *Abeyta,* the evidence actually showed that allowing some individuals to be taken was perfectly acceptable. Thus, protecting desert bighorn sheep is not a compelling government interest. The government has also failed to present any evidence or argument as to why this Court should find the preservation of wilderness character to be a compelling interest "of the highest order." It is of course a laudable goal to maintain some wild lands in this country, but RFRA requires more: to overcome the freedom of religion, an interest must be truly paramount. The government has not demonstrated that this one is.

46. A number of exceptions exist to the National Wildlife Refuge System Administration Act (16 U.S.C. § 668dd – the statute giving rise to the regulations at issue here) and Wilderness Act as they apply to the CPNWR. Most strikingly, when Congress created the wilderness area within the CPNWR, it explicitly specified that the designation would not "preclud[e] or otherwise affect[] continued border operations by the Immigration and Naturalization Service, the Drug Enforcement Administration, or the United States Customs Service within such refuge." Arizona Desert Wilderness Act of 1990, 104 Stat. 4469, Title III(g). This exception allows law enforcement to drive throughout the wilderness, including on the roads forbidden to Dr. Warren and even off roads altogether. In other words, Congress explicitly determined that the stringent protection of the

wilderness area, while important, could give way to other greater interests. The Wilderness Act, much like the Controlled Substances Act discussed in *O Centro,* on its face contemplates various exceptions that *would* be consistent with maintaining wilderness character—thus, exactly as in *O Centro,* allowing some exceptions is compatible with the government's interests. *See* 16 U.S.C. § 1133(c) (allowing temporary roads, motor vehicle use, motorized equipment, motorboats, landing of aircraft, and installation of structures "as necessary to meet the minimum requirements for the administration of the area for the purpose of this Act"). In addition, 50 C.F.R. § 35.5, the motor vehicle regulation, explicitly recognizes that certain things are more important than strict preservation of wilderness; it provides for exceptions not only for activities necessary to manage the refuge, but for "measures required in emergencies involving the health and safety of persons within the area." Congress has also allowed *all* of the federal laws protecting environmental concerns to be unilaterally set aside by the Homeland Security Secretary in his sole discretion "to ensure expeditious construction of the barriers and roads" built to deter border crossing. 8 U.S.C. § 1103(c). Recently, DHS exercised this authority to allow the construction of a new border wall in the designated wilderness area in the CPNWR. 84 Fed. Reg. 94, 21798 (May 15, 2019). The laws waived include the Wilderness Act, the National Wildlife Refuge System Administration Act (16 U.S.C. 668dd-668ee), and Section 301(a)-(f) of the Arizona Desert Wilderness Act—precisely the laws the government has *refused* to waive for Dr. Warren's religious practice. Thus, the government has determined that it *can* make exceptions to these environmental laws; it has simply refused to do so to accommodate Dr. Warren's religious practice. But Congress has directed that if the government *can* do so, it *must* accommodate the exercise of religion. If it can accommodate border enforcement, it can accommodate religious exercise.

47. Statutory exceptions aside, FWS allows various exceptions to the laws for its own and others' activities. For instance, it has explicitly approved using large trucks to haul water deep into the wilderness for wildlife—and also, it says, for human beings, although the

water is considered non-potable (Day 3 at 42). It allows permanent man-made tanks to exist there to provide water to wildlife, even though the tanks themselves are not consistent with the wilderness character (Day 3 at 18-19). It has also allowed the installation of semi-permanent water stations in some areas of the CPNWR, as well as rescue beacons, semi-permanent structures that are certainly not part of the natural wilderness character—all because it apparently acknowledges that absolute faithfulness to wilderness quality is not essential in the face of other crucial needs. In addition, other users receive permission to drive on these roads, including archeologists (RT Day 1 at 48; Day 2 at 107-108) and researchers (Day 2 at 109), and hunters are given access to private roads, although not in wilderness areas (Day 2 at 107). In addition, Pima County Sheriffs may drive on the administrative roads in the wilderness (Day 1 at 48).

48. The government argues, essentially, that none of the exceptions it allows undermine its compelling interest claim because all of those uses are in some way, however attenuated, beneficial to the ultimate underlying interest in environmental conservation. This is not, and has never been, part of the RFRA analysis. Indeed, the broad waiver provision discussed in *O Centro* allowed exceptions explicitly for "the public health and safety," which is also the broad purpose of the Controlled Substances Act itself. But this broad congruence of purpose did not eliminate the exception's fatal effect on the compelling interest. Nor is the government's claim that border law enforcement benefits the refuge credible; the evidence shows that the Border Patrol causes considerable damage to the refuge (Day 2 at 123), and the government presented *no* evidence that the impact caused by illegal activity has decreased as a result of enforcement activities, nor that any environmental benefit of such activities comes close to outweighing the damage they cause. In any event, the FWS refuge supervisor acknowledged that the removal of human remains could also have beneficial effects on wilderness character (Day 3 at 29). Thus, even if FWS *could* legally limit exceptions to only those that can be tied in some loose way to its interests, it still could not justify refusing *this* exception. Additionally, FWS officials agreed that a federal government policy led to the proliferation of migrants and

smuggling activity on the CPNWR (and the attendant need for law enforcement) to begin with (Day 3 at 37). Thus, in seeking to reduce traffic through the CPNWR, the government is not affirmatively protecting the refuge; it is seeking to mitigate the damage caused by its own policies. Notably, the text of RFRA refers very broadly to what "Government" may and may not do, *see* 42 U.S.C. § 2000bb-1, not to what any particular agency can do.

49. The government presented no testimony about how denying Dr. Warren a religious accommodation would specifically advance its interests. Although it asserted vague concerns about trash (Day 3 at 21), the presence of manmade structures and objects (Day 3 at 21-22), and fragmentation (the restriction of animal habitats) (Day 3 at 7), it failed to identify any *actual*, as opposed to theoretical, harms caused by abandonment of property or driving on restricted roads at all, let alone how allowing Dr. Warren's particular limited activities themselves could even *theoretically* harm its interests. This is especially true for the motor vehicle use, which indisputably does not leave trash; the government never identified any harm that could be caused by one vehicle driving on pre-existing roads already regularly traveled by others. The regional refuge supervisor never testified that trash had any actual impact on wildlife—only that in theory it could (Day 3 at 26). She also confirmed that while placing man-made items, including canned food, *could* cause wildlife to either approach or avoid particular areas, she did not know whether it actually did (Day 3 at 27). Thus, all the evidence about harm was speculative. Moreover, *none* of it was tied to allowing Dr. Warren's particular practice. The supervisor testified that illegal activities and the pervasive attendant law enforcement activities can have an impact on wilderness qualities (Day 3 at 7), but none of these impacts were linked in any way to Dr. Warren's religious practice. Nor did the evidence show that the government's identified interests have suffered. For one thing, the Sonoran Pronghorn population[4] hit a low of approximately 20 individual around 2002, and today, there are between 200 and 300 individuals (Day 3 at 17-18); this recovery occurred even

---

[4] The Sonoran Pronghorn is an endangered species that resides largely in the CPNWR.

though Dr. Warren began and has continued his religious practice during this time period. Moreover, the evidence showed that he and his colleagues collect not only their own used supplies, but various trash they find. *See* Day 3 at 49 (supervisor acknowledging, "if they are removing jugs from the area, that would be beneficial. I just don't know to what extent that's done or what impact is still left on that landscape that they are not able to locate."). And although driving trucks across undisturbed wilderness could perhaps impact the landscape, Dr. Warren and his group always stay on established roads that already regularly accommodate vehicles driven by FWS officers, Border Patrol agents, and others (Day 2 at 73-74). There was simply no evidence that allowing this would cause any harm to any identified interest.

50. This Court's task is to "scrutinize the asserted harm of granting specific exemptions to particular religious claimants," *Hobby Lobby*, 573 U.S. at 726-27 (citation omitted), and the government has not presented any such evidence. Accordingly, this Court finds that prosecuting Dr. Warren for these offenses does not advance a compelling government interest.

Least restrictive means

51. Even if prosecuting Dr. Warren did advance a compelling interest, the government would have to prove that it is the "least restrictive means" of furthering that interest, 42 U.S.C. § 2000bb-1(b)(2), that is, that the government "lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion." *Hobby Lobby*, 573 U.S. at 728. The government's power to use other means is not confined to what any particular agency can do unilaterally; rather, "both RFRA and its sister statute, RLUIPA, may in some circumstances require the Government to expend additional funds to accommodate citizens' religious beliefs." *Hobby Lobby*, 573 U.S. at 729-30. Moreover, the government "cannot meet its burden to prove least restrictive means unless it demonstrates that it has actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice." *Warsoldier v. Woodford*, 418 F.3d 989, 999 (9th Cir. 2005). Likewise, if the government cannot demonstrate that feasible

alternatives would not suffice to protect its interests, it cannot meet the least-restrictive-means standard. *Holt*, 135 S. Ct. at 864 (declining to defer to prison officials' security expertise when Department "offered no sound reason" that beard could not be searched for contraband as readily as hair or clothing).

52. Never having identified any actual harms caused by Dr. Warren's religious practice, the government has also not addressed possible alternatives for addressing those hypothetical harms. Nonetheless, it is apparent that less restrictive means of addressing the government's concerns exist, whether or not prosecuting Dr. Warren actually ameliorates any of them. To the extent the alleged harm is trash on the refuge, the government can simply invest greater resources in the removal of trash (although the evidence showed that NMD already removes significant amounts). The government need only expend some limited resources to hire a clean-up crew to periodically traverse the refuge collecting any empty bottles or cans that may have escaped collection. That might have some cost associated with it, but cost is encompassed in what Congress mandated when it passed RFRA. *See Hobby Lobby,* 573 U.S. at 729-30. It could also simply equip any agents who are already driving in the wilderness with trash bags and task them to remove trash while patrolling. And to the extent the alleged harm consists of too much driving in the wilderness, the government could reduce its own use of motor vehicles in the area by some small amount to offset Dr. Warren's religious use, or it could limit others' use (like archeologists and researchers) instead of Dr. Warren's religious use. The government never made any attempt to show that these identified alternatives are not feasible. Accordingly, it cannot satisfy strict scrutiny.

53. Because this prosecution constitutes a substantial burden on Dr. Warren's exercise of his sincerely held religious beliefs and the government cannot prove that refusing to allow his religious practice is the least restrictive means of advancing a compelling government interest, this Court finds him not guilty on both charges.

D. NECESSITY

54. The necessity defense "justifies criminal acts taken to avert a greater harm, maximizing

social welfare by allowing a crime to be committed where the social benefits of the crime outweigh the social costs of failing to commit the crime. . . . Pursuant to the defense. . . a person lost in the woods could steal food from a cabin to survive." *United States v. Schoon*, 971 F.2d 193, 196 (9th Cir. 1992). The Ninth Circuit has expressed these requirements as a four-part test: a defendant must prove "(1) that he was faced with a choice of evils and chose the lesser evil; (2) that he acted to prevent imminent harm; (3) that he reasonably anticipated a causal relation between his conduct and the harm to be avoided; and (4) that there were no other legal alternatives to violating the law." *United States v. Arellano-Rivera*, 244 F.3d 1119, 1125-26 (9th Cir. 2001).

55. Dr. Warren's decision to place supplies at these particular locations was based on reliable, current information about the locations of recent recoveries of human remains. Given the large numbers of remains found in the areas where he was leaving supplies, it was a reasonable inference that individuals would at some point in the near future be in mortal peril there. Because, even with the presence of rescue beacons and other life-saving measures, frequent deaths were continuing to occur, and other actions that might eventually reduce deaths would not prevent the deaths occurring in the immediate future, Dr. Warren faced a choice between standing idly by while predictable deaths continued to occur, and violating the prohibitions against driving on the only roads that lead to the dangerous areas and  leaving objects behind in the refuge.

56.  The death of migrants in the Growler valley was imminent. It was June in the Arizona desert, and strong evidence showed that people were regularly traversing that area without sufficient water for survival. The evidence showed that some 40 sets of human remains had already been recovered in that small area in the previous 8 months; it was thus a well-supported inference that additional deaths would occur in the near future.

57. Although legal avenues of reducing deaths may have existed, it was undisputed that deaths continued to occur despite the presence of rescue beacons on the refuge and permanent water stations and wildlife water sources. Thus, there were still a significant number of reasonably foreseen human deaths to prevent, for which no legal methods

were available in the timeframe when they were needed for *these* individual people. Even the placement of more beacons, which the refuge manager admitted was needed, took time, and in the interim, people were continuing to die. The proffered legal alternatives may help to prevent some *future* deaths, but they could *not* prevent the particular deaths that were likely to occur shortly after Dr. Warren's actions without his interventions. The necessity defense applies even to the prevention of a single human death.

58. Dr. Warren clearly believed that his actions would prevent deaths, and the evidence, including testimony by the Pima County Medical Examiner, a Board Certified Forensic Pathologist, confirmed that this belief was reasonable.

59. Because Dr. Warren proved that he faced a choice between allowing people to die in the Growler Valley and breaking the law, because those deaths were imminent, because no legal alternatives could prevent those particular deaths, and because he reasonably believed his actions would prevent those deaths, his actions, while in violation of the regulations, were justified by necessity. Accordingly, Dr. Warren is not guilty on both charges.

Respectfully submitted this 24th day of May, 2019

By /s/ Amy P. Knight
Gregory J. Kuykendall
Amy P. Knight
531 S Convent Avenue
Tucson, AZ 85701
Attorneys for Defendant Scott Daniel Warren

CERTIFICATE OF SERVICE

I certify that on May 24th, 2019, I electronically transmitted a PDF version of this

document to the Clerk of Court using the CM/ECF System for filing and for transmittal of

a Notice of Electronic Filing to the following CM/ECF registrants:

Nathaniel J. Walters, Esq. (email: Nathaniel.walters@usdoj.gov)
Anna R. Wright, Esq. (email: anna.wright@usdoj.gov)
United States Attorney's Office
405 W. Congress, Suite 4800
Tucson, AZ 85701